# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# NORTHERN DIVISION

NANCI MOORE and ALEXIS MOORE;

     Plaintiffs,

v.

UNITED STATES CENTER FOR
SAFESPORT; SIMONE CARDOSA,
Investigator for United States Center
for SafeSport, in her official capacity,
and personally; Participating Entity 1;
Participating Entity 2; Participating
Entity 3; and Participating Entity 4,

     Defendants.

Case No. :_____

**DEMAND FOR JURY TRIAL**

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

NOW INTO COURT, through undersigned counsel, comes the plaintiffs, Nanci
Moore and Alexis Moore, who respectfully state:

## STATEMENT OF CASE

     Nanci and Alexis Moore, a mother and her daughter, are currently coaches in
the sport of gymnastics, and they have collectively been involved in the sport for
more than fifty (50) years. The pair currently successfully coach upper-level
optional gymnasts, which requires knowledge and expertise above and beyond that

required for recreational or even lower-level competitive gymnastics. The Moore family has a painful history surrounding abuse in the sport, as Alexis was a sexual abuse victim of Dr. Nassar.  Due to the fallout from the hundreds of Nassar victims, the world of gymnastics changed.  Section III of the Ted Stevens Olympic and Amateur Sports Act gave the US Center for SafeSport (the Center) the power to resolve abuse and misconduct reports for individuals within the U.S. Olympic and Paralympic Movement.  The Center was also charged with developing and enforcing policies, procedures, and training to prevent abuse and misconduct.  After a large settlement was announced for Nassar victims, claims began to be made against both Nanci and Alexis in their capacity as coaches.

Currently, more than three years into an investigation, both Nanci and Alexis have been harmed by the actions of those involved in this dilatory investigatory process.  Alexis was abused for ten years by Dr. Nassar, and she and her family endured the civil and criminal process that followed.  Now, they have been harmed by the very organization that is meant to serve individuals in sport by its lack of notice, due process, discovery, fundamental fairness, or any myriad of other substantive and procedural protections normally afforded respondents in such matters.  From the first allegations being reported in June of 2020, to the JAMS arbitration which fully cleared Alexis in June of 2023, the first time that they were given notice of the actual allegations being made against them was when the Center

released its Notice of Decision and Investigatory Report in March of 2023. The Center violated its own rules governing such investigations. The Center openly admitted and flaunted that the investigator and the Center did not objectively evaluate evidence or have an articulatable standard of care. The conduct of the Center has done irreparable harm to both Nanci and Alexis and done so by maliciously investigating and issuing findings that fly in the face of any rational understanding of fundamental fairness. The Center's own investigative report provides concrete support to the notion that the Center is little more than a purely political advocacy group.

## <u>JURISDICTION AND VENUE</u>

1. This Honorable Court has jurisdiction this is a claim for damages and injunctive relief that arise out of the plaintiffs' membership contract with USA Gymnastics ("USAG") and its mandatory connection to the Center through the Ted Stevens Olympic and Amateur Sports Act (the "Act")[1], codified at 36 U.S.C. Sec. 220501 et seq. of the United States Code, and more specifically under Title 36 U.S.C. § 220541, et seq., designation of the United States Center for SafeSport (the "Center"). The plaintiff's membership agreement with USAG triggered duties for all parties under 36 U.S.C. § 220541, and the Center breached those duties which

---

[1] *See* Exhibit 1 (subchapter III pertains to right and responsibilities of the Center).

directly and proximately caused substantial harm to the plaintiffs.  Further, 36 U.S.C. § 220541(d)(3)(A) requires of all legal actions filed against the Center to be removed to US District Court, as US District Courts "shall have original jurisdiction over the action without regard to the amount in controversy or the citizenship of the parties involved."  Therefore, jurisdiction exists under Title 28 U.S.C. §§ 1331 and 1367.

2.     This Honorable Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1337, as this matter involves claims arising under Acts of Congress regulating commerce or protecting trade and commerce against restraints or monopolies, specifically The Sherman Antitrust Act[2] and the Clayton Act.[3]

3.     This Honorable Court has supplemental jurisdiction of Plaintiffs state law claims arising under statute or common law pursuant to 28 U.S.C. § 1338(b), because those claims joined with substantial and related claims under federal law, as well as having a common nucleus of operative facts between the federal and state law claims.

4.     This Honorable Court has personal jurisdiction over Participating Entities 1 - 4 as they are either residents of the state of Michigan or were at the time of underlying conduct, as well as personal jurisdiction over Simone Cardosa in her

---

[2] 15 U.S.C. § 2.
[3] 15 U.S.C. § 26.

personal capacity as her conduct was in connection with numerous direct contacts with residents of Michigan.

5.    Venue is proper in this Honorable Court pursuant to the provisions of 28 U.S.C. §1391(a)(2), because a substantial part of the events, acts, and omissions giving rise to the claim occurred in Bay County, Michigan, in the Eastern District of Michigan, Northern Division.

## PARTIES

6.    Plaintiff, Alexis Moore ("Alexis"), is an adult citizen of the United States, domiciled in Bay County in the State of Michigan.

7.    Plaintiff, Nanci Moore ("Nanci"), is an adult citizen of the United States, domiciled in Bay County in the State of Michigan.

8.    Defendant, United States Center for SafeSport ("the Center"), is an independent national safe sport organization for all Olympic, Paralympic, Pan American, and Para Pan American sports in the United States created by the Ted Stevens Olympic and Amateur Sports Act 36 USC § 220541.  The Center's principal place of business is Denver, in the State of Colorado.

9.    Defendant, Simone Cardosa ("Cardosa"), is an adult citizen of the United States, employed as an investigator by the Center, and believed to be domiciled in Bloomington, in the State of Indiana.

10.     Defendants, Participating Entities 1-4, are Witnesses and Claimants listed in the Center's March 23, 2023 confidential Notice of Decision and Investigative Report.[4]

## **GENERAL ALLEGATIONS**

11.     Nanci is a current member of USAG (her member number is 410285) and she has been a member since October of 1997.

12.     Nanci has been participating in artistic gymnastics and dance for over half a century and instructing dance and gymnastics for over 42 years.

13.     Nanci is employed to coach gymnastics, as well as instruct the dancers in Bay Valley Academy's dance program, which is a competitive travel dance program not organized under the Olympic movement and not subject to the jurisdiction of the Center.

14.     The complaints alleged in the Center's Updated Notice of Allegations and Modification to Temporary Measures, as well as previous Notice of Decision

---

[4] All defendants and witnesses "participating in" the Center's process are defined as an "Applicable Entity" under 36 USC 220541(d)(4)(G). The following 'Participating Entity' convention is used to maintain the required privacy of the individuals participating in the Center's investigation pursuant to the SafeSport Code at XI(S) and 36 USC 220541(f)(4)(C), and to refer back to the Center's March 23, 2023, confidential Notice of Decision and Investigative Report. The witness and claimant numbers correspond to the those listed on the "Party and Witness List" in the Investigative Report, and are as follows: P.E.1 (Witness 23), P.E. 2 (Witness 4), P.E. 3 (Claimant 4), P.E. 4 (Witness 1)

("NOD") and Investigative Report ("IR"), represent the first formal complaints filed against Nanci in the entirety of her forty-plus year professional career.

15.    Alexis is a current member of USAG (her member number is 998474) and she has been a member since at least August of 2015.

16.    Alexis has also been a participant in artistic gymnastics and dance since she was two years old.

17.    Alexis became an occasional coach at Bay Valley Academy in 2011, after being a gymnastics and dance student Bay Valley Academy from 1995-2009.

18.    After graduating from high school in 2011, Alexis attended college at Western Michigan University and participated on the women's gymnastics team until she medically retired in 2013.

19.    After retiring from gymnastics, she transferred to Oakland University on a dance performance scholarship until she graduated with a degree in marketing and dance in 2017.

20.    She has also never had a complaint filed against her before those associated with this legal action.

21.    Alexis became a patient of Dr. Larry Nassar at the age of nine (9) and was abused for ten (10) years.

22.    Alexis participated in the Federal Bureau of Investigation's investigation and criminal case regarding Dr. Nassar, and also in the civil suit.  She

stood with two hundred and four (204) other victims to give their impact statements and received a settlement through the civil suit involving more than three hundred (300) victims. Her bravery led to a greater understanding of the need to protect athletes within the Olympic movement – and the underlying basis for why an organization like the Center was needed.

23.    No allegations were made against either Alexis or Nanci until gymnastics abuse lawsuits became the primary sports related topic in the fall of 2017 and Spring of 2018. The media attention included mass coverage nationally, and specifically in Michigan, that Michigan State University had agreed to set aside a total of five hundred million dollars ($500,000,000.00) for the settlement of abuse claims stemming from the Nassar scandal, with seventy-five million dollars ($75,000,000.00) of the total being held in trust for the late coming claimants. It had become public knowledge that Alexis had received a settlement through Michigan State University for the abuse she suffered at the hands of Dr. Nassar, and she would likely receive a similar settlement from USAG. The settlement agreement with victims and USAG was approved in December 2021 for three hundred and eighty million dollars ($380,000,000).

24.    USAG is the national governing body ("NGB") for gymnastics in the United States, overseeing six disciplines: acrobatic, artistic, gymnastics for all, parkour, rhythmic, and trampoline and tumbling. A member of the U.S. Olympic

and Paralympic Committee and International Gymnastics Federation, the organization serves nearly 200,000 members, including athletes from the beginner to elite levels, parents, coaches, clubs, and club owners, and supports the U.S. teams for the Olympic Games, World Championships, and other top-tier international events. Section 2.2 of the USA Gymnastics Bylaws Eff 2020 Rev 2022 cites their recognition as a National Governing Body. *See* Exhibit 2.

25.   According to the 2022-2023 USAG Membership Agreement Section 2:

> Membership in USA Gymnastics is a privilege and may be (i) denied, withheld, or non-renewed at any time by USA Gymnastics and/or (ii) suspended or terminated in accordance with USA Gymnastics' bylaws, policies and standards. You agree that USA Gymnastics has the right to deny, withhold, non-renew, suspend or terminate your membership if you engage in any sexual misconduct, or if USA Gymnastics has reason to believe you pose a threat to the safety of athletes or other members. Your membership will be effective beginning the date your membership application is approved for one competitive season (August 1st through July 31st) ("Membership Term"). Memberships expire on July 31st of each year.
>
> **You agree to and do hereby submit to the jurisdiction of USA Gymnastics, the U.S. Center for Safesport ("Center"), the U.S. Olympic and Paralympic Committee ("USOPC") and the Fédération Internationale de Gymnastique (FIG).**
>
> You have read and agree to be and are bound by the USA Gymnastics Bylaws, all other policies and procedures promulgated by USA Gymnastics including all rules, policies or procedures whether published by the USOPC, the Center, or USA Gymnastics. You further agree to comply with all applicable state, federal, and local laws. **Any disciplinary measure imposed by the USOPC, the Center or USA Gymnastics extends to your participation in all aspects of the Olympic & Paralympic Movement.** You agree that any disciplinary measure, whether interim or final, whether imposed before or after the

date of this Agreement, whether expired or in effect, may be posted on our website or otherwise publicly published and may include information identifying you and describing the misconduct alleged. (*emphasis added*) *See* Exhibit 3.

26.     The Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017, through amendment to 36 U.S.C. § 2205, the Ted Stevens Olympic and Amateur Sports Act, federally chartered the Center, a 501(c)(3) nonprofit, as the nation's safe sport organization.[5]  It gave the Center the scope and authority to resolve abuse and misconduct reports for more than 11 million individuals throughout the U.S. Olympic and Paralympic Movement. The Act also charged the Center with developing and enforcing policies, procedures, and training to prevent abuse and misconduct. The Center's SafeSport Code ("Code") for the U.S. Olympic and Paralympic Movement, Effective April 1, 2023, governs all participants in the Movement, and our oversight authority helps us ensure all Olympic & Paralympic NGBs adhere to Minor Athlete Abuse Prevention Policies ("MAAPP") that support athlete safety. *See* Exhibit 4.

27.     Under the Center's Code XI(J), the Center must ensure:

For any action taken by the Center against a Respondent including investigation, the imposition of sanctions, and any other disciplinary action, is carried out in a manner that provides procedural due process to the individual, including, at a minimum—

---

[5] 36 USC § 220541.

> (i)     the provision of written notice of the allegations against the individual;
> (ii)    a right to be represented by counsel or other advisor;
> (iii)   an opportunity to be heard during the investigation;
> (iv)    in a case in which a violation is found, a reasoned decision by the Center; and
> (v)     the ability to challenge, in a hearing or through arbitration, interim measures or sanctions imposed by the Center. *Id*.

28.     On or about June 29, 2020, the Center received a report about Alexis and Nanci.[6]

29.     From October 5, 2020, to October 27, 2020, Investigator 1 interviewed Participating Entities.

30.     On or about December 14, 2020, another investigator, Cardosa, was assigned to the matter.

31.     On or about December 21, 2020, the Center sent a Notice of Allegations with allegations of misconduct that did not provide any degree of specificity from which Nanci and Alexis could adequately prepare for an interview or written response. The Center did not include an interim suspension for either Nanci or Alexis.

32.     On or about January 12, 2021-June 24, 2022, the Center and Cardosa continued to interview witnesses.

---

[6] To maintain the required privacy of the individuals participating in the Center's investigation pursuant to the SafeSport Code at XI(S) and 36 USC 220541(f)(4)(C), and the confidential work product within the Center's March 23, 2023, confidential NOD and IR, plaintiffs with reference documents that will be submitted under seal.

33.    On or about February 2, 2021, Cardosa interviewed Nanci and Alexis for the Center.

34.    On or about March 6, 2021, the Center sent an updated Notice of Allegations to Nanci with allegations of misconduct that did not provide any degree of specificity from which Nanci and could adequately prepare for an interview or written response. The Center did not include an interim suspension.

35.    On or about June 21, 2021, Cardosa had a follow-up interview with Nanci for the Center.

36.    On or about March 21, 2022, the Center sent an updated Notice of Allegations to Nanci with allegations of misconduct that did not provide any degree of specificity from which Nanci and could adequately prepare for an interview or written response. The Center again did not include an interim suspension.

37.    On or about March 24, 2022, the Center sent an updated Notice of Allegations to Alexis with allegations of misconduct that did not provide any degree of specificity from which Alexis and could adequately prepare for an interview or written response. The Center again did not include an interim suspension.

38.    On or about March 23, 2023, the Center released the NOD and IR for Nanci and Alexis one full year after last updating their Notice of Allegations and more than eighteen months after the final interview.  Nanci (USCSS CASE NO. 2020-01057) and Alexis (USCSS CASE NO. 2020-0105) both received NOD and

IR from the Center and the Center had consolidated the two matters, into one investigative report.

39.    Upon information and belief, the Center disseminated information to complainants and USAG in in breach of its duties owed to Plaintiffs and in reckless disregard for the truth of the underlying allegations.

40.    Plaintiff's expert witness states, "It's apparent to this writer that both Investigators displayed confirmation bias, and subjectively decided what information from the 9 Claimants and 32 Witnesses and 2 Respondents they were going to review and believe and vice-versa…. [and] (i)n my professional opinion to a reasonable degree of psychological and scientific certainty, the USCSS Investigators did display confirmation bias and neither investigator explored nor considered alternate hypotheses."[7] *See* Exhibit 7

41.    The consolidation of the two matters, between two parties who had an inherent conflict of interest, was unreasonably and overly prejudicial to Alexis and Nanci because the NOD and IR are admitted to evidence for the purpose of a JAMS arbitration by rule in the Code, and therefore, there would be no way disconnecting Alexis or Nanci from allegations made against the other. *See* Code XIV(26)(b).

---

[7] Tong, D. Exp. Aff. at ¶ 28.

42.     Further, all allegations made against Nanci and Alexis in the NOD and

IR sounded in Physical or Emotional Misconduct under the Code. The Code defines

Emotional Misconduct as follows:

1. Emotional Misconduct

Emotional Misconduct includes (a) Verbal Acts, (b) Physical Acts, (c) Acts
that Deny Attention or Support, (d) Criminal Conduct, or (e) Stalking.
Emotional Misconduct is determined by the objective behaviors, not whether
harm is intended or results from the behavior.

   a.   Verbal Act

        Repeatedly and excessively verbally assaulting or attacking
        someone personally in a manner that serves no productive training
        or motivational purpose.
        b. Physical Acts

        Repeated or severe physically aggressive behaviors, including but
        not limited to, throwing sport equipment, water bottles or chairs at
        or in the presence of others, punching walls, windows or other
        objects.

   c. Acts that Deny Attention or Support

        Ignoring or isolating a person for extended periods of time,
        including routinely or arbitrarily excluding a Participant from
        participation.

   d. Criminal Conduct

        Emotional Misconduct includes any act or conduct described as
        emotional abuse or misconduct under federal or state law (e.g.,
        child abuse, child neglect).

   e. Stalking

Stalking occurs when a person purposefully engages in a course of conduct directed at a specific person, and knows or should know, that the course of conduct would cause a reasonable person to (i) fear for their safety, (ii) fear for the safety of a third person, or (iii) to experience substantial emotional distress. "Course of conduct" means at least two or more acts, in which a person directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about another person, or interferes with another person's property. "Substantial emotional distress" means significant mental suffering or anguish. Stalking also includes "cyber-stalking," wherein a person stalks another using electronic media, such as the internet, social networks, blogs, cell phones, texts, or other similar devices or forms of contact.

f. Exclusion

Emotional Misconduct does not include professionally accepted coaching methods of skill enhancement, physical conditioning, team building, appropriate discipline or improved Athlete performance. Emotional Misconduct also does not include conduct reasonably accepted as part of sport or conduct reasonably accepted as part of Participant's participation. Code IX(D)(1)(a-f).

The Code defines Physical Misconduct as follows:

2. Physical Misconduct

Physical Misconduct is any intentional contact or non-contact behavior that causes, or reasonably threatens to cause, physical harm to another person. Examples of physical misconduct may include, without limitation:

a. Contact violations

Punching, beating, biting, striking, strangling or slapping another; intentionally hitting another with objects, such as sporting equipment; encouraging or knowingly permitting an Athlete to return to play prematurely following a serious injury (e.g., a concussion) and without the clearance of a medical professional.

b. Non-contact violations

Isolating a person in a confined space, such as locking an Athlete in a small space; forcing an Athlete to assume a painful stance or position for no athletic purpose (e.g., requiring an athlete to kneel on a harmful surface); withholding, recommending against, or denying adequate hydration, nutrition, medical attention or sleep; providing alcohol to a person under the legal drinking age; providing illegal drugs or nonprescribed medications to another.

c. Criminal Conduct

Physical Misconduct includes any act or conduct described as physical abuse or misconduct under federal or state law (e.g.,child abuse, child neglect, assault).

d. Exclusion
Physical Misconduct does not include professionally accepted coaching methods of skill enhancement, physical conditioning, team building, appropriate discipline, or improved Athlete performance. For example, hitting, punching and kicking are well-regulated forms of contact in combat sports, but have no place in swimming. Physical Misconduct also does not include conduct reasonably accepted as part of sport or conduct reasonably accepted as part of Participant's participation.[8]

43.     The Code lays out a definition of Physical and Emotional Misconduct. However, the nature of the rules requires the Center's investigators to embark on an objective three element evaluation of the allegations:

1.  Did the acts or omissions giving rise to the allegation actually happen; and if so,

---

[8] Code IX(D)(2)(a-d).

2. Do the act or omissions reasonably trigger one of the physical or emotional misconduct rules; and if so,

3. Are the acts or omissions excluded under the rule (i.e., professionally accepted coaching techniques, etc.)

44.   When the allegations of misconduct accrued prior to the Centers creation, the Center mandates that it is a current violation of the Code for a Participant to engage in "any conduct that would violate any current or previous standards promulgated by the U.S. Center for SafeSport, an NGB, an LAO, or the USOPC that are analogous to Prohibited Conduct and that existed at the time of the alleged conduct…" *See* Exhibit 4, Code IX.

45.   The analogous rules would be found within USAG's Athlete Welfare Policies that were in place at the time of the conduct, which also require an objective evaluation of professionally accepted coaching methods.

46.   The IR enumerates the analogous rules at pages 115-119 citing the USA Gymnastics Participant Welfare Policies of 2009 and 2012, including but not limited to these relevant parts:

a. "Physical Abuse

i. Any physical contact with a participant that intentionally causes or is likely to cause the participant to sustain bodily or personal injury, including without limitation, striking, hitting, biting,

shaking, shoving, forcing an athlete to train or compete when seriously injured or mandating excessive exercise as a form of punishment;

ii. Any physical contact with a participant that intentionally creates or is likely to create a threat or bodily harm or personal injury;

iii. Giving alcohol or inappropriate drugs to a participant; or

iv. Any violation of applicable law involving physical contact, or that is specifically designed to protect minors.

**Physical contact that is reasonably intended to coach, teach, or demonstrate a gymnastics skill or to prevent or lessen injury (e.g. spotting, catching) does not constitute physical abuse. Infrequent, non-intentional physical contact, particularly contact which arises out of an error or a misjudgment on the part of the gymnast, participant, or coach, does <u>not</u> constitute physical abuse."** (emphasis added)

47. In all instances herein an objective standard of review was required under both the USAG Athlete Welfare Policies and the Code when evaluating coaching conduct.

48.     Upon information and belief, the Center never embarked on an inquiry that followed the rules set forth in the Code or USAG Participant Welfare Policies – specifically, an objective evaluation of professionally accepted coaching techniques and practices that would have been covered under the exclusionary language of the Code – specifically ignoring any evaluation that would have been exculpatory in nature.

49.     Plaintiff's expert witness states, "This expert, with a reasonable degree of professional certainty, believes that the investigation conducted by the U.S. Center for SafeSport and its investigators, was callous, malicious, and in reckless disregard for any objective truth. The USCSS was implemented by Congress with the sole purpose of giving the athletes and coaches equal protection from abusive behaviors, and this concept is greatly regarded and needed. In this case, however, Nanci and Alexis Moore were not provided due process afforded to them under the Ted Steven Olympic and Amateur Sports Act, 36 USC 2205, and the USCSS investigative and resolution systems are fundamentally flawed, and consequently, completely defied the purpose of the USCSS by neglecting their responsibility to Nanci and Alexis Moore."[9] *See* Exhibit 8.

---

[9] Wright, M., Exp. Aff. at ¶ 19.

50.    Black's Law Dictionary defines a standard of care as "the level of diligence that a reasonably prudent person should exercise in the same or similar circumstances."

51.    A common understanding of the definition of professional would be a person who has mastered a high level of expertise in a subject or field.

52.    The express language of the Code addresses the inherent necessity of evaluating "professionally accepted coaching methods" when investigating allegations of physical and emotional misconduct that arise within the framework of coaching sport.[10]

53.    Black's further defines 'standard of care' as "the level of diligence that a reasonably prudent person should exercise in the same or similar circumstances."

54.    In matters concerning "professionally accepted coaching methods" the standard of care required under the Code would be what a reasonable prudent professional gymnastics coach, who is coaching elite level gymnastics, would have done under the same or similar circumstances.

55.    On or about April 14, 2023, Nanci received an Amended Notice of Allegations from the Center alleging Nanci had violated her previously imposed two-year suspension by teaching and competing in dance with dancers who may

---

[10] Code XI(D)(1,2).

have also been gymnasts, or in the presence of gymnasts. While issuing this notice the Center vacated Nanci's previous NOD and IR and imposed an Interim Suspension.

56.     Competitive Dance is not an Olympic movement sport and does not fall under the Center's jurisdiction.

57.     On or about April 27, 2023, the Center agrees to forgo Rule 40 arbitration and allows Nanci to coach while under supervision.

58.     On or about April 28, 2023, Nanci received yet another Updated Notice of Allegations from the Center with allegations of misconduct that did not provide any degree of specificity from which Nanci and could adequately prepare for an interview or written response.

59.     On or about May 15, 2023, Nanci received another Updated Notice of Allegations from the Center with allegations of misconduct that did not provide any degree of specificity from which she could adequately prepare for an interview or written response, no interim suspension was imposed.

60.     No sufficient notice of the nature of the allegations, number of allegations, or relevant times or places were provided to either Nanci or Alexis until the Center issued its decision.  Therefore, they could not truly be heard during the investigation as they did not know what information was necessary to aid in the investigation.

61.     Receiving no formal discovery of claimant interviews, even with redactions, prior to the NOD, or prior to a Rule 40 Hearing, deprived Nanci and Alexis of their right to Fair Notice and Opportunity during the investigative process. The Notice of Allegation with only conclusory statements did not provide the necessary information for counsel to mount a fair and equitable defense during the pendency of the investigative stage. Further, lack of more specifics regarding the allegations and attendant circumstances prejudiced Nanci and Alexis by not allowing the opportunity to produce expert testimony regarding allegations of abuses that are meant to be determined against an objective standard.

62.     The Center failed to provide any application of any aspect of the rules of evidence. The Code states that "(s)trict conformity to the rules of evidence shall not be necessary, and hearsay evidence may be considered."[11]  No strict conformity inherently means that some degree of meaningful conformity to the rules of evidence would be applied. The record is replete with both investigators from the Center testifying on behalf of the claimants, as well as egregious hearsay, and other significant violations of the standards of evidence. The Center consistently allowed claimants to argue medical diagnoses and other allegations regarding doctor's notes, care plans, and return to play issues while not once providing one piece of record evidence to support those claims. Further, the Center allowed complainants to push

---

[11] XIV(26)(a).

theories of abuse while not providing any foundation to those claims. In the age of smart phones, social media, and very involved club parents, there is not even one photo of anything that could be considered a basis to claim abuse.

63.    On June 8, 2023, Alexis fully prevailed in JAMS arbitration on the merits of her case and was placed back on full participation status along with repayment of her JAMS arbitration fees.

64.    The Center has repeatedly placed Nanci on public lists preventing or limiting her participation in sport as a coach and has attempted to require Alexis to self-report to all her fellow professionals at every USAG sanctioned event that she has been investigated and sanctioned by the Center, before giving either of them any acceptable or meaningful Notice or Due Process.

65.    The Center deprived Alexis, a Nassar victim herself, and Nanci of fundamental fairness by dragging them through a dilatory investigation that lasted more than three years.

66.    Both Alexis and Nanci have participated fully during the investigation and have maintained all their obligations as USAG members.

67.    The Center's actions show actual malice as it knowingly violated its own Code and harmed members who should have been protected by the Code and the bylaws of USAG under Section 13.4 which states, "USAG shall adopt a Safe Sport Policy applicable to all USAG's members, employees, Board directors,

officers, committee members, volunteers, athletes and other participants. That policy will meet or exceed the minimum standards mandated by applicable law, the Center, and the USOPC. USAG shall also adopt Safe Sport Investigations & Resolutions Procedures for resolution of complaints submitted to USAG's Safe Sport Department."

68.     The Center interfered with the contractual obligation USAG owed to both Nanci and Alexis to apply uniform rules and regulations by conducting such a dilatory investigation and failing to investigate the claims made in a professionally acceptable or just manner. By accepting conclusory statements and refusing to apply objective standards, the Center harmed both plaintiffs and violated the business relationship intended to exist between them and USAG, as well as them Bay Valley Academy, and with their athletes/parents.

69.     The Ted Stevens Olympic and Amateur Sports Act provides limitations on Defendant's liability, stating it:

> "(S)hall not be liable for damages in any civil action for defamation, libel, slander, or damage to reputation arising out of any action or communication, if the action arises from the execution of the responsibilities or functions described in this section, section 220542, or section 220543."[12]

---

[12] 36 U.S.C. § 220541(d)(1).

70.     However, exceptions to the limitations on the Center's liability are when the Center "acted with actual malice, or provided information or took action not pursuant to this section, section 220542, or section 220543."[13]

71.     Absent within the statute is a liability limitation associated with breach of contract, negligent supervision, intentional infliction of emotional distress, or any claims arising under restraint of trade.

72.     "Actual malice exists where a defendant had actual knowledge that the alleged defamatory statement was false or acted with reckless disregard as to its truth or falsity at a time when the defendant had serious doubts as to its truth."[14]

73.     The Center's NOD and IR published on March 23, 2023, contained conclusory statements and factually inaccurate accusations easily disproven upon investigation as evidenced by the June 8, 2023, JAMS arbitration hearing decision which removed all restrictions from Alexis' coaching status and ordered that her arbitration fees be repaid.  The Center removed Nanci from the suspended list, while leaving her on the Database under restrictions, and a JAMS arbitration is not

---

[13] 36 U.S.C. § 220541(d)(2).

[14] *Bauer v. 7-Eleven, Inc.*, 391 S.W.3d 25, 27 (Mo. App. 2012) (citing *St. Amant v. Thompson*, 390 U.S. 727, 730-31 (1968)); *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).

currently available to her, but plaintiffs anticipate a similar outcome should a neutral third-party ever examine her case.

74.     While the Center relied upon its investigator, Cardosa, to compile and generate the interviews and report, Cardosa, and a previous investigator, engaged in prejudicial misconduct while questioning and weighing statements made by Participating Entities, and the actions of both Cadoza and the previous investigator breached the duties owed to the Plaintiffs by the Center and was the direct and proximate cause of substantial injury and harm caused to both Plaintiffs.

75.     The Center placed Nanci on a public ban list called a Centralized Disciplinary Database ("Database") based on the alleged misconduct investigated by Cardosa and alleged by Participating Entities 1-4.

76.     Upon information and belief, the Center required Alexis to self-report at all USAG sanctioned events that she was coaching under restrictions due to misconduct.

77.     Upon information and belief, Participating Entities 1-4 provided false, inaccurate, and defamatory statements to both investigators during the process which spanned nearly three years, and these false statements were the direct and proximate cause of substantial harm the Plaintiffs.

78.     Upon information and belief, Participating Entity 1 provided knowingly false statements regarding Nanci, and edited a video which was submitted

to the Center with a false story regarding an injury at a USAG sanctioned meet. Plaintiffs are in possession of an unedited video of the same event which disproves Participating Entity 1's version of events.

    a.  IR, Exhibit 24, p. 530: "I have a very, very, very close, close friend whose athlete was at their gym for many years…Not while I was filming at in their gym, particularly inside their gym, because with cameras in there, people tend to not act naturally.  I know that at one point they were talking very negatively about an athlete, so I turned her microphone off actually because I didn't think I should be hearing that. But I have heard comments while filming at meets that she has made. I've seen mannerisms and things at meets, more so at meets than personally in the gym."

    b.  IR, Exhibit 24, p. 531: "I heard her tell her athletes, her level tens particularly, 'If you guys weren't so fat, you could make it through your bar routine.' That's what sparked for me and I told my friend that her daughter had told me this as well."

    c.  IR, Exhibit 24, p. 531: When asked if she had seen Nanci ask an athlete to compete when injured, "Yes. Like, take your boot off and go compete, go do bars."

d.  IR, Exhibit 24, p. 533: "I've had athletes tell me that if they performed a skill run, she would drop them. Just drop them out of nowhere. I was told by a couple that the girls had pictures on their cell phones of bruises and pinches and red marks that Nancy had given them."

e.  IR, Exhibit 14, p.810: "I've heard stories from athletes of pictures that they have kept inside their phones of the bruises and red marks and pinches that she has given them, I've heard stories of how she has told athletes don't tell your parents what happens here, if you go home sick I'll drop you down a level, take your boot off you don't need it who cares what the doctor said you can still practice."

f.  IR, Exhibit 14, p. 811: "Not only am I a coach here in [redacted] but I am a part of the [redacted] state committee and I work for [redacted regional gymnastics media outlet], which is the regional media team, we cover meets, do features, etc…so with that being said I have filmed inside Bay Valley for an all access, filmed athletes at invitationals, state meets, regionals and nationals. So when I say I have seen these athletes go from upbeat and spunky to terrified and scared it's because I have video documentation to prove it."

g.  IR, Exhibit 14, p. 811: "Does Athlete definitely gave herself a concussion there's no question about it, she sat up and was shaking her

head and blinking her eyes, as if trying to get her bearings…This athlete

finished the routine and the competition, even though hitting your head

like that would most definitely result in a concussion, whiplash and a

med express visit…So for them to not follow the concussion protocol

does not surprise me at all."

79.    Upon information and belief, Participating Entity 2 provided the Center

with a taped interview in which she knowingly falsely asserted:

A. IR, Exhibit 34, p. 649: "Her (Nanci) saying, "You know if ya'll lost a

little weight, bars wouldn't be quite so hard for you."

B. IR, Exhibit 3, p. 190: "I know her teammate, who graduated the year

before her, had a concussion and was forced to practice on the

concussion."

C. IR, Exhibit 3, p. 198: "Nanci made that child stay on beam for five and

a half hours before she would let her leave. And then her mom was

sitting in the lobby cause like practice was over at noon on a Saturday,

two o'clock."

D. IR, Exhibit 3, p. 204: "[Redacted] hurt her foot and was in a boot for a

week or two and then just a brace because it was a really bad sprain.

By a different doctor was seen. They forced her to tape it within a week

and start tumbling on it and had to do full floor teens four weeks later to compete."

80.    Upon information and belief, Participating Entity 3 gave testimony at Alexis' JAMS arbitration which was false despite being under oath.  She claimed she was injured on a Monday before a meet and forced to work out using her injured shoulder all week, but this was disproven by other witnesses in the JAMS arbitration.

81.    If the injury had occurred on the day Participating Entity 3 claims, Alexis was at Western Michigan University in Kalamazoo, Michigan, at a dance competition and could not possibly have engaged in the activities Participating Entity 3 claims occurred.

82.    Simple Notice to plaintiffs would have allowed them to prove the injury could not have occurred in the manner claimed by Participating Entity 3 to an investigator during the dilatory process pursued by Cardosa and the Center if they were interested in the discovery of the facts.  The Arbitrator was able to discern the facts easily enough, acting as a true neutral third-party.

83.    Upon information and belief, Participating Entity 3 provided the Center with a recorded interview in which she knowingly falsely asserted:

    A. IR, Exhibit 3, p. 182: "Well, Moore saw of....(w)hat I kind of wrote about and talked about originally was what I saw; not what she had done to me.  And what I've seen her do is she has physically thrown

kids through scales [skills] if they were scared.  Kicked them out of the gym told them to leave.  Threaten to call their parent. Do things like that.  Push them to tumble like physically pushing them across the floor or pushing them into walls…And I just vividly remember Nanci shoving her on every single event or she was tiny.  So literally living her up and throwing her over in scales [skills] so that she would just get over it and do what she needed to do."

B. IR, Exhibit 3, p. 184: "I think 2016.  I hurt my shoulder on a Monday. Like March, February, March in there. And- [Redacted questions] Yes, I was on floors on a Monday.  We had a competition that Saturday.  And I was tumbling and dislocated my shoulder and not to the extent of needing somebody to put it back for me or go to the hospital…I had worked my shoulder back into place…And I remember Nanci standing in front of me and Alexis was behind me rubbing my shoulder…and I had to practice the rest of the week on it.  With no limited numbers, no anything.  Then come Saturday, competition day, I re-dislocated my shoulder and that time it had to be put back into place."

C. IR, Exhibit 3, p. 186: "And no matter any doctor's note, I had…I went to the doctors.  Found out it was a bone bruise and that I needed to be in a boot.  No weight bearing on it, everything. They didn't care."

84.     Upon information and belief, Participating Entity 4 provided the Center with a recorded interview in which he knowingly falsely asserted:

A.  IR, Exhibit 36, p. 674: "Nancy shoved her off the platform on the single bar, because [athlete] would not go on the single bar to do her bar exercises.  Nancy shoved her off."

B.  IR, Exhibit 1, p. 128: "(W)e talked to other coaches, and came to the understanding that Nanci should…she should not have been allowed in that gym whatsoever, under a concussion protocol. She was not clear, she shouldn't have been on equipment."

C.  IR, Exhibit 1, p. 141: "Yeah, she actually grabbed [athlete] by the back of the neck, and left marks, that they have pictures of, but they won't…I've tried talking to the dad, and they won't do anything right now."

85.     Participating Entity 4 provided text messages pertaining to "planting seeds" and discussing possible lawsuits with other parents:

A.  IR, Exhibit 22: "Planted a seed to someone that will tell [mother] that they refer to [daughter athlete] as a little bitch."

B.  IR, Exhibit 22: "[Mother] talked to a lawyer Friday…Not to wait to file. Won't seem urgent."

86.    Upon information and belief, claims the Center and Participating Entities 1-4 made within the IR, if true, would mean that Nanci violated multiple laws including MCL750.136b (child abuse) and MCL 750.81 (assault and battery)- which due to the falsity of those claims arguably amount to defamation or libel *per se*.

87.    Upon information and belief, Participating Entity 4 was attempting to build a case with other parents, planting "seeds" of abuse allegations, and trying to recover damages through the court.  Notably, no police report was filed.

88.    According to the Code, *see* IX(G)(2):

> "In addition to constituting misconduct, filing a knowingly false allegation that a Participant engaged in Prohibited Conduct may violate state criminal law and civil defamation laws. Any Participant making a knowingly false allegation in a matter over which the Center exercises jurisdiction shall be subject to disciplinary action by the Center."

89.    Cardosa interviewed some Participating Entities, Nanci, and Alexis. She assigned the "credibility" rating to each.  She chose not to interview other Participating Entities, but instead relied upon manifestly unprofessional statements collected by an investigator who had been removed from the investigation previously.  Interviewers in the investigation employed improper methodology by testifying on behalf of witnesses, providing legal advice to complainants, lack of basic understanding of the underlying facts, and many other unfair practices likely to gather false information from Participating Entities and draw inherently

unreasonable conclusion from the facts.  Cardosa completed the report, submitting her findings to the Center which were full of falsehoods and exhibited a reckless disregard for those false statements or the harm they would cause.

90.    Upon information and belief, the Center never provided proper oversite and training to investigators regarding the objective analysis of sport specific allegations of physical and emotional misconduct, which breached the duties owed to plaintiffs and was the direct and proximate cause of substantial injuries and harm to Plaintiffs.

91.    Nanci had not been afforded fair Notice until the NOD was published; therefore, the Center and Cardosa acted upon knowingly false information or in reckless disregard for the veracity of the statements included in the NOD relying on false and conclusory statements from Participating Entities and refused to follow its own Code regarding objective analysis of the underlying allegations.

92.    When questioned during Alexis' JAMS arbitration, Cardosa asserted, together with the Center's counsel, that the Center did not employ professionals from within the sports they seek to oversee in order to obtain objective standards for misconduct which center of professionally accepted coaching methods.

93.    Cardosa and the Center's counsel attempted to qualify Cardosa as a qualified investigator regarding coaching by pointing out her Title IX experience, law degree, and recreational equestrian background.

94.     A recreational, or even competitive, rider in equestrian sports does not qualify an investigator with any requisite degree of knowledge to address professionally accepted coaching standards in gymnastics.

95.     Upon information and belief, the Center's investigator, Cardosa, a trained attorney with an inactive bar license, would be aware of the difference between an objective and subjective standard, as well as what type of standard of care would be appropriate when evaluating such set of allegations.

96.     During Alexis' JAMS arbitration, Cardosa refused to answer whether the emotional or physical misconduct provisions created an objective standard – simply pointing her answer to whatever the Code says.

97.     Upon information and belief, during Alexis' JAMS arbitration, Cardosa was either unwilling or unable to articulate the standard of care that should be applied to investigations surrounding emotional or physical coaching misconduct undertaken pursuant to the Code and investigated by the Center.

98.     The Center chose to utilize Cardosa's report and depend upon her judgment when imposing punishment on the plaintiffs.  The Center created a system which allowed one investigator the latitude to circumvent its own rules and stated policies.  This conduct is extreme and outrageous as it violates the Act, the policies of both the Center and USAG as well as the public's sense of justice and equitable treatment.

99.    Both Cardosa and the Center acted recklessly with regard to the plaintiffs and the harm their actions would directly and proximately cause.  Plaintiffs have been involved with sport for many years, have family ties in sport, and rely on the sport for their professional livelihood.  As such, they should have been accorded at least those guarantees and equal treatment afforded to all participants in Olympic movement sports.

100.    Cardosa and the Center were the source of the harm to plaintiffs as they chose the manner in which to pursue the investigation and to preclude plaintiffs from meaningful participation by refusing to provide with any specificity the underlying basis from which the Plaintiffs could produce exculpatory evidence.  Simply stating that plaintiffs may participate without real, substantive Notice or Opportunity to participate adds to the harm and injustice.

101.    The Center has now rescinded Nanci's suspension from the Database, but has not moved forward with any third-party neutral decision process which could shed light on the unjust and reckless manner this investigation was conducted.

102.    The Center and USAG are aware of plaintiffs' history as a family with Dr. Nassar.  Dr. Nassar and his activities are cited within the statute which created the Center as a reason for its creation.

103.    The Center disseminated a callous email to Alexis at approximately the same time as the NOD and IR providing her information on assistance should she

contemplate suicide, as the Center was aware of her mental health history and history of abuse in sport, and without providing any prior notice regarding the pending release of the decision.

104.   Further, both Cardosa and the Center are aware of the plaintiffs' history with Dr. Nassar and the likelihood that placing either of them on the same Database as Alexis' abuser would be extremely harmful.

105.   The Center was statutorily granted the scope and authority to resolve abuse and misconduct reports for more than 11 million individuals throughout the U.S. Olympic and Paralympic Movement. One way it utilizes this power is through publishing the Database.

106.   The Database is published publicly and denotes those deemed by the Center to be unfit to participate in sport.  The Center's Database website states: "The U.S. Center for SafeSport's Centralized Disciplinary Database is a resource designed to keep the public informed when individuals connected with the U.S. Olympic & Paralympic Movements are either subject to certain temporary restrictions pending investigation by the Center or are subject to certain sanctions after an investigation found them in violation of the SafeSport Code. The database also contains certain eligibility decisions made by the NGB, their Local Affiliated Organizations ("LAO"), or the U.S. Olympic & Paralympic Committee ("USOPC"), including those rendered prior to the establishment of the Center."

107.   Once an individual is listed on the Database, the Code states that a permanent ban is not subject to appeal.

108.   The Database amounts to a permanent child abuser registry, without regard to any substantive procedural safeguards that should be in place.

109.   Individuals listed as permanently banned on the database are effectively outside of sport.  Even the competing gymnastics organization, such as the National Gymnastics Association and American Athletic Union, will not admit an individual listed on the Database.  There is no recourse and no other way to participate in sport once placed on the Database.  The entire gymnastics sport is monopolized and controlled by the Center and USAG.  There is no other way onto the Olympic Gymnastics Team or the National Team, or participate in or practice your trade within gymnastics.  Even the other gymnastics associations, that are not subject to the Center's jurisdiction, will not allow participation by anyone who is ineligible on the Database.

## CAUSES OF ACTION COMMON TO ALEXIS AND NANCI MOORE

## COUNT I: BREACH OF CONTRACT AGAINST CENTER AND CARDOSA

Plaintiffs, Nanci and Alexis, reallege the allegations from Paragraphs 1 through 108 as though copied herein *in extenso*.

110.    To plead breach of contract under Michigan law, the following must be alleged: (1) the existence of a valid contract between the parties; (2) the terms of the contract require performance of certain actions; (3) a party breached the contract; and (4) the breach caused the other party's injury.[15]

111.    Elements to Center:

    a.  Both Nanci and Alexis are members of USAG, and under their membership agreement they fall under the jurisdiction of the Center.

    b.  The terms of the membership agreement, the Act, and the Code require the Center to follow procedural and due process requirements regarding claims made against USAG members, and create the duties owed to Nanci and Alexis.

    c.  The dilatory and unprofessional manner the investigation was carried out, the NOD and IR, and the various Notices of Allegation all failed to follow the requirements regarding claims. The Center has failed to follow the procedures set forth in their own Code and the Act creating the Center, thereby breaching the duties between the parties by refusing to provide any objective analysis of the underlying facts as it relates to

---

[15] *Keiper, LLC v. Intier Auto. Inc.*, 467 Fed. Appx. 452, 459 (6th Cir. 2012).

professionally accepted coaching techniques or methods, as well as relying upon conclusory statements of medical diagnosis with no medical proof.

d. The acts and omissions of the Center are the direct and proximate cause of serious harm to both Plaintiffs.

112. Elements to Cardosa:

a. Both Nanci and Alexis are members of USAG, and under their membership agreement they fall under the jurisdiction of the Center. Cardosa is an employee of the Center, who investigated the allegations and composed the IR on the Center's behalf.

b. The terms of the membership agreement, the Act, and the Code require the Center to follow procedural and due process requirements regarding claims made against USAG members. Upon information and belief, Cardosa was the investigator for the case and composed the NOD and IR (or significant portions thereof).

c. The dilatory and unprofessional manner the investigation was conducted, the Notices of Allegation, and the NOD and IR breached the contract between the parties by not following the procedures and requirements within the Center's own process by refusing to provide any objective analysis of the underlying facts as it relates to

professionally accepted coaching techniques or methods, as well as relying upon conclusory statements of medical diagnosis with no medical proof. Upon information and belief, Cardosa was the principal investigator, wrote the NOD and IR (or significant portions thereof), and the various Notices of Allegation were based upon her reports.

d.  The acts and omissions of Cardosa are the direct and proximate cause of serious harm to both Plaintiffs.

<u>COUNT II: RESPONDEAT SUPERIOR AGAINST CENTER</u>

Plaintiffs, Nanci and Alexis, reallege the allegations from Paragraphs 1 through 108 as though copied herein *in extenso*.

113.  Under the doctrine of respondent superior "[a]n employer is generally liable for the torts its employees commit within the scope of their employment."[16]

114.  The Center is the employer of Cardosa, who acts as an investigator on its behalf.

115.  Upon information and belief, Cardosa's actions as an investigator for the Center constitute torts against both plaintiffs.

116.  The acts and omissions of Cardosa are the direct and proximate cause of serious harm to both Plaintiffs.

---

[16] *Hamed v. Wayne Cnty.*, 803 N.W.2d 237, 244 (Mich. 2011).

COUNT III: NEGLIGENT SUPERVISION AGAINST CENTER

Plaintiffs, Nanci and Alexis, reallege the allegations from Paragraphs 1 through 108 as though copied herein *in extenso*.

117.   An employer owes a duty to protect a third party from an employee if they know or should have known of the employee's propensities before the tort.[17]

118.   The Center knew of Cardosa's actions as they reviewed her investigation and reports prior to using them in the NOD and IR or as the basis of any of the Notice of Allegations or placement upon the Database.

119.   Upon information and belief, the Center was also aware that Cardosa had evaluated many prior cases using a non-objective standard while reviewing allegations of physical and emotional misconduct in coaching.

120.   The Center's acts and omissions are the direct and proximate cause of serious harm to both Plaintiffs.


COUNT IV: TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP OR EXPECTANCY AGAINST CENTER, CARDOSA, PARTICIPATING ENTITY 3

Plaintiffs, Nanci and Alexis, reallege the allegations from Paragraphs 1 through 108 as though copied herein *in extenso*.

---

[17] *See Doe v. Borromeo*, No. 305162; 305163, 5-7 (Mich. Ct. App. Sep. 20, 2012).

121.   The elements of tortious interference with a business relationship are: (1) existence of a valid business relationship (not necessarily evidenced by an enforceable contract) or expectancy; (2) the knowledge of the relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy; and (4) the resultant damage to the plaintiff.[18]

122.   Elements to Center:

   a. Nanci and Alexis are members of USAG, and therefore have a valid business relationship with USAG.

   b. Nanci and Alexis are coaches at Bay Valley Academy, and therefore have a valid business relationship with Bay Valley Academy.

   c. Nanci and Alexis are coaches of gymnasts who are members of USAG, and therefore have a valid business relationship with the gymnasts.

   d. The Center claims jurisdiction over both plaintiffs on page 2 of their NOD stating that they were "subject to the disciplinary jurisdiction of the Code". That jurisdiction is only applicable because of the plaintiffs' USAG membership.

---

[18] *Maiberger v. City of Livonia*, 724 F. Supp. 2d 759, 772 (E.D. Mich. 2010) (citing *Lucas v. Monroe County* 203 F.3d 964, 978-79 (6th Cir. 2000)).

e.   The Center mentions Nanci and Alexis' employment at Bay Valley Academy within the IR and is aware of the business relationship.

f.   The Center refers to Nanci and Alexis as coaches of gymnasts within the IR and is aware of the business relationship.

g.   The Center intentionally relied upon a dilatory investigation and process which violated their own procedures by refusing to provide any objective analysis of the underlying facts as it relates to professionally accepted coaching techniques or methods, as well as relying upon conclusory statements of medical diagnosis with no medical proof.

h.   The Center's acts and omissions directly and proximately caused serious injury and harm to the Plaintiffs.

123.   Elements to Cardosa:

a.   As an employee of the Center, Cardosa shares the same elements listed above for the Center, while in addition she chose to conduct the investigation and write her reports in such a manner as to violate the procedures put in place by her employer and stated under oath at the JAMS arbitration for Alexis that the standard applied was that of a minor athlete's opinion instead of the standard articulated in the Code.

124.   Elements to Participating Entity 3:

a. Nanci and Alexis have a valid business relationship with USAG (through their membership), Bay Valley Academy (as their employer), and the gymnasts that they coach.

b. Participating Entity 3 is aware of these business relationships as her child was a gymnast at Bay Valley Academy, a member of USAG, and allegedly one of the gymnasts that Nanci and Alexis coached.

c. On information and belief, Participating Entity 3 provided false statements to Cardosa and the Center, which aided in their decision to discipline Nanci and Alexis.

d. Cardosa's acts and omissions directly and proximately caused serious injury and harm to the Plaintiffs.

## COUNT V: TORTIOUS INTERFERENCE WITH A CONTRACT AGAINST CENTER, CARDOSA, PARTICIPATING ENTITY 3

Plaintiffs, Nanci and Alexis, reallege the allegation from Paragraphs 1 through 108 as though copied herein *in extenso*.

125.    The elements of tortious interference with    a contract are    (1)    the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant.[19]

126.    Elements to Center:

a. Nanci and Alexis have a contract with USAG (through their membership), Bay Valley Academy (as their employer), and the gymnasts that they coach.

b. USAG wrongfully instituted punitive actions against Nanci and Alexis based up the Center's determinations, which breached the defendant's contracts with USAG, Bay Valley Academy, and their gymnastics students.

c. The contract was breached when the Center intentionally relied upon a dilatory investigation and process which violated their own procedures by refusing to provide any objective analysis of the underlying facts as it relates to professionally accepted coaching techniques or methods, as well as relying upon conclusory statements of medical diagnosis with no medical proof.

---

[19] *Badiee, supra* at 366–367, 695 N.W.2d 521; *Mahrle v. Danke,* 216 Mich.App. 343, 350, 549 N.W.2d 56 (1996); *Jim–Bob, Inc. v. Mehling,* 178 Mich.App. 71, 95–96, 443 N.W.2d 451 (1989).

d. The Center's acts and omissions directly and proximately caused serious injury and harm to the Plaintiffs.

127.  Elements to Cardosa:

a. As an employee of the Center, Cardosa shares the same elements listed above for the Center, while in addition she chose to conduct the investigation and write her reports in such a manner as to violate the procedures put in place by her employer and her refusal to state under oath at the JAMS arbitration for Alexis that the standard applied was the objective standard articulated in the Code.

128.  Elements to Participating Entity 3:

a. Nanci and Alexis have a contract with USAG (through their membership), Bay Valley Academy (as their employer), and the gymnasts that they coach.

b. Participating Entity 3 is aware of these business relationships as her child was a gymnast at Bay Valley Academy, a member of USAG, and allegedly one of the gymnasts that Nanci and Alexis coached.

c. On information and belief, Participating Entity 3 provided false statements to Cardosa and the Center, which aided in their decision to discipline Nanci and Alexis.

d.   Cardosa's acts and omissions directly and proximately caused serious injury and harm to the Plaintiff's.

COUNT VI: DEFAMATION AGAINST CENTER, CARDOSA, AND PARTICIPATING ENTITY 3

Plaintiffs, Nanci and Alexis, reallege the allegations from Paragraphs 1 through 108 as though copied herein *in extenso*.

129.   The elements that must be established to sustain a defamation claim are (1) a false and defamatory statement regarding the plaintiff, (2) a communication to a third party that is not privileged, (3) fault on the part of the publisher that amounts to at least negligence, and (4) either special harm caused by the publication or actionability of the statement regardless of special harm, otherwise known as defamation *per se*.[20]

130.   Elements against Center:

a.   The Center alleged facts that, if true, would be a violation of Michigan law against Nanci and Alexis within their NOD and IR.

b.   The Center placed Nanci on the Database under restriction.

c.   The Center determined that Alexis would be required to self-report to her peers that she was coaching under restrictions.

---

[20] *Smith v. Anonymous Joint Enterprise*, 487 Mich. 102, 113, 793 N.W.2d 533 (2010).

d.  The Center intentionally relied upon an investigation and process which violated their own procedures by refusing to provide any objective analysis of the underlying facts as it relates to professionally accepted coaching techniques or methods, as well as relying upon conclusory statements of medical diagnosis with no medical proof.  The information gathered in that manner should not have been relied upon, and the Center exercised actual malice in publishing their findings.

e.  The statements regarding Nanci and Alexis are defamatory *per se* as they allege all the elements of criminal acts.

f.  The Center's acts and omissions directly and proximately caused serious injury and harm to the Plaintiffs.

131.  Elements against Cardosa:

a.  By information and belief, Cardosa submitted reports to the Center that alleged facts that, if true, would be a violation of Michigan law against Nanci and Alexis within their NOD and IR.

b.  Upon information and belief, it was Cardosa's report that formed the basis for the NOD and IR.

c.  Cardosa discussed the process and her involvement during her testimony at Alexis' JAMS arbitration, admitting that she determined the credibility to assign to each witness and chose who to interview or

reinterview.  Upon information and belief, she showed actual malice by utilizing a process which violated the Center's process to compile a report she knew would be used to determine disciplinary actions against plaintiffs which are published by the Center.

d. Upon information and belief, Cardosa committed defamation *per se* by alleging facts within the reports she generated that would, if true, have violated Michigan Criminal Code.

e. Cardosa's acts and omissions directly and proximately caused serious injury and harm to the Plaintiffs.

132. Elements against Participating Entity 3:

a. Upon information and belief, Participating Entity 3 made false statements regarding both Nanci and Alexis as referenced in ¶¶ 80-83 that, if true, would violate the Michigan Criminal Code.

b. The above ¶ 88 cites the Code's language regarding their stance on false statements made by Participating Entities, placing false allegations outside of the privilege provided to the Center.

c. Upon information and belief, Participating Entity 3 acted with actual malice when she provided false statements regarding the plaintiffs which would be used in a disciplinary process.

d. As the defamatory statements made by Participating Entity 3 constituted, if true, violations of the Michigan Criminal Code, they are defamatory *per se*.

e. The acts and omissions of Participating Entity 3 directly and proximately caused serious injury and harm to the Plaintiffs.

<u>COUNT VII: INVASION OF PRIVACY BY FALSE LIGHT AGAINST CENTER, CARDOSA, AND PARTICIPATING ENTITY 3</u>

Plaintiffs, Nanci and Alexis, reallege the allegations from Paragraphs 1 through 108 as though copied herein *in extenso*.

133.   To state a claim for false light (invasion of privacy) in Michigan, a plaintiff must allege: (1) publication of a false statement harmful to another's interest; (2) the intention that the publication cause harm, recognition of likely harm, or negligence to likely harm; and (3) knowledge that the statement is false or reckless disregard to its veracity.[21]

134.   Elements against Center:

a. The Center alleged facts that, if true, would be a violation of Michigan law against Nanci and Alexis within their NOD and IR.

b. The Center placed Nanci on the Database under restriction.

---

[21] *Kollenberg v. Ramirez*, 127 Mich.App. 345, 352 (1983).

c. The Center determined that Alexis would be required to self-report to her peers that she was coaching under restrictions.

d. The intent of the Database is explained in ¶ 106, and it is intended to harm those who are placed upon it by alerting the public that they have been deemed unfit to participate in sport.

e. The intent of requiring a coach to self-report to her peers would be to alert them that the coach is currently being disciplined.

f. The Center either had knowledge that the statements made during the investigation were false, or acted with reckless disregard for their veracity when they accepted the investigatory results from an investigation which disregarded their own processes and safeguards.

g. The Center's acts and omissions are the direct and proximate cause of serious injury and harm to the Plaintiffs.

135. Elements against Cardosa:

a. As an employee of the Center, Cardosa shares the same elements listed above for the Center, while in addition she chose to conduct the investigation and write her reports in such a manner as to violate the procedures put in place by her employer.

b. Upon information and belief, Cardosa wrote her reports knowing that the Center would publish the content as part of a NOD or IR if they were to be issued.

c. Upon information and belief, Cardosa knew how her investigation and report would be used to harm Nanci and Alexis.

d. Upon information and belief, Cardosa either had knowledge that the statements made during the investigation were false or acted with reckless disregard for their veracity after viewing the text messages referenced in ¶ 88.

e. Cardosa's acts and omissions are the direct and proximate cause of serious injury and harm to the Plaintiffs.

136.   Elements against Participating Entity 3:

a. Upon information and belief, Participating Entity 3 made false statements regarding both Nanci and Alexis as referenced in ¶¶ 80-83 that, if true, would violate the Michigan Criminal Code, knowing that those statements would be used in the investigatory report and subsequent documents.

b. Upon information and belief, Participating Entity 3 knew or should have known that allegations regarding actions of the nature cited in ¶ 79-82 would harm the reputation and professional standing of plaintiffs.

c. Upon information and belief, Participating Entity 3 knew of the falsity of these claims as they were disproved during the JAMS arbitration for Alexis.

d. Participating Entity 3's acts and omissions are the direct and proximate cause of serious injury and harm to the Plaintiffs.

## COUNT VIII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST CENTER AND CARDOSA

Plaintiffs, Nanci and Alexis, reallege the allegations from Paragraphs 1 through 108 as though copied herein *in extenso*.

137. To establish a claim of intentional infliction of emotional distress, a plaintiff must prove the following elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress.[22]

138. Elements against Center:

a. The Center, by violating their own procedures and standards in order to discipline plaintiffs for behavior which, if true, would fall under the Michigan Criminal Code all while using a dilatory process, engaged in extreme and outrageous conduct.

b. The Center intentionally followed this course despite plaintiffs and their attorney attempting to participate in the process with only the conclusory information giving in the Notices of Allegation.

---

[22] *Hayley v. Allstate Ins. Co.,* 262 Mich. App. 571, 577 (2004).

c.  The Center's choices about the investigation, Notices of Allegation, temporary measures, use of the Database, JAMS arbitration, and dilatory nature of the entire process are the direct cause of the plaintiffs' emotional distress.

d.  The Center's acts and omissions are the direct and proximate cause to injury and severe emotional distress, including suicidal ideation, for the Plaintiffs.

139.  Elements against Cardosa:

a.  As an employee of the Center, Cardosa shares the same elements listed above for the Center, while in addition she chose to conduct the investigation and write her reports in such a manner as to violate the procedures put in place by her employer.

b.  Cardosa's acts and omissions are the direct and proximate cause of injury and severe emotional distress, including suicidal ideation, for the Plaintiffs.

## **CAUSES OF ACTION SPECIFIC TO NANCI MOORE**

## COUNT IX: SHERMAN ANTI-TRUST AGAINST CENTER

Plaintiff, Nanci, realleges the allegations from Paragraphs 1 through 108 as though copied herein *in extenso*.

140.    Section 2 of the Sherman Anti-trust Act states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court."[23]

141.    It is generally required that to demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.[24]

142.    The purpose of the (Sherman) Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest.[25]

---

[23] 15 U.S.C. § 2.

[24] *See* 3 P. Areeda & D. Turner, Antitrust Law at ¶ 820, p. 312. (1978).

[25] *Spectrum Sports, Inc v. Quillan*, 506 U.S. 447, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). See, e.g., *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977); *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 116-117, 107 S.Ct. 484, 492-493, 93 L.Ed.2d 427 (1986).

143.   The Center acted in a predatory or anticompetitive manner when they attempted to prevent Nanci from teaching dance classes, when dance does not fall under the jurisdiction of the Center (*see* ¶¶ 55 and 56).

144.   The Center acted in a predatory or anticompetitive manner when they placed Nanci in the Database, effectively precluding her from coaching gymnastics (see ¶¶ 105-109) as she now has no recourse since her JAMS arbitration has also been cancelled.

145.   Paragraphs 105 and 106 cite the intent behind the Database, while ¶ 26 addresses the intent of the Act which created the Center including its jurisdiction and function over all of the Olympic movement sports.  As such, placing a coach on the Database is done with the specific intent to keep that coach out of sport.

146.   When the Center attempted to ban Nanci from teaching dance, a sport which is not under their jurisdiction, it was acting with specific intent to keep her out of the marketplace altogether.

147.   The Center has shown that it has a dangerous probably of achieving monopoly power, as it already controls the Database for banning all participation in any Olympic movement sport.  That Database can also be viewed by anyone searching for a participant's name during a job interview in an unrelated field.  The Database is also utilized by other non-Olympic movement gymnastics associations Therefore, the Database effectively locks participants completely out of sport and

potentially out of employment, which is unrelated to sport, and does so by violating its own rules and using a predatory process that is the direct and proximate cause of harm to Nanci, but also to the market as a whole.

## COUNT X: CLAYTON ANTI-TRUST AGAINST CENTER

Plaintiff, Nanci, realleges the allegations from Paragraphs 1 through 108 as though copied herein *in extenso*.

148.   The Clayton Act[26] allows for legal and equitable relief if the Center has violated anti-trust laws.

149.   Section 15 of the Clayton Act states:

> "(A)any **person** who shall be injured in his business or property by reason of anything forbidden in the **antitrust laws** may sue therefor in any district court of the United **States** in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. The court may award under this section, pursuant to a motion by such **person** promptly made, simple interest on actual damages for the period beginning on the date of service of such **person**'s pleading setting forth a claim under the **antitrust laws** and ending on the date of judgment, or for any shorter period therein, if the court finds that the award of such interest for such period is just in the circumstances."

150.   The Sherman Act cited above falls under the Clayton Act as the Sherman Act is an "antitrust law" as defined by 15 U.S.C. 12(a).

---

[26] 15 U.S.C. § 26.

151.   The Center's actions as described above violate the antitrust laws of the United States, thereby making Nanci entitled to relief under the Clayton Act.

152.   The Center's actions are the direct and proximate cause of harm to both Nanci and the marketplace at large, both inside the sport of gymnastics and the Olympic movement in general.

COUNT XI: MICHIGAN ANTI-TRUST REFORM ACT AGAINST CENTER

Plaintiff, Nanci, realleges the allegations from Paragraphs 1 through 152 as though copied herein *in extenso*.

153.   MCL 445.772 (MARA) provides, "A contract, combination, or conspiracy between 2 or more persons in restraint of, or to monopolize, trade or commerce in relevant market is unlawful."

154.   MCL 445.773 also provides, "The establishment, maintenance, or use of a monopoly, or any attempt to establish a monopoly, of trade or commerce in a relevant market by any person, for the purpose of excluding or limiting competition or controlling, fixing, or maintaining prices, is unlawful."

155.   MCL 445.778(2) permits treble damages if the defendants' actions have been found to be "flagrant" violations of MARA by the trier of fact.

156.   MCL 445.778(2) permits anyone that is injured or threatened to be injured due to violations of the MARA to file suit for injunctive or other equitable relief, actual damages, interest, taxable costs and reasonable attorney fees.

157.   The acts attributed to the Center in ¶¶ 143-147 have either already established or are attempting to establish the maintenance or use of a monopoly of trade or commerce in sport for the purpose of excluding or limiting competition.

158.   The Center's acts and omissions are the direct and proximate cause of harm to both Nanci and the marketplace at large, both inside the sport of gymnastics and the Olympic movement in general.

<u>COUNT XII: DEFAMATION AGAINST PARTICIPATING ENTITIES 1, 2, AND 4</u>

Plaintiff, Nanci, realleges the allegations from Paragraphs 1 through 108 as though copied herein *in extenso*.

159.   The elements that must be established to sustain a defamation claim are (1) a false and defamatory statement regarding the plaintiff, (2) a communication to a third party that is not privileged, (3) fault on the part of the publisher that amounts to at least negligence, and (4) either special harm caused by the publication or actionability of the statement regardless of special harm, otherwise known as defamation *per se*.[27]

160.   Elements against Participating Entity 1:

---

[27] *Smith v. Anonymous Joint Enterprise*, 487 Mich. 102, 113, 793 N.W.2d 533 (2010).

a. Upon information and belief, Participating Entity 1 made false statements regarding both Nanci and Alexis as referenced in ¶ 78 (a-g) that, if true, would violate the Michigan Criminal Code.

b. The above ¶ 88 cites the Code's language regarding their stance on false statements made by Participating Entities, placing false allegations outside of the privilege provided to the Center.

c. Upon information and belief, Participating Entity 1 acted with actual malice when she provided false statements regarding the plaintiffs which would be used in a disciplinary process.

d. As the defamatory statements made by Participating Entity 1 constituted, if true, violations of the Michigan Criminal Code, they are defamatory *per se*.

e. The statements by Participating Entity 1 are the direct and proximate cause to serious injury and harm to Plaintiff.

161. Elements against Participating Entity 2:

a. Upon information and belief, Participating Entity 2 made false statements regarding both Nanci and Alexis as referenced in ¶¶ 79(A-D) that, if true, would violate the Michigan Criminal Code.

b. The above ¶ 88 cites the Code's language regarding their stance on false statements made by Participating Entities, placing false allegations outside of the privilege provided to the Center.

c. Upon information and belief, Participating Entity 2 acted with actual malice when she provided false statements regarding the plaintiffs which would be used in a disciplinary process.

d. As the defamatory statements made by Participating Entity 2 constituted, if true, violations of the Michigan Criminal Code, they are defamatory *per se*.

e. The statements made by Participating Entity 2 are the direct and proximate case of serious injury and harm to Plaintiff.

162. Elements against Participating Entity 4:

a. Upon information and belief, Participating Entity 4 made false statements regarding both Nanci and Alexis as referenced in ¶¶ 84 (A-C) and 85 (A-B) that, if true, would violate the Michigan Criminal Code.

b. The above ¶ 88 cites the Code's language regarding their stance on false statements made by Participating Entities, placing false allegations outside of the privilege provided to the Center.

c. Upon information and belief, Participating Entity 4 acted with actual malice when he provided false statements regarding the plaintiffs which would be used in a disciplinary process.

d. As the defamatory statements made by Participating Entity 4 constituted, if true, violations of the Michigan Criminal Code, they are defamatory *per se*.

e. The statements made by Participating Entity 4 are the direct and proximate cause of serious injury and harm to Plaintiff.

## COUNT XIII: INVASION OF PRIVACY BY FALSE LIGHT AGAINST PARTICIPATING ENTITIES 1, 2, AND 4

Plaintiff, Nanci, realleges the allegations from Paragraphs 1 through 108 as though copied herein *in extenso*.

163.   To state a claim for false light (invasion of privacy) in Michigan, a plaintiff must allege: (1) publication of a false statement harmful to another's interest; (2) the intention that the publication cause harm, recognition of likely harm, or negligence to likely harm; and (3) knowledge that the statement is false or reckless disregard to its veracity.[28]

164.   Elements against Participating Entity 1:

---

[28] *Kollenberg v. Ramirez*, 127 Mich.App. 345, 352 (1983).

    a. Upon information and belief, Participating Entity 1 made false statements regarding both Nanci and Alexis as referenced in ¶ 78 (a-g) that, if true, would violate the Michigan Criminal Code, knowing that those statements would be used in the investigatory report and subsequent documents.

    b. Upon information and belief, Participating Entity 1 knew or should have known that allegations regarding actions of the nature cited in ¶ 78 (a-g) would harm the reputation and professional standing of plaintiffs.

    c. Upon information and belief, Participating Entity 1 knew of the falsity of these claims as she shortened a video in order to back up her claims and provided no additional evidence despite claiming to have it in her possession.

    d. The acts, omissions, and statements by Participating Entity 1 is the direct and proximate cause of serious injury and harm to Plaintiff.

165. Elements against Participating Entity 2:

    a. Upon information and belief, Participating Entity 2 made false statements regarding both Nanci and Alexis as referenced in ¶¶ 79(A-D) that, if true, would violate the Michigan Criminal Code, knowing

that those statements would be used in the investigatory report and subsequent documents.

b. Upon information and belief, Participating Entity 2 knew or should have known that allegations regarding actions of the nature cited in ¶ 79(A-D) would harm the reputation and professional standing of plaintiffs.

c. Upon information and belief, Participating Entity 2 knew of the falsity of these claims many of which were disproved during the JAMS arbitration for Alexis.

d. The statements made by Participating Entity 2 are the direct and proximate cause of serious injury and harm to Plaintiff.

166. Elements against Participating Entity 4:

a. Upon information and belief, Participating Entity 4 made false statements regarding both Nanci and Alexis as referenced in ¶¶ 84-85 that, if true, would violate the Michigan Criminal Code, knowing that those statements would be used in the investigatory report and subsequent documents.

b. Upon information and belief, Participating Entity 4 knew or should have known that allegations regarding actions of the nature cited in ¶¶ 84-85 would harm the reputation and professional standing of plaintiffs.

    c.  Upon information and belief, Participating Entity 4 knew of the falsity of these claims and was building a case by "planting seeds" and speaking with other parents and attorneys.

    d.  The statements of Participating Entity 4 are the direct and proximate cause of serious injury and harm to Plaintiff.

WHEREFORE, Nanci and Alexis Moore respectfully request the entry of a judgment against defendants and in favor of plaintiffs, providing the following relief:

A. Awarding Nanci and Alexis their actual, consequential, and compensatory damages, damage to their reputation, interest, attorneys' fees, costs, and expenses;

B. Awarding Nanci and Alexis their attorneys' fees and costs incurred in the instant matter;

C. Awarding Nanci equitable relief, including an injunction requiring the Center to put all investigation, decisions, or further punitive actions (including but not limited to removing Nanci from the Database) on hold until the outcome of the instant action;

D. Awarding Nanci treble damages;

E. Awarding Nanci and Alexis interest, costs, and expenses; and

F. Awarding all other relief as allowed by applicable statute, court rule, or common law, as this Court deems just and equitable.

DATED:      July 13, 2023

Respectfully submitted,


By: */s/ Russell S. Prince*

Russell Scott Prince
**Bryan & Prince, PA.**
1600 East 8th Avenue
Centro Ybor A100 Tampa, FL
33605 (813) 491-8767
*rprince@bryanprincepa.com*
www.bryanprincepa.com

*Attorney for Plaintiffs*

## <u>JURY DEMAND</u>

NOW COMES Plaintiffs, Nanci and Alexis Moore, by and through their attorneys, BRYAN & PRINCE, PA, and hereby demands a trial by jury in the above cause.


DATED:     July 13, 2023


Respectfully submitted,

By: */s/ Russell S. Prince*
Russell Scott Prince
Bryan & Prince, PA.

1600 East 8th Avenue Centro
Ybor A100 Tampa, FL
33605 (813) 491-8767
*rprince@bryanprincepa.com*
www.bryanprincepa.com
*Attorney for Plaintiffs*