UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

| | |
|---|---|
| NANCI MOORE and ALEXIS MOORE,<br><br>Plaintiffs,<br><br>-vs-<br><br>U.S. CENTER FOR SAFESPORT;<br>SIMONE CARDOSA, Investigator for<br>United States Center for SafeSport, in her<br>official capacity, and personally;<br>Participating Entity 1; Participating Entity<br>2; Participating Entity 3; and Participating<br>Entity 4,<br><br>Defendants. | Case No. 1:23-cv-11681<br><br>Hon. Thomas L. Ludington<br><br>Hon. Patricia T. Morris |

## U.S. CENTER FOR SAFESPORT AND SIMONE CARDOSA'S MOTION TO DISMISS

Defendants the U.S. Center for SafeSport and Simone Cardosa (collectively "Defendants") move under Federal Rule of Civil Procedure 12(b)(1) and (6) to dismiss Plaintiffs' Complaint and state as follows:

1.      Plaintiffs' claims are largely based on the Center's alleged violation of its duties under the SafeSport Act. In the SafeSport Act, Congress expressly stated that the Act does not give rise to a claim under state law or create a private right of action. See 36 U.S.C. §§ 220541(a)(2)(C) ("Nothing in this subsection shall be construed . . . to give rise to a claim under State law or create a private right of action.") and § 220541(d)(3)(B) ("Nothing in this chapter shall be construed to

1

create a private right of action."). The Complaint should be dismissed because Congress expressly disavowed creation of a private right of action.

2.      Membership in the Olympic and Paralympic Movement is a privilege and not a right. All determinations by the Center regarding an individual's eligibility to participate in the Olympic and Paralympic Movement fall within the exclusive authority Congress granted to the Center under the SafeSport Act. The Complaint should be dismissed because Congress expressly preempted judicial review of the Center's methods and decisions regarding an individual's eligibility to participate in the Olympic and Paralympic Movement and this Court does not have jurisdiction.

3.      The Complaint should be dismissed because the Center has absolute immunity from damages lawsuits challenging its eligibility decisions.

4.      Plaintiff Nanci Moore's claims should be dismissed because she has failed to exhaust her administrative remedies and, therefore, this Court lacks jurisdiction.

5.      Plaintiff Alexis Moore arbitrated her claims that are the subject of this action.  Plaintiff Alexis Moore's claims should be dismissed because this Court does not have the power to re-litigate issues presented in arbitration. At most, she can pursue remedies under the Federal Arbitration Act.

6.      Additionally, each of Plaintiffs' claims independently fail as a matter of law. Plaintiffs' contract claims fail because they have not identified a contract

between themselves and the Center. Plaintiffs' Respondeat Superior "claim" is not an independent claim, but a theory supporting vicarious liability. Plaintiffs' negligent supervision claim fails because there is no duty running to Plaintiffs enforceable in a lawsuit. Plaintiffs' defamation and false light claims fail because they are barred by statute and they do not properly allege malice. Plaintiff Nanci Moore's antitrust claims all fail because Congress has exempted eligibility decisions from antitrust laws and she has failed to establish antitrust standing.

WHEREFORE, Defendants respectfully request this Court to grant their Motion to Dismiss Plaintiffs' Complaint and grant such further relief this Court deems just and equitable.

Dated: September 13, 2023          Respectfully submitted,

   *s/ Joseph J. Zonies*
Joseph J. Zonies, No. 29539
(admitted to E.D. Mich. 8/25/23)
ZONIES LAW LLC
1700 Lincoln Street, Suite 2400
Denver, CO  80203
(720) 464-5300
jzonies@zonieslaw.com

Kevin M. Mulvaney (P76915)
WILSON ELSER MOSKOWITZ
EDELMAN & DICKER LLP
17197 N. Laurel Park Drive, Suite 201
Livonia, MI  48152
(t): 313 327-3100
(e) Kevin.mulvaney@wilsonelser.com

*Attorneys for Defendant U.S. Center for SafeSport*

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

| | |
|---|---|
| NANCI MOORE and ALEXIS MOORE, | |
| Plaintiffs, | |
| -vs- | Case No. 1:23-cv-11681 |
| | Hon. Thomas L. Ludington |
| U.S. CENTER FOR SAFESPORT; SIMONE CARDOSA, Investigator for United States Center for SafeSport, in her official capacity, and personally; Participating Entity 1; Participating Entity 2; Participating Entity 3; and Participating Entity 4, | Hon. Patricia T. Morris |
| Defendants. | |

**BRIEF IN SUPPORT OF
U.S. CENTER FOR SAFESPORT AND SIMONE CARDOSA'S
MOTION TO DISMISS**

## **TABLE OF CONTENTS**

INDEX OF AUTHORITIES.................................................................. iii

CONCISE STATEMENT OF ISSUES PRESENTED ......................... vii

CONTROLLING OR MOST APPROPRIATE AUTHORITY ..............ix

INTRODUCTION ................................................................................1

CERTIFICATE OF CONFERRAL .......................................................4

BACKGROUND ..................................................................................4

The Olympic and Paralympic Movement...........................................4

The U.S. Center for SafeSport ...........................................................5

Plaintiffs Sued the Center for Damages Because They Disagree with Its
  Adjudication Methodology and Eligibility Actions .......................8

LEGAL STANDARD..........................................................................13

ARGUMENT .......................................................................................14

I.    Plaintiffs' Claims Should Be Dismissed Because Congress Expressly
      Dictated that the SafeSport Act Does Not Create a Private Right of
      Action.......................................................................................14

II.   All Plaintiffs' Claims Are Preempted by the Amateur Sports Act and
      This Court Does Not Have Jurisdiction to Re-Adjudicate the Center's
      Eligibility Decisions .................................................................20

III.  The Center Is Immune from Lawsuits Regarding Its Eligibility
      Decisions...................................................................................24

IV.   The Court Lacks Jurisdiction Over Plaintiff Nanci Moore's Claims
      Because She Has Failed to Exhaust Her Administrative Remedies..............26

V.    Plaintiff Alexis Moore's Claims Should Be Dismissed – Her Sole
      Remedy, If There Is One, Is to File an Action Under the Federal
      Arbitration Act..........................................................................29

VI.   Each of Plaintiffs' Claims Against the Center Independently Fail as a Matter of Law ........................................................................................29

    A.   Plaintiffs' Contract Claims Fail as They Do Not Allege a Contract with the Center and Certainly not Ms. Cardosa (Claim I – against the Center and Ms. Cardosa) ..............................................29

    B.   Plaintiffs' "Respondeat Superior" Claim  Is Not a Claim (Claim II – against the Center) .........................................................................32

    C.   Plaintiff's Negligent Supervision Claim Fails for Lack of a Tort Duty (Claim III – against the Center) ....................................................33

    D.   Plaintiffs' Tortious Interference with Business and Contract Claims Fail as a Matter of Law (Claims IV & V - against the Center, Ms. Cardosa, and Participating Entity 3) ...............................34

    E.   Plaintiffs' Have Failed to Plead Claims for Defamation and Invasion of Privacy (Claims VI & VII – against the Center, Ms. Cardosa, and Participating Entity 3) ....................................................38

    F.   Plaintiffs fail to sufficiently allege "extreme and outrageous conduct" as required for an intentional infliction of emotional distress claim (Claim VIII – against the Center and Ms. Cardosa) .................................................................................................45

    G.   The Center Is Exempt From and Did Not Violate Antitrust Laws (Claims IX, X, & XI – against the Center) ...............................47

CONCLUSION ........................................................................................54

# INDEX OF AUTHORITIES

## Cases

*360 Const. Co. v. Atsalis Bros. Painting Co*., 915 F. Supp. 2d 883 (E.D. Mich. 2012)....................................................................................................33

*Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641 (6th Cir. 2015) .........................7

*Andrews v. Prudential Securities, Inc.*, 160 F.3d 304 (6th Cir. 1998) ....................45

*Apple v. Glenn*, 183 F.3d 477 (6th Cir. 1999) ...........................................................13

*Arora v. Henry Ford Health Sys.*, No. 2:15-CV-13137, 2017 WL 4119946 (E.D. Mich. Sept. 18, 2017), aff'd, No. 17-2252, 2018 WL 3760888 (6th Cir. July 9, 2018).............................................................................. 31, 32

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)............................................................. 14, 44

*Baker v. Wood, Ris & Hames, P.C.*, 364 P.3d 872 (Colo. 2016) ............................34

*Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426 (6th Cir. 2008)................50

*Behagen v. Amateur Basketball Ass'n of U.S.*, 884 F.2d 524 (10th Cir. 1989).. 5, 48

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).....................................................14

*BPS Clinical Lab'ys v. Blue Cross & Blue Shield of Michigan*, 552 N.W.2d 919 (Mich. Ct. App. 1996) ................................................................... 36, 37

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977).............. 49, 50

*Callaghan v. U.S. Center for Safe Sport*, No: 2:18-cv-336-FtM-99CM, 2018 WL 4107951 (M.D. Fla. Aug. 29, 2018)................................................. 3, 28

*CBC Cos., Inc. v. Equifax*, 561 F.3d 569 (6th Cir. 2009)........................................50

*Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264 (2007).....................49

*Danou v. Kroger Co.*, 557 F. Supp. 1266 (E.D. Mich. 1983) .................................47

*De Atucha v.  Commodity Exch., Inc.*, 608 F. Supp. 510 (S.D.N.Y. 1985).............53

*Derderian v. Genesys Health Care Sys.*, 689 N.W.2d 145 (Mich. Ct. App. 2004) .......................................................................................................35

*Fashion Originators Guild of Am. v. Fed. Trade Comm'n,* 114 F.2d 80 (2d Cir. 1940), *aff'd sub nom. Fashion Originators' Guild of Am. v. Fed. Trade Comm'n,* 312 U.S. 457 (1941) ...........................................................54

*First Med Representatives, LLC. v. Futura Medical Corp.*, 195 F. Supp.2d 917 (E.D. Mich. 2002) ...................................................................................47

*Formall v. Community Nat'l Bank*, 421 N.W.2d 289 (Mich. Ct. App. 1988).. 35, 36

*Gilbert v. United States Olympic Committee, et al.*, 1:18-cv-00981-CMA-MEH, 2019 WL 10252758 (D. Colo. Mar. 6, 2019).... 1, 3, 12, 24, 25, 26, 54

*Gold Medal LLC v. USA Track & Field*, 187 F. Supp. 3d 1219 (D. Or. 2016), aff'd, 899 F.3d 712 (9th Cir. 2018).....................................................48

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391 (7th Cir. 1993) ................................................................................................52

*Harris v. U.S. Center for SafeSport*, No. 4:22-cv-01063, 2023 WL 2072394 (E.D. Mo. Feb. 17, 2023) .............................................................................42

*Hill v. Sears, Roebuck & Co.*, 822 N.W.2d 190 (Mich. 2012) ................................33

*Hollowell v. Career Decisions, Inc.*, 298 N.W.2d 915 (Mich. Ct. App. 1980).......45

*HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874 (6th Cir. 1991) ..........49

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09-cv-3690, 2015 WL 3988488 (N.D. Ill. June 29, 2015).................................................52

*In re Omnicare, Inc. Sec. Litig.,* 769 F.3d 455 (6th Cir. 2014) ................................7

*Ireland v. Edwards*, 584 N.W.2d 632 (Mich. Ct. App. 1998) .................................43

*JES Properties, Inc. v. USA Equestrian, Inc.*, 458 F.3d 1224 (11th Cir. 2006) ......49

*Kelley ex rel. Slay v. Michigan Nat. Bank*, 141 N.W.2d 73 (Mich. 1966) .............54

*Lee v. U.S. Taekwondo Union*, 331 F. Supp. 2d 1252 (D. Haw. 2004)...... 18, 19, 38

*Lynch v. Magnavox Co.*, 94 F.2d 883 (9th Cir. 1938) .............................................51

iv

*Mattis v. Massman*, 355 F.3d 902 (6th Cir. 2004) .................................................45

*Mersen USA--Midland-MI, Inc. v. Graphite Machining Servs. & Innovations, LLC*, No. 12-10961, 2013 WL 3242948 (E.D. Mich. June 26, 2013) ...............................................................................................36

*Michels v. United States Olympic Comm.*, 741 F.2d 155 (7th Cir. 1984) ..............12

*Morgan v. Ponder*, 892 F.2d 1355 (8th Cir. 1989)...................................................54

*Moses.com Securities, Inc. v. Comprehensive Software Systems, Inc.*, 406 F.3d. 1052 (8th Cir. 2005) ...........................................................................44

*Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555 (7th Cir. 1991) ........................50

*NicSand, Inc. v. 3M Co.*, 507 F.3d 442 (6th Cir. 2007).............................. 14, 49, 53

*Nothstein v. USA Cycling*, 499 F. Supp. 3d 101 (E.D. Penn. Nov. 5, 2020)..........39

*Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320 (6th Cir. 1990)................13

*Pedell v. Heartland Health Care Ctr.*, No. 271276, 2007 WL 840876 (Mich. Ct. App. Mar.20, 2007)..................................................................................37

*Pfannenstiel v. Merrill Lynch, Pierce, Fenner & Smith*, 477 F.3d 1155 (10th Cir. 2007) ...........................................................................................26

*Pierson v. Ray*, 386 U.S. 547 (1967) ......................................................................25

*Pliuskaitis v. USA Swimming, Inc.*, 243 F. Supp. 3d 1217 (D. Utah 2017), aff'd on other grounds, 720 F. App'x 481 (10th Cir. 2018).........................20

*Pool Water Prods., v. Olin Corp.*, 258 F.3d 1024 (9th Cir. 2001) ..........................50

*Prime Rate Premium Fin. Corp. v. Larson*, 226 F. Supp. 3d 858 (E.D. Mich. 2016) ...................................................................................................33

*Reighard v. ESPN, Inc.*, 991 N.W.2d 803 (Mich. Ct. App. 2022) .................. 39, 40

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522 (1987)..................................................................................................5

*Sanderson v. United States Center for SafeSport, Inc.*, No. 21-CV-01771-CMA, 2021 WL 3206322 (D. Colo. July 29, 2021).................... 2, 21, 22, 54

*Sanner v. Bd. of Trade*, 62 F.3d 918 (7th Cir. 1995) ........................................ 52, 53

*Sawabini v. Desenberg*, 372 N.W.2d 559 (Mich. Ct. App. 1985) ........................... 46

*Slaney v. Int'l Amateur Ath. Fed.*, 244 F.3d 580 (7th Cir. 2001) ..................... 20, 22

*Smith v. Anonymous Joint Enterprise*, 793 N.W.2d 533 (Mich. 2010) ................... 38

*Tomlin v. Percy*, No. CV 21-10641, 2023 WL 4095232 (E.D. Mich. June 20, 2023) ................................................................................................................ 46

*U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399 (6th Cir. 2016) ................................................................................................................ 13

*U.S. v. Ritchie*, 15 F.3d 592 (6th Cir. 1994) ........................................................ 13

*Walton–Floyd v. United States Olympic Comm.*, 965 S.W.2d 35 (Tex. App. 1998) ................................................................................................................ 20

**Statutes**

15 U.S.C.A. § 1 et seq. ......................................................................................... 47

36 U.S.C. § 220541 ........... 2, 6, 15, 16, 17, 18, 25, 27, 32, 33, 37, 39, 42, 46, 47, 48

36 U.S.C. §§ 220541-43 ......................................................................................... 2

**Rules**

Fed. R. Civ. P. 12(b)(1) ................................................................................... 2, 13

Fed. R. Civ. P. 12(b)(6) ............................................................................ 2, 7, 9, 13

Local Rules of the United States District Court for the Eastern District of Michigan 7.1 ................................................................................................. 4

**Other Authorities**

Restatement (Third) of Torts: Phys. & Emot. Harm § 7, cmt. g (2010) ................. 34

Senate Report No. 115-443 (Dec. 19, 2018) .................................................... 41, 42

## CONCISE STATEMENT OF ISSUES PRESENTED

I.  In the SafeSport Act, Congress expressly stated that it does not create a private right of action.   See 36 U.S.C. §§ 220541(a)(2)(C) ("Nothing in this subsection shall be construed . . . to give rise to a claim under State law or create a private right of action.") and 220541(d)(3)(B) ("Nothing in this chapter shall be construed to create a private right of action."). Should Plaintiffs' claims, all of which are based on the Center's alleged breach of its duties under the SafeSport Act, be dismissed because Congress expressly disavowed creation of a private right of action?

II. Membership in the Olympic and Paralympic Movement is a privilege and not a right.  All determinations by the Center regarding an individual's eligibility to participate in the Olympic and Paralympic Movement fall within the exclusive authority Congress granted to the Center under the SafeSport Act. Should the complaint be dismissed because Congress expressly preempted judicial review of the Center's methods and decisions regarding an individual's eligibility to participate in the Olympic and Paralympic Movement?

III. Should the complaint be dismissed because the Center has absolute immunity from lawsuits challenging its eligibility decisions?

IV.    As a condition of their membership in USA Gymnastics, Plaintiffs have agreed to be bound by the Center's policies and procedures, which include the SafeSport Code for the U.S. Olympic and Paralympic Movement and its arbitration clause requiring that all claims be arbitrated. Should Plaintiff Nanci Moore's claims be dismissed because she has failed to exhaust her administrative remedies and therefore this Court lacks jurisdiction?

V.    Plaintiff Alexis Moore arbitrated her claims that are the subject of this action. Should Plaintiff Alexis Moore's claims be dismissed because they cannot be re-litigated in this Court?

VI.    Should Plaintiffs' claims be dismissed because they fail as a matter of law?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*The SafeSport Act Does Not Provide a Private Right of Action*

36 U.S.C. § 220541(a)(2)(C)

*Claims Based on the Center's Eligibility Decisions Are Preempted Under the Amateur Athletes Act*

*Sanderson v. United States Center for SafeSport, Inc.*, No. 21-CV-01771-CMA, 2021 WL 3206322, at *4 (D. Colo. July 29, 2021)

*Slaney v. Int'l Amateur Ath. Fed.*, 244 F.3d 580, 594-96 (7th Cir. 2001)

*The Center Is Immune from Damages Lawsuits*

*Gilbert v. United States Olympic Committee, et al.*, 1:18-cv-00981-CMA-MEH, 2019 WL 10252758 (D. Colo. Mar. 6, 2019)

*Plaintiff Nanci Moore Has Failed to Exhaust Her Administrative Remedies*

*Callaghan v. U.S. Center for Safe Sport*, No: 2:18-cv-336-FtM-99CM, 2018 WL 4107951, at *6 (M.D. Fla. Aug. 29, 2018)

## INTRODUCTION

Since its inception in 2017, the U.S. Center for SafeSport (the "Center") has received tens of thousands of reports of alleged misconduct in the Olympic and Paralympic Movement (the "Movement"). *See, e.g., Gilbert v. United States Olympic Committee, et al.*, 1:18-cv-00981-CMA-MEH, 2019 WL 10252758 (D. Colo. Mar. 6, 2019), at *6 (noting that in just its second year the Center "received its 1000th complaint."). In 2022 alone, the Center received over 5,000 reports. In nearly every case the Center adjudicates, someone is likely to be critical of the Center: either the Center did not do enough, did too much, or could have done something differently.

Given the sheer volume of cases handled by the Center, allowing lawsuits like this—when someone disagrees with how the Center adjudicated or, as here, is currently adjudicating allegations of misconduct—would effectively bury the Center in litigation and end its ability to function. Moreover, allowing Respondents in the Center's processes to intimidate Claimants who report alleged misconduct and witnesses who voluntarily participate in a Center investigation by suing them in an ongoing investigation, will end the Center's ability to adjudicate claims of abuse in the Movement.[1] Even the threat of a flood of lawsuits will impact the Center's ability

---

[1] Under the SafeSport Code for the U.S. Olympic and Paralympic Movement, a "Respondent" is an individual who is "alleged to have violated the Code." ECF No.

1

to impartially resolve reports of misconduct within its jurisdiction. The Center and Ms. Cardosa (collectively "Defendants") move under Rules 12(b)(1) and (6) to dismiss the Complaint against them.

First, all of Plaintiffs' claims are based upon their allegation that Defendants violated the SafeSport Act.[2] However, in that very Act, Congress expressly disavowed creation of a private right of action. *See* 36 U.S.C. § 220541(a)(2)(C) ("Nothing in this subsection shall be construed . . . to give rise to a claim under State law or create a private right of action."); *see also* § 220541(d)(3)(B) ("Nothing in this chapter shall be construed to create a private right of action."). Plaintiffs' claims are barred by this statutory language.

Second, Congress expressly preempted judicial review of the Center's methods and decisions regarding an individual's eligibility to participate in the Movement. *Sanderson v. United States Center for SafeSport*, *Inc.*, No. 21-CV-01771-CMA, 2021 WL 3206322, at *4 (D. Colo. July 29, 2021) (hereinafter "*Sanderson*") ("[A]s [the Center's] eligibility determinations fall within the exclusive parameters of the Amateur Sports Act, this court lacks jurisdiction to hear

---

1-4, PageID.127. A "Claimant" is an individual "who is alleged to have experienced conduct that constitutes a Code violation." ECF No. 1-4, PageID.124.

[2] Congress has twice amended the Amateur Sports Act to authorize the Center to carry out its mission: the Protecting Young Victims from Abuse and Safe Sport Authorization Act of 2017 and the Empowering Olympic, Paralympic, and Amateur Athletes Act of 2020.  *See* 36 U.S.C. §§ 220541-43 (collectively the "SafeSport Act").

Plaintiff's claims."). As such, this Court does not have jurisdiction over these matters.

Third, the Center has absolute immunity from lawsuits challenging its eligibility decisions.

> [The Center] argues it cannot be subject to suit for its eligibility decisions, because immunity serves to protect it for acts in its adjudicatory and prosecutorial capacity…. I agree. The policy considerations that determine whether a party is protected by absolute immunity are squarely aligned with the issues that are presented by Plaintiffs' claims.

*Gilbert v. United States Olympic Committee, et al.*, 1:18-cv-00981-CMA-MEH, 2019 WL 10252758 (D. Colo. Mar. 6, 2019), at *3. As that court said, "SafeSport simply cannot effectively serve its purpose of protecting amateur athletes if it is subject to the threat of liability for every eligibility decision it makes." *Id.* at *6.

Fourth, Plaintiff Nanci Moore has an obligation to arbitrate her claims and has failed to exhaust these administrative remedies. *See Callaghan v. U.S. Center for Safe Sport*, No: 2:18-cv-336-FtM-99CM, 2018 WL 4107951, at *6 (M.D. Fla. Aug. 29, 2018) (dismissing complaint for failure to exhaust administrative remedies, including the plaintiff's "procedural concerns raised in this lawsuit."). Plaintiff Alexis Moore, who did arbitrate her claims raised in this lawsuit, cannot now sue on those very same claims. At most, she can bring an action under the Federal Arbitration Act ("FAA") seeking to vacate or modify the Arbitrator's decision.

Finally, each of Plaintiffs' claims independently fail as a matter of law. Plaintiffs' contract claims fail because they have not identified a contract between themselves and the Center. Plaintiffs' tort claims fail because there is no duty running to Plaintiffs enforceable in a lawsuit. Plaintiffs' defamation and false light claims fail because they are barred by statute and they do not properly allege malice. Plaintiff Nanci Moore's antitrust claims all fail because Congress has exempted eligibility decisions from antitrust laws and she has failed to establish antitrust standing. The Complaint should be dismissed as to the Center and Ms. Cardosa.

## CERTIFICATE OF CONFERRAL

Pursuant to LR 7.1, the undersigned counsel conferred with Plaintiffs' counsel, including by discussing the Center's immunity from this lawsuit, the Court's lack of jurisdiction, and Plaintiffs' failure to exhaust administrative remedies.  Plaintiffs object to the requested relief.

## BACKGROUND

**The Olympic and Paralympic Movement.**

The Movement is made up of more than 50 private associations called National Governing Bodies ("NGBs"). It is estimated that more than 11 million

people are members of the Movement, including coaches and athletes. One such NGB is USA Gymnastics ("USAG").

Plaintiffs are members of USAG and entered into a contractual relationship with USAG. ECF No. 1-3, PageID.109 ("This Agreement creates a legally binding contract between you and USA Gymnastics, Inc."). Membership in the Movement, including USAG, is a privilege, not a right. *Id.* Moreover, because the Movement is made up of private associations, not state actors, substantive due process protections do not apply to issues regarding membership and eligibility. *See, e.g., Behagen v. Amateur Basketball Ass'n of U.S.*, 884 F.2d 524, 531 (10th Cir. 1989) (holding that the U.S. Olympic Committee ("USOC")[3] and NGBs are private actors "to whom the [substantive] due process prohibitions of the Constitution [do not] apply."); *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 547 (1987) ("Because the USOC is not a governmental actor, the SFAA's claim that the USOC has enforced its rights in a discriminatory manner must fail.").

**The U.S. Center for SafeSport.**

The Center is an independent nonprofit organization responsible for investigating and resolving allegations of emotional, physical, and sexual abuse

---

[3] On June 20, 2019, the USOC was renamed as the United States Olympic and Paralympic Committee ("USOPC").

within the Movement.[4] Through the SafeSport Act, Congress provided that the Center shall "serve as the independent national safe sport organization and be recognized worldwide as the independent national safe sport organization for the United States." 36 U.S.C. § 220541(a)(1)(A).

The Center's mission is to safeguard "amateur athletes against abuse, including emotional, physical, and sexual abuse, in sports." § 220541(a)(1)(B). Congress directed the Center to "develop training, oversight practices, policies, and procedures to prevent the abuse, including emotional, physical, and sexual abuse, of amateur athletes participating in amateur athletic activities through national governing bodies." § 220541(a)(1)(C). The Act gives the Center broad discretion to resolve eligibility issues. It states, "[t]he Center may, in its discretion, utilize a neutral arbitration body and develop policies and procedures to resolve allegations of sexual abuse within its jurisdiction to determine the opportunity of any amateur athlete, coach, trainer, manager, administrator, or official, who is the subject of such an allegation, to participate in amateur athletic competition." § 220541(c)(1). The Act also expressly states that nothing in it can "give rise to a claim under State law or create a private right of action." § 220541(a)(2)(C); see also § 220541(d)(3)(B).

---

[4] Plaintiffs incorrectly state the Center was "created by the Ted Stevens Olympic and Amateur Sports Act…." ECF No. 1, PageID.5, ¶ 8, and that it is federally chartered. ECF No. 1, PageID.10, ¶ 26. The Center is a private 501(c)(3) and was created prior to enactment of any legislation. It is not federally chartered.

In furtherance of its mission, the Center created the SafeSport Code for the U.S. Olympic and Paralympic Movement ("the Code").[5] The Code establishes procedures whereby the Center investigates and resolves allegations that individuals in the Movement have violated the Code by engaging in sexual, emotional, or physical abuse. ECF No. 1-4, PageID.142-148. After completing an investigation, an investigator typically will prepare a report that "sets forth the investigator's findings of fact," including credibility findings. *Id.*, PageID.147. The Center then applies those factual findings to the Code (or rules and laws existing at the time of the misconduct) to determine whether a Code violation was established by a preponderance of the evidence. *Id.* If the Center determines a violation occurred, it will then determine what, if any, eligibility sanction should be imposed. *Id.* Sanctions can range from a written warning to permanent ineligibility. *Id.*, PageID.149-150. The Center can also impose temporary restrictions or measures on an individual's eligibility during the course of an investigation. *Id.*, PageID.148-149.

---

[5] Plaintiffs attached several exhibits to their Complaint, including the 2023 SafeSport Code for the Olympic and Paralympic Movement. These documents may be considered under Fed. R. Civ. P. 12(b)(6). *See In re Omnicare, Inc. Sec. Litig.,* 769 F.3d 455, 466 (6th Cir. 2014) ("[I]f a plaintiff references or quotes certain documents . . . a court can then consider them in resolving the Rule 12(b)(6) motion without converting the motion to dismiss into a Rule 56 motion for summary judgment.") (citation omitted). Also, "[w]hen a Rule 12(b)(1) motion attacks the factual basis for jurisdiction . . . the district court has broad discretion over what evidence to consider and may look outside the pleadings to determine whether subject-matter jurisdiction exists." *Adkisson v. Jacobs Eng'g Grp., Inc.,* 790 F.3d 641, 647 (6th Cir. 2015).

These can include travel restrictions, chaperone requirements, and even a suspension. *Id.* All these steps are part of the Center's methodology to determine the eligibility of individuals to participate in the Movement.

**Plaintiffs Sued the Center for Damages Because They Disagree with Its Adjudication Methodology and Eligibility Actions.**

All of Plaintiffs claims arise from their assertions that the Center (and its employee Ms. Cardosa) failed, or is currently failing, to properly adjudicate their alleged misconduct resulting in the Center incorrectly limiting their eligibility to participate in the Movement. A factual basis for nearly every claim is as follows: the Center "*never* embarked on an inquiry that followed the rules set forth in the Code or USAG Participant Welfare Policies – specifically, an objective evaluation of professionally accepted coaching techniques and practices that would have been covered under the exclusionary language of the Code – specifically ignoring any evaluation that would have been exculpatory in nature." ECF No. 1, PageID.19-20, ¶¶ 48-54 (emphasis added).

Plaintiff Nanci Moore claims this allegedly faulty adjudication methodology led to the Center incorrectly issuing a temporary measure and Notice of Decision against her suspending or limiting her eligibility to participate in sport. Plaintiff Alexis Moore claims this same allegedly faulty adjudication process led to the Center incorrectly issuing a Notice of Decision impacting her eligibility to participate in the Movement by placing her on probation.

8

First, a cursory review of the actual Notices of Decision in Plaintiffs' matters demonstrates that the entire factual predicate upon which Plaintiffs' Complaint rests is false.[6]

---

[6] As discussed below, in the context of a Rule 12(b)(6) motion a Court must normally accept well pled allegations as true. However, the Court need not do so if the allegation is provably false by Plaintiffs' own exhibits. This assessment can be made without converting a motion to dismiss to one for summary judgment where, as here, the relevant materials are attached to the Complaint and properly before the Court. *See supra,* footnote 5.





It is not surprising that Plaintiff Nanci Moore disagrees with the Center's eligibility decision. However, as discussed below, this Court is not the appropriate forum to litigate this issue because it does not have the jurisdiction to do so. Plaintiff must arbitrate these claims.[8]



---

[7] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████

[8] After issuance of the Notice of Decision, Plaintiff Nanci Moore requested an arbitration under the Code. ████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████ The Center withdrew its Notice of Decision and, upon completion of its investigation into these new allegations, it will issue a new Notice of Decision at which time Plaintiff Nanci Moore will have the opportunity to arbitrate all eligibility decision.

███████████████████████████████████████

████████████████████

This Court should not accept Plaintiffs' invitation to delve into the details of the allegations underlying the Center's investigation into their eligibility. *See, e.g., Michels v. United States Olympic Comm.*, 741 F.2d 155, 159 (7th Cir. 1984) (Posner, J., concurring) ("Any doubt on this score can be dispelled by the reflection that there can be few less suitable bodies than the federal courts for **determining the eligibility, or the procedures for determining the eligibility**, of athletes to participate in the Olympic Games." (emphasis added)). Moreover, allowing Plaintiffs' cases to proceed would open the floodgates to litigation against the Center and every courageous individual who comes forward to report abuse or voluntarily participates in the Center's process.

Under Plaintiffs' reasoning, every Respondent in every one of the thousands of cases the Center adjudicates could file a lawsuit against the Center before the Center has even completed its investigation and rendered a decision. This would bury the Center in endless litigation and undermine its ability to carry out is mission. *See Gilbert*, 2019 WL 10252758 at *6 ("[I]f SafeSport were subject to suit by every disappointed party in [the thousands of reports it investigates], it would lead to the 'avalanche of suits' that immunity must protect against." (quoting *Forrester v. White*, 484 U.S. 219, 226 (1988)).

12

## LEGAL STANDARD

Dismissal of Plaintiffs' complaint under Rule 12(b)(1) is appropriate where the Court lacks subject matter jurisdiction. A facial jurisdictional challenge "questions the sufficiency of the pleading" and a factual jurisdictional challenge requires the court to "weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist." *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990). A Rule 12(b)(1) factual-attack analysis does not require a presumption of truth with respect to the facts alleged in the complaint. *U.S. v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). Furthermore, a court may, on its own initiative, dismiss a complaint for lack of subject-matter jurisdiction under Rule 12(b)(1) where the allegations of the complaint are "totally implausible, attenuated, unsubstantial, frivolous, devoid of merit, or no longer open to discussion." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999).

Under Rule 12(b)(6), dismissal is appropriate where a plaintiff fails to state a claim upon which relief can be granted. "And '[a]lthough a court must construe a complaint's allegations in favor of the plaintiff, . . . and must accept all factual allegations as true, . . . the court need not accept legal conclusions or unwarranted factual inferences.'" *U.S. ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 409 (6th Cir. 2016) (internal citation omitted); *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007). "Nor does a complaint suffice if it tenders 'naked assertions[s]' devoid of further factual enhancement." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

Moreover, in the context of an antitrust suit, "antitrust standing and Article III standing are not one and the same, and we not only may—but we must—reject claims under Rule 12(b)(6) when antitrust standing is missing." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007). An antitrust plaintiff "must do more than make allegations of consequential harm resulting from a violation of the antitrust laws." *Id.* (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 545 (1983) (quotations omitted)). Even though a complaint may allege that the defendant had an intent to harm the plaintiff, district courts must still consider "[o]ther relevant factors—the nature of the [claimant's] injury, the tenuous and speculative character of the relationship between the alleged antitrust violation and the [claimant's] alleged injury, the potential for duplicative recovery or complex apportionment of damages, and the existence of more direct victims of the alleged conspiracy—weigh heavily against judicial enforcement." *Id.*

## ARGUMENT

### I.    Plaintiffs' Claims Should Be Dismissed Because Congress Expressly Dictated that the SafeSport Act Does Not Create a Private Right of Action.

All of Plaintiffs' claims arise from the Center and its employee Ms. Cardosa acting to protect athletes from abuse pursuant to the congressionally-mandated

14

duties under the SafeSport Act. *See, e.g.,* ECF No. 1, PageID.3-4, ¶ 1 ("The plaintiff's membership agreement with USAG triggered duties for all parties under 36 U.S.C. § 220541, and the Center breached those duties which directly and proximately caused substantial harm to the plaintiffs."). This same statute, however, repeatedly makes clear that Congress did *not* create a private right of action.

The SafeSport Act sets forth certain procedural due process rights that must be afforded each respondent in the Center's processes:

> (i)  the provision of written notice of the allegations against the individual;
> (ii)  a right to be represented by counsel or other advisor;
> (iii)  an opportunity to be heard during the investigation;
> (iv)  in a case in which a violation is found, a reasoned written decision by the Center; and
> (v)  the ability to challenge, in a hearing or through arbitration, interim measures or sanctions imposed by the Center.

36 U.S.C. § 220541(a)(1)(H). Plaintiffs' entire Complaint is based on the Center's alleged failure to provide this "procedural due process."

For example, Plaintiffs allege the Center failed to provide them with sufficient "notice" as required by the statute and they, therefore, did not get the "opportunity to be heard during the investigation" as required by the statute. Plaintiffs summarize their complaints in paragraph 61 of their Complaint:

> Receiving no formal discovery of claimant interviews, even with redactions, prior to the NOD, or prior to a Rule 40 Hearing, deprived Nanci and Alexis of their right to **Fair Notice and Opportunity during the investigative process**. The Notice of Allegation with only conclusory statements did not provide the necessary information for

counsel to mount a fair and equitable defense during the pendency of the investigative stage. Further, lack of more specifics regarding the allegations and attendant circumstances prejudiced Nanci and Alexis by not allowing the opportunity to produce expert testimony regarding allegations of abuses that are meant to be determined against an objective standard.

ECF No. 1, PageID.22, ¶ 61 (emphasis added); PageID.11, ¶ 31 (The Center's "Notice of Allegations … did not provide any degree of specificity from which Nanci and Alexis could adequately prepare for an interview or written response."); PageID.12, ¶¶ 34, 36, 37 (same); PageID.21, ¶ 60 ("No sufficient notice of the nature of the allegations, number of allegations, or relevant times or places were provided to either Nanci or Alexis until the Center issued its decision. Therefore, they could not truly be heard during the investigation as they did not know what information was necessary to aid in the investigation."); PageID.39, ¶ 111(c) ("The Center has failed to follow the procedures set forth in their own Code and the Act creating the Center, thereby breaching the duties between the parties.").

All of these complaints arise from the Center's purported failure to follow the requirements of the statute. However, in the very section of the SafeSport Act upon which Plaintiffs base their case, Congress expressly dictated that these provisions do not create a private right of action. 36 U.S.C. § 220541(a)(2) ("Nothing in this subsection shall be construed…to give rise to a claim under State law or to create a private right of action; or . . . to render the Center a state actor.").

Plaintiff Nanci Moore also alleges the Center's publication of her name in the Center's publicly available Centralized Disciplinary Database was defamatory. ECF No. 1, PageID.23, ¶ 64 ("The Center has repeatedly placed Nanci on public lists preventing or limiting her participation in sport as a coach . . . ."). However, the same subsection of the SafeSport Act discussed above requires the Center to "publish and maintain a publicly accessible internet website that contains a comprehensive list of adults who are barred by the Center." 36 U.S.C. § 220541(a)(1)(G). This provision is also subject to the same disclaimer of a private right of action. *See* § 220541(a)(2). As Congress understood, the Center would not be able to carry out its statutory mandate to protect sport, including through the publication of a "list of adults who are barred by the Center," if simultaneously that requirement gave rise to a right to sue the Center or its employees. The Center currently has over 1700 individuals listed in its database. Allowing each of these individuals to pursue lawsuits against the Center or its employees would severely impact the Center's ability to fulfill its critical mission.

Plaintiffs' also complain about the Center's and Ms. Cardosa's investigation methodology:

> Cardosa interviewed some Participating Entities, Nanci, and Alexis. She assigned the "credibility" rating to each. She chose not to interview other Participating Entities, but instead relied upon manifestly unprofessional statements collected by an investigator who had been removed from the investigation previously. **Interviewers in the investigation employed improper methodology** by testifying on

17

> behalf of witnesses, providing legal advice to complainants, lack of basic understanding of the underlying facts, and many other unfair practices likely to gather false information from Participating Entities and draw inherently unreasonable conclusion from the facts.

ECF No. 1, PageID.33-34, ¶ 89 (emphasis added). However, the same section of the SafeSport Act discussed above, expressly requires the Center to "establish mechanisms that allow for the reporting and investigation of alleged violations of [the Center's] policies and procedures…." 36 U.S.C. § 220541(a)(1)(D). Hence, the Center's execution of these statutory obligations cannot form the basis of a claim under state law.

Importantly, all of Plaintiffs' claims fail as a matter of law regardless of the theory under which they are brought. For example, in *Lee v. U.S. Taekwondo Union*, 331 F. Supp. 2d 1252, 1257 (D. Haw. 2004), plaintiff brought state law claims, including ultra vires activity, breach of contract, breach of implied contract, and tortious interference with contract arguing that he was wrongfully removed as the team coach because of his Korean ancestry. *Id.* at 1258. He sought, among other things, injunctive relief, including reinstatement to the team. *Id.* The court held plaintiff could not bring his claims in federal court because Congress did not intend to create a private right of action in the Amateur Sports Act: "[Lee's claims] challenge the method by which Lee was removed as coach and another person was named as coach. Lee has no right to bring such a challenge in court." *Id.* at 1257 (citations omitted). The court concluded:

> [T]he USOC may be sued only with respect to matters not arising under
> the Amateur Sports Act, such as, for example, with respect to a dispute
> over a lease that the USOC may have signed with the landlord of its
> offices. Given this express statutory statement that Congress did not
> intend to create a private right of action under the Amateur Sports Act,
> Lee has no private right of action under that Act.

*Id.* The court applied this analysis to all of Lee's state law claims because they

essentially attacked the USOC's statutorily mandated duties to determine eligibility.

*Id.* ("[T]he Amateur Sports Act not only preempted eligibility challenges brought

directly under it, but other state law causes of action that essentially sought relief

based on the athlete's eligibility.").

For the same reasons, Plaintiff Nanci Moore's request for injunctive relief to

enjoin the Center from completing its investigation into the allegations of her

misconduct, ECF No. 1, PageID.66, ¶ C, is legally barred. An injunction would

infringe on the Center's congressionally mandated duties to investigate and

adjudicate the eligibility of individuals who have allegedly engaged in sexual,

emotional, and physical misconduct within the Movement. As the Court stated in

Lee:

> To the extent Lee is asking this court to name him the coach of the 2004
> United States Taekwondo Team as a remedy for the alleged violation
> of § 1981, Lee is asking the court to infringe on the USOC's exclusive
> jurisdiction regarding all matters pertaining to participation in the
> Olympic Games. The court will not do this.

*Lee*, 331 F. Supp. 2d at 1260 n.2.

Here, Plaintiffs complain that the Center did not follow a proper methodology in investigating the allegations of their misconduct, should not have issued decisions impacting their eligibility to participate in the Movement, and should not have published them in the database. These are all complaints about the Center's execution of its statutory duties as set forth in the SafeSport Act, which Congress has expressly stated do not give rise to a private right of action. Accordingly, Plaintiffs claims should all be dismissed.

## II.   Plaintiffs' Claims Are Preempted by the Amateur Sports Act and This Court Does Not Have Jurisdiction to Re-Adjudicate the Center's Eligibility Decisions.

It is well settled that state law challenges to "questions of athletes' eligibility [under the Amateur Sports Act] are preempted." *Slaney v. Int'l Amateur Ath. Fed.*, 244 F.3d 580, 594-96 (7th Cir. 2001). "Allowing coaches or athletes to litigate eligibility in court" would "conflict with a principal purpose of the [Amateur] Sports Act: establishing uniform eligibility standards and a comprehensive mechanism for the prompt resolution of disputes outside the judicial process." *Pliuskaitis v. USA Swimming, Inc.*, 243 F. Supp. 3d 1217, 1227 (D. Utah 2017), aff'd on other grounds, 720 F. App'x 481 (10th Cir. 2018); *Walton–Floyd v. United States Olympic Comm.*, 965 S.W.2d 35, 40 (Tex. App. 1998) ("The interest of maintaining consistent interpretations among jurisdictions requires the Act to pre-empt claims asserted under state tort law. To hold a common law duty exists outside the scope of the Act,

20

thereby enabling an individual athlete to bring suit, threatens to override legislative intent and opens the door to inconsistent interpretations of the Act."). This same reasoning has been extended to the Center's investigatory and adjudicatory processes. *See Sanderson,* 2021 WL 3206322, at *4.

In *Sanderson*, the Center temporarily suspended plaintiff from participation in the Movement and imposed temporary measures limiting his travel and requiring a chaperone. *Id.* at *1-2. Plaintiff sued the Center seeking injunctive relief and damages "for breach of contract and retaliation against SafeSport." *Id.* at *2. The court determined that, because Congress had vested such processes and decisions solely with the Center, it did not have jurisdiction to interfere with the method by which the Center determined eligibility.  As the court explained:

> [C]ourts routinely find that the Amateur Sports Act preempts not only eligibility challenges brought directly under the Act, but state-law causes of action that essentially seek relief based on the athlete's eligibility. *See, e.g., Slaney v. Int'l Amateur Ath. Fed'n,* 244 F.3d 580, 596 (7th Cir. 2001); *Pliuskaitis v. USA Swimming, Inc.*, 243 F. Supp. 3d 1217, 1225 (D. Utah 2017) (dismissing the plaintiff's state-law claims for, inter alia, breach of contract and the duty of good faith and fair dealing, as the claims went "to the heart of his eligibility to coach and [were] thus preempted by the [Amateur] Sports Act."), *aff'd sub nom. Pliuskaitis v. USA Swimming,* 720 F. App'x 481 (10th Cir. 2018) and *Graham v. U.S. Anti-Doping Agency*, No. 5:10-CV-194-F, 2011 WL 1261321, at *5 (E.D.N.C. Mar. 31, 2011) (concluding the plaintiff's claims, styled as claims for constitutional violations and slander, actually challenged the plaintiff's eligibility and, therefore, fell outside of the court's jurisdiction).
>
> Therefore, Plaintiff "cannot escape the fact that [his] state-law claims ... **are actually challenges to the method by which [SafeSport and]**

**the USO[P]C determine[ ] eligibility of athletes.**" *Slaney*, 244 F.3d at 596. Accordingly, as eligibility determinations fall within the exclusive parameters of the Amateur Sports Act, this court lacks jurisdiction to hear Plaintiff's claims. *See Graham*, 2011 WL 1261321 at *5.

*Sanderson*, 2021 WL 3206322, at *3-4 (emphasis added).

Similarly, in *Slaney*, an athlete brought state law claims against the USOC, seeking damages for its "administration of its drug testing program, and specifically 'the [alleged] unlawful manner in which the USOC conducts its doping program….'" *Slaney*, 244 F.3d at 596. The court held that her state law claims were preempted:

> Slaney cannot escape the fact that her state-law claims, whether framed as breach of contract, negligence, breach of fiduciary duty, fraud, constructive fraud, or negligent misrepresentation, **are actually challenges to the method by which the USOC determines eligibility of athletes**. . . . Thus, the district court was correct in determining that it lacked subject matter jurisdiction over Slaney's state-law claims against the USOC and thus in dismissing those causes of action pursuant to Fed. R. Civ. P. 12(b)(1).

*Id.* at 596 (emphasis added).

Here, Plaintiffs sued the Center because they disagree with the methods the Center used to adjudicate their eligibility to remain in sport. As the *Sanderson* court held, there is no federal jurisdiction to question the Center's methods or its eligibility decisions because Congress dictated that such decisions fall exclusively in the Center's purview.

These concerns are heightened here because the Center's has an *ongoing open* investigation into Plaintiff Nanci Moore. By filing suit against the Center prior to exhausting her administrative remedies (*see infra*) she is seeking to force the Center to litigate this matter twice: through a likely upcoming arbitration and simultaneously in this Court. Moreover, Plaintiff Alexis Moore has already had her "day in court" and presented all these same arguments to an arbitrator. Now, the Center is having to relitigate the very same matters.

Finally, allowing Plaintiffs to sue individuals who reported misconduct to the Center or who are currently voluntarily participating in the Center's process would be unconscionable. The Center has no subpoena power and cannot compel Claimants or witnesses to participate in its processes. These individuals have nothing to gain from participation other than the hope to make sport safer. Allowing Plaintiffs to sue these individuals, particularly while an investigation is ongoing, will effectively end the Center's ability to fulfill its mission. If individuals can be sued for reporting misconduct or voluntarily participating in the Center's process—the exclusive process to address eligibility to participate in sport—no one will participate. In fact, the Center reasonably anticipates that it will have difficulty gaining voluntary participation of Claimants and witnesses in any future arbitration with Plaintiff Nanci Moore because they are being sued or are under threat of litigation if they participate. The processes established by Congress and the Center are intended to

23

prevent such intimidation tactics, and this Court cannot provide the venue for them to do so.

## III. The Center Is Immune from Lawsuits Regarding Its Eligibility Decisions.

The Center and Ms. Cardosa are immune from damages actions related to the exercise of the Center's adjudicatory or prosecutorial functions. *See Gilbert,* 2019 WL 10252758, at *7. In *Gilbert*, plaintiffs sued the Center alleging the Center failed to properly "prosecute" claims against a third party who allegedly harmed them. *Id.* at *5 ("Plaintiffs claim that, as a result of SafeSport's decision to reinstate [third party], their reputations were injured … and they suffered emotional and mental distress…."). In dismissing the action, the Court stated:

> Applying the functional approach, I find that Plaintiffs challenge SafeSport's role as a 'prosecutor' of alleged sexual abuse in that they allege SafeSport failed or refused to 'pursu[e] the case against [Respondent]…. I find SafeSport's decision is akin to that as a 'prosecutor' closely associated with the judicial process, and SafeSport is protected by absolute immunity from liability for its decision…. Prosecutorial immunity protects a prosecutor's decision to bring, or not bring, charges against an individual.

*Id.* at *6. As the court noted, immunity extends to all aspects of the prosecutorial function. *Id.* at *4 ("Although the passage contemplates a civil lawsuit by an individual who the prosecutor charged but failed to convict, the reasoning also applies if alleged victims of the person charged could bring a civil suit against the prosecutor when he decided to dismiss the charges.").

In reaching its decision, the *Gilbert* court explained the need for absolute immunity is at its peak where lawsuits "would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.* at \*6 (quoting *Imbler v. Pachtman*, 424 U.S. 409, 423 (1976)). This concern is particularly relevant here because Congress expressly indicated that the Center shall act as an independent body. *See* 36 U.S.C. § 220541(a)(1)(A) (Congress directed that the Center "serve as the *independent* national safe sport organization and be recognized worldwide as the *independent* national safe sport organization for the United States." (emphases added)). To carry out this critical mandate, the Center must "be at liberty to exercise [its] functions with independence and without fear of" facing damages lawsuits by one side or the other. *Pierson v. Ray*, 386 U.S. 547, 554 (1967).

Moreover, "if SafeSport were subject to suit by every disappointed party in [the thousands of reports it receives], it would lead to the 'avalanche of suits' that immunity must protect against." *Gilbert,* 2019 WL 10252758, at \*6 (quoting *Forrester v. White*, 484 U.S. 219, 226 (1988)). Requiring the Center to divert its limited resources to litigate eligibility decisions in court would undermine its ability to "safeguard[] amateur athletes against abuse, including emotional, physical, and sexual abuse, in sports." 36 U.S.C. § 220541(a)(1)(B). As the *Gilbert* court stated,

25

"SafeSport simply cannot effectively serve its purpose of protecting amateur athletes if it is subject to the threat of liability for every eligibility decision it makes." *Gilbert*, 2019 WL 10252758, at *6.

Here, in violation of these principles that were clearly laid out in *Gilbert*, Plaintiffs sued the Center and Ms. Cardosa because they disagree with the methods Defendants used to adjudicate their eligibility to participate and the Center's ultimate decisions on those issues. Absolute immunity is "essential" to protecting the Center's "decision-making process from reprisals by dissatisfied litigants." *Pfannenstiel v. Merrill Lynch, Pierce, Fenner & Smith*, 477 F.3d 1155, 1158 (10th Cir. 2007). The claims should be dismissed.

## IV.    The Court Lacks Jurisdiction Over Plaintiff Nanci Moore's Claims Because She Has Failed to Exhaust Her Administrative Remedies.

Plaintiffs' contracts with USAG require them to "agree and be bound by…all other policies and procedures promulgated by USA Gymnastics including all rules, policies or procedures whether published by the USOPC, the Center, or USA Gymnastics." ECF No. 1-3, PageID.109. One of these policies they agreed to is the Code. Under the Code, binding arbitration is the sole process through which individuals in the Movement (like Plaintiffs) can challenge the Center's adjudicatory actions and decisions, including Plaintiffs' complaints about the Center's processes. The Code provides as follows:

> Each Participant, by virtue of membership, affiliation, or participation or other activity making them subject to the jurisdiction of the Center, agrees to abide by and be subject to these Arbitration Rules as the sole and exclusive method of resolving any challenge to the Center's eligibility decision(s) or the Center's processes.

ECF No. 1-4, PageID.151; *see also* 36 U.S.C. § 220541(c)(1). Under the Code, when the Center imposes a temporary measure, individuals, such as Plaintiff Nanci Moore, have a right to a prompt arbitral hearing upon request. ECF No. 1-4, PageID.163, Rule 40(a). Such a hearing can, among other things, address the "Center's processes" and "allegations that the Center failed to follow its procedures." *Id.*, PageID.164, Rule 40(d)(iii).

As noted in the Complaint, on or about April 14, 2023, the Center issued an Amended Notice of Allegations and imposed a temporary measure on Plaintiff Nanci Moore, suspending her. ECF No. 1, PageID.20, ¶ 55. Plaintiff requested relief from the suspension to continue training her athletes who were preparing for a major event. *Id.*, PageID.21, ¶ 57. The Center agreed to allow her to coach subject to continuing temporary measures, including that she only coach while under supervision of another qualified adult, *i.e.,* the Center kept a temporary measure in place limiting her eligibility to participate. *Id.* To date, Plaintiff has not requested a hearing on the Notice imposing these measures and she remains under this temporary measure. Plaintiff could have requested such a hearing at any time after issuance of the Notice, including to this day. *See* ECF No. 1-4, PageID.163, Rule 40(a) (a

hearing can be requested "[a]t any time after Notice of a Temporary Measure Notice of Allegations and Temporary Measures…."). The Notice informs Plaintiff of her right to request a hearing and sets forth the steps to do so. And Plaintiff is clearly aware of this right, as she has requested hearings in the past. Rather than request this hearing, she inappropriately filed this action.

As Plaintiff Nanci Moore had (and still has) administrative remedies available to her under the Code to air her grievances, this action should be dismissed for her failure to exhaust those administrative remedies. *See, e.g., Callaghan v. U.S. Center for Safe Sport*, No. 2:18-cv-336-FtM-99CM, 2018 WL 4107951, at *5 (M.D. Fla. Aug. 29, 2018) (dismissing complaint for failure to exhaust administrative remedies in the context of a temporary measure, including "Plaintiff's procedural concerns raised in this lawsuit.").

Moreover, when the Center completes its re-opened investigation into Plaintiff Nanci Moore, it will issue an Amended Notice of Decision. If the Center determines in the Amended Notice of Decision that a sanction is appropriate, Plaintiff Nanci Moore will have the obligation to arbitrate that decision. There, she can then raise and adjudicate her claims that the Center's methods of investigation were unsound, that she was not provided proper notice, and, ultimately, that the Center reached the wrong decision on eligibility–all claims she has wrongfully filed here. Under the Code, to which Plaintiff Nanci Moore agreed to be bound when she

contracted with USAG, she must arbitrate those claims, and this Court does not have jurisdiction to adjudicate them.

**V.    Plaintiff Alexis Moore's Claims Should Be Dismissed – Her Sole Remedy, If There Is One, Is to File an Action Under the Federal Arbitration Act.**

As noted above, Plaintiffs, through their contract with USAG, agreed to arbitrate their claims involving the Center and its Code. This includes any claims that the Center failed to provide proper notice, failed to apply the applicable rules of evidence, failed to properly weigh evidence and credibility, and, ultimately, that the Center reached the wrong decision on eligibility. In her arbitration, Plaintiff Alexis Moore had the opportunity to, and did, in fact, raise all these issues–the same issues she now seeks to litigate in this Court. If Plaintiff Alexis Moore is now critical of the manner in which the Arbitrator addressed those issues, the same issues she raises here, her sole remedy, if any, is to file an action under the FAA seeking to modify or vacate the Arbitrator's Decision. The law does not permit her to re-litigate issues in this Court that were presented to the Arbitrator.

**VI.    Each of Plaintiffs' Claims Against the Center Independently Fail as a Matter of Law.**

All of Plaintiffs' claims fail under the analyses above and should be dismissed. In addition, each of Plaintiffs' claims independently fail as a matter of law.

**A.    Plaintiffs' Contract Claims Fail as They Do Not Allege a Contract with the Center and Certainly not Ms. Cardosa (Claim I – against the Center and Ms. Cardosa).**

Plaintiffs claim the Center and Ms. Cardosa breached an alleged contract between themselves and the Center "to follow procedural and due process requirements regarding claims made against them" and engaged in a "dilatory and unprofessional" investigation.[9] ECF No. 1, PageID.39-41, ¶¶ 110-112. However, Plaintiffs fail to identify any contract with the Center or Ms. Cardosa where those contractual promises were allegedly made.

From the face of the Complaint, it is evident Plaintiffs have a contract with USAG. *See id.*, PageID.9-10 ¶ 25 (outlining Membership Agreement); *see also* ECF No. 1-3, PageID.109 ("This Agreement creates a legally binding contract between you and USA Gymnastics, Inc."). Under the Membership Agreement *with USAG*, Plaintiffs agreed to submit to the jurisdiction of the U.S. Center for SafeSport, among other entities. *Id.* ("You agree to and do hereby submit to the jurisdiction of USA Gymnastics, the U.S. Center for SafeSport ("Center") . . . ."). Plaintiffs also agreed as follows:

> You have read and agree to be and are bound by the USA Gymnastics Bylaws, all other policies and procedures promulgated by USA Gymnastics <u>including all rules, policies or procedures whether published by the USOPC, the Center</u>, or USA Gymnastics. You further agree to comply with all applicable state, federal, and local laws. Any disciplinary measure imposed by the USOPC, the Center or USA Gymnastics extends to your participation in all aspects of the Olympic & Paralympic Movement.

---

[9] This latter allegation is based on Plaintiffs' demonstrably false premise that the Center failed to apply the "professionally accepted coaching technique" exception when analyzing whether they engaged in emotional or physical abuse.

*Id.* (emphasis added). Plaintiffs are subject to the jurisdiction of the Center and its Code through their contract *with USAG*.[10]

Plaintiffs fail to allege any contractual agreement between themselves *and the Center or Ms. Cardosa* where these alleged contractual promises are made. Plaintiffs fail to describe even the most basic elements of such a contract, including when the alleged agreement was made, what law governs the contract, the term of the alleged contract, where the agreement was made, who made the agreement, what are the express terms of the alleged agreement, and what consideration was provided. *See, e.g., Arora v. Henry Ford Health Sys.,* No. 2:15-CV-13137, 2017 WL 4119946, at *4 (E.D. Mich. Sept. 18, 2017), aff'd, No. 17-2252, 2018 WL 3760888 (6th Cir. July 9, 2018) (dismissing plaintiff's breach of contract claim where the alleged contract lacked "the elements of a contract like the names of parties to the contract, legal consideration, mutuality of agreement, or mutuality of obligation.").

Ms. Cardosa is even one step further removed. Ms. Cardosa is an employee of the Center, a non-profit corporation. She is one of dozens of investigators employed by the Center. The employees of corporations could not possibly, solely through their employment with the corporation, have contracts with every person with whom the corporation interacts. Plaintiffs' claim for breach of contract against

---

[10] The USAG contract is governed by Indiana law. ECF No. 1-3, PageID.114.

31

Ms. Cardosa fails for the same reasons set forth above: lack of the basic elements of a contract.

To the extent Plaintiffs attempt to argue the Code forms an independent contract with the Center or Ms. Cardosa, this also fails. The Code is incorporated by reference into Plaintiffs' contracts with USAG. But this does not create a contractual relationship between Plaintiffs and the Center any more than the USAG contract incorporating "all applicable state, federal, and local laws" creates a contract between the Plaintiffs and state, federal, and local governments.

Moreover, Congress expressly required the Center to create the policies and procedures making up the Code and then incorporated that Code into the statute governing the NGBs, such as USAG. 36 U.S.C. § 220541(b) ("The policies and procedures developed under subsection (a)(1)(C) shall apply as though they were incorporated in and made a part of section 220524 of this title."). It is also through this statute that the Code is applied through the NGBs to Plaintiffs.

## B.   Plaintiffs' "Respondeat Superior" Claim  Is Not a Claim (Claim II – against the Center).

Plaintiffs' claim entitled "Respondent Superior" is not an independent claim for relief but rather a common law doctrine whereby an employer may be vicariously liable for the negligent acts of an employee, and this "claim" should be dismissed. *See, e.g., Arora*, 2017 WL 4119946, at *6 (dismissing claim because "[r]espondeat superior is not an independent cause of action, but rather a basis for a principal's

32

vicarious liability for its agents' actions."); *360 Const. Co. v. Atsalis Bros. Painting Co.*, 915 F. Supp. 2d 883, 894 (E.D. Mich. 2012) ("[T]here is no independent cause of action for *respondeat superior*, which is the label the plaintiff placed on count VII of the second amended complaint. That count will be dismissed as well.").

### C.     Plaintiff's Negligent Supervision Claim Fails for Lack of a Tort Duty (Claim III – against the Center).

Negligent supervision, like all negligence claims, requires proof of a duty. *Prime Rate Premium Fin. Corp. v. Larson*, 226 F. Supp. 3d 858, 870 (E.D. Mich. 2016). "Whether a defendant owes a plaintiff a duty of care is a question of law decided by the circuit court." *Hill v. Sears, Roebuck & Co.*, 822 N.W.2d 190, 195 (Mich. 2012). Here, Plaintiffs do not establish the Center owed them a duty and, therefore, their tort-duty based claim should be dismissed.

Although it is difficult to discern the basis for this claim, it appears Plaintiffs are alleging the Center had a duty to protect them from Ms. Cardosa "using a non-objective standard while reviewing allegations of physical and emotional misconduct." ECF No. 1, PageID.42, ¶ 119. However, because the Center must adjudicate *conflicting* interests in every case, its legal duties cannot run to any particular party. Congress required that the Center exercise *independent discretion*, so that the Center can adjudicate claims of parties with opposing interests (Claimants and Respondents). *See* 36 U.S.C. § 220541(a)(1)(A) (Congress directed that the Center "serve as the *independent* national safe sport organization and be recognized

worldwide as the *independent* national safe sport organization for the United States."
(emphases added)). Courts are most likely to find "no-duty" where the challenged
action involves "a discretionary determination of the sort insulated from review."
Restatement (Third) of Torts: Phys. & Emot. Harm § 7, cmt. g (2010) (explaining
"Deference to discretionary decisions of another branch of government" (italics
omitted)). For example, one court cautioned against imposing tort law duties where
doing so "could result in adversarial relationships" due to "conflicting duties and
loyalties." *Baker v. Wood, Ris & Hames, P.C.*, 364 P.3d 872, 877 (Colo. 2016)
(explaining why attorneys owe no duties to will beneficiaries).

Accordingly, the Center does not owe a legal duty of care, *enforceable in a
tort lawsuit for damages*, to individuals (whether Claimants or Respondents) whose
claims and defenses it is adjudicating. Recognition of such a duty arising from every
action and decision the Center issues could literally bury the Center in lawsuits. For
this reason, Plaintiffs' negligent supervision claims fail.

### D. Plaintiffs' Tortious Interference with Business and Contract Claims Fail as a Matter of Law (Claims IV & V - against the Center, Ms. Cardosa, and Participating Entity 3).

By definition, tortious interference with a contract or business relationship are
intentional torts. Indeed, it is well-settled that "'[o]ne who alleges tortious
interference with a contractual or business relationship must allege the intentional
doing of a per se wrongful act or the doing of a lawful act with malice and unjustified

in law for the purpose of invading the contractual rights or business relationship of another.'" *Derderian v. Genesys Health Care Sys.,* 689 N.W.2d 145, 157-58 (Mich. Ct. App. 2004) (quoting *CMI Int'l, Inc. v. Intermet Int'l Corp.,* 649 N.W.2d 808 (Mich. Ct. App. 2002)). Plaintiffs have failed to plead any of these requisites.

> Plaintiffs' claims are summarized in their Complaint as follows:

> The Center interfered with the contractual obligation USAG owed to both Nanci and Alexis to apply uniform rules and regulations by conducting such a dilatory investigation and failing to investigate the claims made in a professionally acceptable or just manner. By accepting conclusory statements and refusing to apply objective standards, the Center harmed both plaintiffs and violated the business relationship intended to exist between them and USAG, as well as the Bay Valley Academy, and with their athletes/parents.

ECF No. 1, PageID.44, ¶ 122(g). These allegations are insufficient.

As to the first factor, a "'per se wrongful act' is an act that is inherently wrongful or one that is never justified under any circumstances." *Formall v. Community Nat'l Bank*, 421 N.W.2d 289, 293 (Mich. Ct. App. 1988). Plaintiffs fail to allege the Center or Ms. Cardosa (or Participating Entity 3), engaged in any act that is inherently wrongful or never justified under any circumstances. The actions by the Center and Ms. Cardosa in carrying out their statutorily-mandated duties to investigate and adjudicate misconduct, even if in an allegedly "unprofessional" manner, cannot be deemed a "per se wrongful act".

Plaintiffs also fail to allege "specific, affirmative acts" that were "done with malice" or "improper motive" that led to any tortious interference. *BPS Clinical*

*Lab'ys v. Blue Cross & Blue Shield of Michigan*, 552 N.W.2d 919, 925 (Mich. Ct. App. 1996) (citing *Feldman v. Green*, 360 N.W.2d 881 (Mich. Ct. App. 1984) ("To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference.")); *see also Formall, Inc.,* 421 N.W.2d at 293 ("Improper means illegal, unethical, or fraudulent.").

Here, Plaintiffs allege the Center and Ms. Cardosa interfered by conducting a "dilatory investigation and failing to investigate the claims made in a professionally acceptable or just manner." As a matter of law, these allegations fail to rise to the level of "specific, affirmative act" that were "done with malice" or "improper motives."

Plaintiffs further fail to allege, as required, that the Center or Ms. Cardosa took action *with the specific intent to induce USAG, Bay Valley, and other gymnasts to breach their contracts with Plaintiffs*. It is not sufficient to allege the Defendants' actions caused injury to Plaintiffs' business. Rather, they must identify "specific, affirmative acts" that reflect the Defendants' *purpose* was to induce these parties to breach their contracts or to interfere with business relations. *Mersen USA--Midland-MI, Inc. v. Graphite Machining Servs. & Innovations, LLC*, No. 12-10961, 2013 WL 3242948, at *3 (E.D. Mich. June 26, 2013) ("[A]s applied by Michigan courts, a party's knowledge that its conduct may interfere with another's business

expectancies is insufficient to support a claim for tortious interference. Instead, interference must be the party's intended purpose."); *see also Pedell v. Heartland Health Care Ctr.*, No. 271276, 2007 WL 840876, at *9 (Mich. Ct. App. Mar.20, 2007) (must allege defendants "did so in order to interfere with his business expectancies."). Plaintiffs have not come close to alleging this because it simply is not true.

The Center has investigated and issued decisions on thousands of cases. The Center's purpose is set forth in statute: "safeguarding amateur athletes against abuse, including emotional, physical, and sexual abuse, in sports." 36 U.S.C. § 220541(a)(1)(B). All the Center can do is limit an individual's eligibility to participate in the private associations making up the Movement. It stretches the imagination to argue that the Center or Ms. Cardosa acted with the specific purpose of inducing anyone to breach their contract with Plaintiffs, and, more importantly, Plaintiffs have failed to allege any specific affirmative acts demonstrating such an intent. *See BPS Clinical Labs.*, 552 N.W.2d at 925 ("Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference.").

Finally, a tortious interference claim requires that a plaintiff must, at a minimum, allege a third-party contract was breached or a business expectancy was

37

lost. Yet, Plaintiffs fail to allege any of these third-parties actually breached their contracts or that business relations were lost.

As noted above, USAG's contract with Plaintiffs expressly states USAG can and will enforce any decisions of the Center. ECF No. 1-3, PageID.109. Accordingly, there is no breach of contract where USAG is simply enforcing a contractual provision. Moreover, USAG, like the Center, has a statutory right to determine eligibility to participate in its private association, and its decisions to do so are preempted from review under the Amateur Sports Act. *See Lee*, 331 F. Supp. 2d at 1257. Thus, no claim for breach against USAG would stand. These claims should be dismissed.

### E. Plaintiffs' Have Failed to Plead Claims for Defamation and Invasion of Privacy (Claims VI & VII – against the Center, Ms. Cardosa, and Participating Entity 3).

A claim for defamation under Michigan law requires the plaintiff to allege a false and defamatory statement regarding the plaintiff, a communication to a third party that is not privileged, fault on the part of the publisher that amounts to at least negligence, and either special harm caused by the publication or actionability of the statement regardless of special harm, otherwise known as defamation per se. *Smith v. Anonymous Joint Enterprise*, 793 N.W.2d 533 (Mich. 2010). Invasion of privacy claims are evaluated under largely the same legal standards. *See Reighard v. ESPN,*

*Inc.*, 991 N.W.2d 803, 818 (Mich. Ct. App. 2022) ("[D]efamation and false-light invasion-of-privacy claims are governed by the same legal standards….").

Plaintiffs' claims fail for at least three reasons: (1) there is no private right of action against the Center or Ms. Cardosa when they are fulfilling express statutory obligations; (2) Plaintiffs have failed to identify any specific false statement to form the basis of their defamation or invasion of privacy claims; and (3) Congress has provided specific immunity protection against defamation and invasion of privacy suits.

First, to the extent Plaintiff Nanci Moore's claim is based on the Center's Centralized Disciplinary Database, Congress has expressly disclaimed such actions. A key part of the Center's congressional mandate is to provide notice to the public of those persons who have been rendered ineligible to participate in the Movement. In fact, Congress requires the Center to publish such a database. *See* 36 U.S.C. § 220541(a)(1)(G) (requiring the Center to "publish and maintain a publicly accessible internet website that contains a comprehensive list of adults who are barred by the Center…."). In this same statutory section, Congress mandated that the Center's publishing of such data could  not "give rise to a claim under State law or to create a private right of action." 36 U.S.C. § 220541(a)(2)(C); *see also Nothstein v. USA Cycling*, 499 F. Supp. 3d 101, 120 (E.D. Penn. Nov. 5, 2020) (concluding that defendant NGB was immune from liability for its placement of the plaintiff on a list

of suspended athletes because the placement arose "from the execution of the responsibilities or functions described in the [SafeSport Act].").

Second, Plaintiffs fail to identify any specific false and defamatory *statement* that forms the basis for these claims. Plaintiffs only state the Center and Cardosa "alleged facts, that if true, would be a violation of Michigan law." ECF No. 1, PageID.48-49, ¶¶ 130(a), 131(a). They do not identify what the statements were, how they were false, nor where or to whom they were allegedly published. This lack of specificity prevents the Court from determining "as a matter of law whether a statement is actually capable of defamatory meaning." *Reighard,* 991 N.W. 2d at 812 (internal citation omitted). It is not for the Center and Cardosa, nor the Court, to solve Plaintiffs' pleading deficiencies. This claim should simply be dismissed.

Moreover, to the extent Plaintiff Nanci Moore's defamation and invasion of privacy claims are based upon being "placed on the Database[11] under restriction," ECF No. 1, PageID.48, ¶ 130(b), the statement that she was "under restriction" is indisputably true and, therefore, cannot form the basis of a defamation claim. While she may disagree with the Center's investigation, findings, and publishing of those results, she must concede the Center truthfully published its findings.

---

[11] The Center's Centralized Disciplinary Database can be accessed at: https://uscenterforsafesport.org/response-and-resolution/centralized-disciplinary-database/

To the extent Plaintiff Alexis Moore's defamation and invasion of privacy claims are based upon the Center "determin[ing] that Alexis would be required to self-report to her peers that she was coaching under restrictions," ECF No. 1, PageID.48 ¶ 130(c), this also is true and cannot form the basis of a defamation claim. Moreover, to the extent she, herself, made a statement to a third party (something she does not allege), that would not be a statement made by the Center nor Ms. Cardosa. Plaintiff Alexis Moore may disagree with the Center's investigation and findings, but she fails to identify any statement published by the Defendants to a third party that was false.

Third, Congress has determined that the Center, Ms. Cardosa, and the Participating Entities all have immunity from defamation and invasion of privacy claims, absent specific factual allegations demonstrating actual malice. Recognizing that the Center's actions in furtherance of its mission to end abuse might subject the Center to frivolous liability lawsuits, Congress sought "[t]o minimize the risk to the Center of litigation arising from actions performed in the course of the investigation, adjudication, and sharing of information of abuse allegations[.]" S. Rep. No. 115-443 at *2. Congress provided the following explicit "Limitation on liability" for the Center, its employees, and those participating in its processes:

> Except as provided in paragraph (2) [regarding actual malice], an applicable entity shall not be liable for damages in any civil action for defamation, libel, slander, or damage to reputation arising out of any action or communication, if the action arises from the execution of the

41

> responsibilities or functions described in this section, section 220542,
> or section 220543.

36 U.S.C. § 220541(d)(1) (emphasis added). Congress envisioned the protection on

liability would "extend not only to actions for defamation, libel, slander, or damage

to reputation, but also to related actions, including, but not limited to, false light,

intrusion upon seclusion, tortious interference, and abuse of process." S. Rep. No.

115-443 at *3. The Center, Ms. Cardosa, and the Participating Entities are all

"applicable entities" under this statute. 36 U.S.C. § 220541(d)(4) (A, F, G).

Congress did provide an exception to immunity from damages if an applicable

entity acted with "actual malice." 36 U.S.C. § 220541(d)(2). However, "[t]here is a

presumption that the Center…, or officers, employees or agents thereof act pursuant

to their duties...and without actual malice." S. Rep. No. 115-443 at *4. Absent some

showing of actual malice, the Center, Ms. Cardosa, and the Participating Entities are

immune from damages for defamation or invasion of privacy "arising out of any act

or communication" associated with the Center's processes. *See Harris v. U.S. Center

for SafeSport*, No. 4:22-cv-01063, 2023 WL 2072394, *3 (E.D. Mo. Feb. 17, 2023)

(dismissing complaint against Center for publication on the Centralized Disciplinary

Database because Center is immune from defamation claims and plaintiff failed to

plead "any factual allegations from which the Court could reasonably infer

Defendant acted with actual malice."

The Michigan Court of Appeals has defined "actual malice" as follows:

42

Actual malice is defined as knowledge that the published statement was false or as reckless disregard as to whether the statement was false or not. Reckless disregard for the truth is not established merely by showing that the statements were made with preconceived objectives or insufficient investigation. Furthermore, ill will, spite or even hatred, standing alone, do not amount to actual malice. "Reckless disregard" is not measured by whether a reasonably prudent man would have published or would have investigated before publishing, but by whether the publisher in fact entertained serious doubts concerning the truth of the statements published.

*Ireland v. Edwards*, 584 N.W.2d 632, 640 (Mich. Ct. App. 1998) (internal citation omitted). Moreover, in Michigan, a plaintiff "bears the burden of showing actual malice by clear and convincing evidence." *Id.* at 637.

Plaintiffs have failed to allege any facts that show Defendants acted with actual malice, much less sufficient facts to overcome the strong presumption that the Center and Ms. Cardosa acted *without malice*. As to the Center, the Complaint contains just two allegations regarding "malice." First, Plaintiffs allege the Center showed "actual malice as it knowingly violated its own Code…." ECF No. 1, PageID.23, ¶ 67. This allegation does not identify any provision of the Code that was allegedly violated, nor does it set forth any factual support that the Center acted with actual malice. Second, Plaintiffs allege:

The Center intentionally relied upon an investigation and process which violated their own procedures by refusing to provide any objective analysis of the underlying facts as it relates to professionally accepted coaching techniques or methods, as well as relying upon conclusory statements of medical diagnosis with no medical proof. The information gathered in that manner should not have been relied upon, and the Center exercised actual malice in publishing their findings.

43

ECF No. 1, PageID.49, ¶ 130(d). As noted above, the factual foundation of this allegation ("refusing to provide any objective analysis of the underlying facts as it relates to professionally accepted coaching techniques") is provably false by the Center's Notices of Decision, *see infra*, and does not rise to an allegation of malice. As to Ms. Cardosa, Plaintiffs make only one allegation:

> Cardosa discussed the process and her involvement during her testimony at Alexis' JAMS arbitration, admitting that she determined the credibility to assign to each witness and chose who to interview or reinterview. Upon information and belief, she showed actual malice by utilizing a process which violated the Center's process to compile a report she knew would be used to determine disciplinary actions against plaintiffs which are published by the Center.

ECF No. 1, PageID.49-50, ¶ 131(c). This allegation again fails to identify any Center process that was allegedly violated, nor does it allege any facts supporting a claim of actual malice. Under the long line of cases following *Iqbal,* merely stating a legal conclusion such as "exercised actual malice" without alleging a single fact in support of that conclusion is legally deficient. *See Moses.com Securities, Inc. v. Comprehensive Software Systems, Inc.*, 406 F.3d. 1052, 1062 (8th Cir. 2005) ("[T]he plaintiff must allege facts – not mere legal conclusions – that, if true, would support the existence of the claimed torts.").

Finally, in their contracts with USAG, Plaintiffs expressly *consented to* and agreed that any disciplinary measure could be publicly published. Plaintiffs' USAG contracts state as follows:

44

> Any disciplinary measure imposed by the USOPC, the Center or USA
> Gymnastics extends to your participation in all aspects of the Olympic
> & Paralympic Movement. You agree that any disciplinary measure,
> whether interim or final, whether imposed before or after the date of
> this Agreement, whether expired or in effect, <u>may be posted on our
> website or otherwise publicly published and may include information
> identifying you and describing the misconduct alleged</u>.

ECF No. 1-3, PageID.109 (emphasis added). Michigan courts have concluded that a

"communication regarding a person is absolutely privileged if it is consented to."

*Hollowell v. Career Decisions, Inc.*, 298 N.W.2d 915, 922 (Mich. Ct. App. 1980)

Plaintiffs' defamation and invasion of privacy claims fail as a matter of law.

### F. Plaintiffs fail to sufficiently allege "extreme and outrageous conduct" as required for an intentional infliction of emotional distress claim (Claim VIII – against the Center and Ms. Cardosa).

A claim for intentional infliction of emotional distress requires proof that the

defendant engaged in "extreme and outrageous conduct," intentionally or recklessly,

that caused the plaintiff "severe emotional distress." *Mattis v. Massman*, 355 F.3d

902, 908 (6th Cir. 2004) (citation omitted). "The outrageous conduct requirement is

satisfied only by conduct that is '**so outrageous in character, and so extreme in**

**degree, as to go beyond all possible bounds of decency, and to be regarded as**

**atrocious, and utterly intolerable in a civilized community**.'" *Andrews v.*

*Prudential Securities, Inc.*, 160 F.3d 304, 309 (6th Cir. 1998) (quoting *Roberts v.*

*Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908 (Mich. 1985) (emphasis added)).

"[T]he distress inflicted [must be] so severe that no reasonable man [or woman]

could be expected to endure it." *Id.* (quoting *Roberts*, 374 N.W.2d at 908-09). "It is initially for the trial judge to decide whether [the] defendant's conduct might reasonably be regarded as so extreme and outrageous as to allow recovery for intentional infliction of emotional distress." *Sawabini v. Desenberg*, 372 N.W.2d 559, 565 (Mich. Ct. App. 1985).

Here, Plaintiffs summarize their claim for intentional infliction of emotional distress as follows:

> The Center's choices about the investigation, Notices of Allegation, temporary measures, use of the Database, JAMS arbitration, and dilatory nature of the entire process are the direct cause of the plaintiffs' emotional distress.

ECF No. 1, PageID.55, ¶ 138(c); ¶ 139 (same as to Defendant Cardosa). As noted above, Congress expressly imbued the Center with discretion when addressing eligibility decisions. 36 U.S.C. § 220541(b). While Plaintiffs may disagree with how the Center conducted its investigation and its ultimate findings, the Center was acting pursuant to its statutory duties. Moreover, the Center's methods and processes are not "atrocious and utterly intolerable in a civilized community" and cannot support a cause of action for intentional infliction of emotional distress. *See, e.g., Tomlin v. Percy*, No. CV 21-10641, 2023 WL 4095232, at *10-11 (E.D. Mich. June 20, 2023) (granting summary judgment on intentional infliction of emotional distress claim because defendant police officer's conduct was not extreme or outrageous when he pistol-whipped and slammed plaintiff's head into pavement).

46

### G.     The Center Is Exempt From and Did Not Violate Antitrust Laws (Claims IX, X, & XI – against the Center).

Plaintiff Nanci Moore alleges claims for relief under three interrelated antitrust laws: (1) the Sherman Act; (2) the Clayton Act; and (3) the Michigan Antitrust Reform Act ("MARA"). The three claims involve an overlapping legal framework and are based upon the same factual allegations. *See Danou v. Kroger Co.*, 557 F. Supp. 1266, 1268 (E.D. Mich. 1983) (explaining that federal courts' interpretation of the Sherman Act (15 U.S.C.A. § 1 et seq.) are persuasive authority as to meaning of Michigan antitrust statute patterned after the Sherman Act); *see also First Med Representatives, LLC. v. Futura Medical Corp.*, 195 F. Supp.2d 917, 922 (E.D. Mich. 2002) (applying Sherman Act analysis to "allegations of both state and federal antitrust violations."). All three antitrust claims fail because the Center is exempt from antitrust law. Additionally, the antitrust claims all fail as a matter of law for lack of standing and other reasons discussed below.

The Center is exempt from antitrust laws because Congress expressly provided it with the exclusive authority to resolve allegations of abuse and determine a person's eligibility to participate in the Movement. Congress stated that the Center "shall serve as the independent national safe sport organization and be recognized worldwide as the independent national safe sport organization for the United States." 36 U.S.C. § 220541(a)(1)(A). Congress empowered the Center to "exercise jurisdiction" over Olympic and Paralympic sports "with regard to safeguarding

47

amateur athletes against abuse, including emotional, physical, and sexual abuse, in sports." 36 U.S.C. § 220541(a)(1)(B). This express grant of authority to determine eligibility to participate in the Movement related to abuse renders the Center immune from antitrust claims.

In *Behagen,* a basketball player brought a claim against an NGB claiming his ineligibility decision violated the Sherman Act. *Behagen*, 884 F.2d at 529. The court noted that Congress had expressly granted exclusive authority to the NGB to determine eligibility issues and this broad grant exempted the NGB from the Sherman Act:

> Behagen complains of exactly that action which the Act directs—the monolithic control of an amateur sport by the NGB for that sport and by the appropriate international sports federation of which the NGB is a member. This truth is underscored by the fact that the ABA/USA could not be authorized under the Act unless it maintained exactly that degree of control over its sport that Behagen here alleges as an antitrust violation. *See* 36 U.S.C. § 391(b)(4). **We hold that the defendants' actions were necessary to implement the clear intent of Congress, and therefore are exempt from the federal antitrust laws.**

*Id.* at 529–30 (emphasis added). This holding has been consistently extended to cases addressing the Movement. *See, e.g., Gold Medal LLC v. USA Track & Field*, 187 F. Supp. 3d 1219, 1228–29 (D. Or. 2016), aff'd, 899 F.3d 712 (9th Cir. 2018) ("Out of these sweeping grants of authority, courts have conferred the [U.S. Olympic and Paralympic Committee] and its partner NGBs with limited implied immunity from antitrust liability on issues stretching from the scheduling of individual competitions

to athlete eligibility."); *see also JES Properties, Inc. v. USA Equestrian, Inc.*, 458 F.3d 1224, 1232 (11th Cir. 2006) (United States Equestrian Foundation immune from antitrust liability where it set up scheduling rules to minimize competition conflicts).

Accordingly, the Center is exempt from antitrust laws because it is acting pursuant to express authority granted by Congress. Where Congress has mandated that the Center shall have authority to determine the eligibility of individuals to participate in the Movement, "there is a 'clear repugnancy' between the [SafeSport Act] and the antitrust complaint, *i.e.*, . . . the two are 'clearly incompatible.'" *Credit Suisse Securities (USA) LLC v. Billing*, 551 U.S. 264, 275 (2007) (holding that that securities laws were "clearly incompatible" with antitrust laws, such that securities law implicitly precluded antitrust claims).

Plaintiff also lacks antitrust standing because her claims are based upon her alleged individual damages and she fails to allege injury to competition overall. "[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement we must dismiss it as a matter of law." *NicSand*, 507 F.3d at 450; *see also HyPoint Tech., Inc. v. Hewlett-Packard Co.*, 949 F.2d 874, 877 (6th Cir. 1991); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 484-89 (1977). General allegations of harm to competition are insufficient to survive a motion to dismiss: "[Plaintiff's] complaint offers generalized allegations

49

of antitrust injury, but the Supreme Court requires more than 'naked assertion[s]' to establish antitrust standing." *CBC Cos., Inc. v. Equifax*, 561 F.3d 569, 572 (6th Cir. 2009). A plaintiff alleging antitrust injury must allege injury to a relevant market, not just injury to the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n,* 528 F.3d 426, 434 (6th Cir. 2008). That is, an antitrust plaintiff must demonstrate that "the alleged violation tended to reduce competition overall" and that "the plaintiff's injury was a consequence of the resulting diminished competition." *CBC Cos.*, 561 F.3d at 572 (quoting *J.B.D.L. Corp. v. Wyeth-Ayerst Labs., Inc.*, 485 F.3d 880, 887 (6th Cir. 2007)). This heightened standard for pleading antitrust injury reflects the principle that antitrust laws exist to protect competition, not individual competitors. *Brunswick Corp.*, 429 U.S. at 488 (citing *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 320 (1962)).

Here, Plaintiff fails to allege any anticompetitive injury to competition overall which then caused her individual injury. Plaintiff fails to identify any specific market that allegedly suffered antitrust injury such as decreased competition or increased prices. *See, e.g., Pool Water Prods., v. Olin Corp.*, 258 F.3d 1024, 1034 (9th Cir. 2001) ("[T]he antitrust laws are only concerned with acts that harm allocative efficiency and raise the price of goods above their competitive level or diminish their quality.") (internal citation and quotation omitted); *see also Nelson v. Monroe Reg'l Med. Ctr.*, 925 F.2d 1555, 1564 (7th Cir. 1991) (antitrust injury "means injury from

higher prices or lower output, the principal vices proscribed by the antitrust laws."). Plaintiff's antitrust claims are all based upon her alleged individual injury, which is insufficient as a matter of law to establish antitrust standing. *See, e.g.,* ECF No. 1, PageID.57, ¶ 144 ("The Center acted in a predatory or anticompetitive manner when they placed Nanci in the Database, effectively precluding her from coaching gymnastics…."). Plaintiff's conclusory allegations, that the Center holds a "monopoly" are also insufficient to state an antitrust claim. *See Lynch v. Magnavox Co.*, 94 F.2d 883, 888 (9th Cir. 1938) ("The word 'monopolize,' as there used, apparently means the acquisition of power to fix prices, limit production, or deteriorate quality." (citing *Standard Oil Co. v. United States*, 221 U.S. 1, 52, 53, 61 (1910)). None of these outcomes has been alleged.

Plaintiff also alleges the Center acted in a "predatory or anticompetitive manner when they attempted to prevent Nanci from teaching dance classes" and attempted to ban her "from teaching dance, a sport which is not under their jurisdiction, . . . with specific intent to keep her out of the marketplace altogether." ECF No. 1, PageID.57, ¶¶ 143, 146. Even if true, this involves only an individual injury and not an injury to competition overall. In addition, Plaintiff fails to acknowledge that the Center is *not* investigating Plaintiff because she taught dance, but rather the Center is investigating Plaintiff because, among other things, she admitted to coaching dance at *a USAG facility*, which, if true, would be a violation

of her suspension. ECF No. 1-4, PageID.150 ("Suspension for a specified period of time from participation, in any capacity, in any program, activity, Event, or competition sponsored by, organized by, or under the auspices of the USOPC, any NGB, or any LAO, **or at a facility under the jurisdiction of the same**."). Plaintiff may be free to coach dance to the appropriate athletes but may not do so at a facility under the jurisdiction of an NGB and, hence, under the jurisdiction of the Center.

Plaintiff's "dance" claim also fails to allege the Center *caused* an antitrust injury. "[T]he Supreme Court has required the application of certain doctrines to restrict the scope of relief under [the federal antitrust laws]," and "[o]ne of these restrictive doctrines is that of antitrust standing, or the requirement that a plaintiff demonstrate 'a direct link between the antitrust violation and the antitrust injury.'" *Sanner v. Bd. of Trade*, 62 F.3d 918, 926-27 (7th Cir. 1995) (quoting *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993)). The antitrust standing analysis is akin to the "common-law tort limitation of proximate cause," and involves an "analysis of 'the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them.'" *Sanner*, 62 F.3d at 927 (collecting cases); *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09-cv-3690, 2015 WL 3988488, at *17 (N.D. Ill. June 29, 2015) (noting that "the directness inquiry in antitrust-standing law is predicated on the well-known concept of proximate causation"). Where, as here, a plaintiff fails to establish the

requisite causal relationship necessary for antitrust standing, a court "not only may—

but [it] must—reject [any request for relief] under Rule 12(b)(6)." *NicSand, Inc.*, 507

F.3d at 449.

Here, the Center has no jurisdiction over any organization or person outside

of the Movement. To the extent Plaintiff suffered an alleged injury outside of the

Movement – in competitive dance for example – the claim is too attenuated.

Plaintiff's antitrust claims are based upon a hypothetical that, but for the Center

fulfilling its statutory obligation to investigate and resolve misconduct *in the*

*Movement*, she is not able to coach dance *outside* the Movement. The alleged harm

flowing from this theory turns on the potential decisions of an untold number of

dancers, their parents, and coaches.  *See De Atucha v. Commodity Exch., Inc.*, 608

F. Supp. 510, 516 (S.D.N.Y. 1985) (dismissing for lack of antitrust standing where

establishing the causal chain between plaintiff's alleged injury and the challenged

conduct would require the court to "reconstruct[]" "the actions of innumerable

individual decisionmakers"). This necessary guesswork elongates the causal chain

past the point of no return, rendering Plaintiff's alleged harm too remote for purposes

of antitrust standing as a matter of law. *See Sanner*, 62 F.3d at 926 (explaining that

to have antitrust standing, the plaintiff must "demonstrate a direct link between the

antitrust violation and the antitrust injury" (citation omitted)).

Moreover, the Center's "motive" in publishing Plaintiff's suspension on the database is to protect athletes from abuse and has nothing to do with competition overall. Indeed, the Supreme Court has even acknowledged that competition may be restrained if there is some independent reason to justify the exclusion. *See, e.g., Fashion Originators Guild of Am. v. Fed. Trade Comm'n,* 114 F.2d 80, 85 (2d Cir. 1940), *aff'd sub nom. Fashion Originators' Guild of Am. v. Fed. Trade Comm'n,* 312 U.S. 457 (1941) (holding that exclusion from market is unlawful if "**there is no independent reason by virtue of their conduct to justify the exclusion**"). "Anticompetitive conduct" for purposes of Sherman Act claim is conduct without legitimate business purpose that makes sense only because it eliminates competition. *Morgan v. Ponder*, 892 F.2d 1355, 1358 (8th Cir. 1989); *see also Kelley ex rel. Slay v. Michigan Nat. Bank*, 141 N.W.2d 73, 77 (Mich. 1966) ("[T]he overriding test is protection of the public interest."). All of Plaintiff's antitrust claims should be dismissed.

## CONCLUSION

Congress has expressly dictated that there is no private right of action against Defendants for actions taken under the SafeSport Act. As explained in *Sanderson*, this Court lacks jurisdiction to litigate or re-litigate the Center's methods or eligibility decisions. Moreover, for the reasons identified in *Gilbert*, the Defendants are absolutely immune from lawsuits regarding their methods and eligibility

decisions. Plaintiff Nanci Moore must exhaust her administrative remedies prior to

coming to this Court for relief, and Plaintiff Alexis Moore must proceed under the

FAA for the claims she already presented to an arbitrator. Finally, all of Plaintiffs'

claims independently fail as a matter of law.  The Court should dismiss the Center

and Ms. Cardosa from this case.


Dated: September 13, 2023                     Respectfully submitted,

                                               *s/ Joseph J. Zonies*
                                              Joseph J. Zonies, No. 29539
                                              (admitted to E.D. Mich. 8/25/23)
                                              ZONIES LAW LLC
                                              1700 Lincoln Street, Suite 2400
                                              Denver, CO  80203
                                              (720) 464-5300
                                              jzonies@zonieslaw.com

                                              Kevin M. Mulvaney (P76915)
                                              WILSON ELSER MOSKOWITZ
                                              EDELMAN & DICKER LLP
                                              17197 N. Laurel Park Drive, Suite 201
                                              Livonia, MI  48152
                                              (t): 313 327-3100
                                              (e) Kevin.mulvaney@wilsonelser.com

                                              *Attorneys for Defendant U.S. Center for*
                                              *SafeSport*

## CERTIFICATE OF SERVICE

I hereby certify that this Motion was filed and served on this 13th day of September 2023, using the CM/ECF system, which will serve as notification of such filings on counsel for all parties.

_s/ Joseph J. Zonies_
Joseph J. Zonies