UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

NANCI MOORE and ALEXIS MOORE,

               Plaintiffs,                      Case No. 1:23-cv-11681

v.                                         Honorable Thomas L. Ludington
                                          United States District Judge
U.S. CENTER FOR SAFESPORT, et al,

               Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS PARTICIPATING ENTITY 2 AND PARTICIPATING ENTITY 3'S MOTION TO DISMISS

This case stems from a United States Center for SafeSport (SafeSport) investigation into two Michigan Gymnastic coaches, Plaintiffs Nanci and Alexis Moore, for abuse allegations. During the investigation, SafeSport interviewed dozens of "Participating Entities."[1] After its investigation, SafeSport suspended Nanci and sanctioned Alexis. Dissatisfied, the two sued SafeSport, the SafeSport investigator who worked on their cases, and Participating Entities 1–4, partly for allegedly tortious statements Participating Entities 1–4 made during their interviews. Shortly after Plaintiffs sued, Participating Entities 2 and 3—both Alabama residents—filed a joint motion to be dismissed from this case. They argue that this Court lacks personal jurisdiction over them. In the end, Participating Entities 2 and 3 are correct, so their Motion to Dismiss, ECF No. 19, will be granted.

## I. BACKGROUND

### A. The Key Players

For decades, Plaintiff Nanci Moore and her daughter, Plaintiff Alexis Moore, have been

---

[1] In accordance with a federal statute, these interviewees' identities are confidential and will not be disclosed here. *See* 36 U.S.C. § 220541(d)(4)(G),

involved in gymnastics. *See* ECF No. 1 at PageID.6–7. They currently coach "upper-level optional gymnasts" at Bay Valley Academy in Bay City, Michigan. *Id.* at PageID.1, 6, 7. Plaintiffs are also members of USA Gymnastics—the national governing body (NGB) of gymnastics under a United States Olympic Committee (USOC) certification. *Id.* at PageID.3; *see* 36 U.S.C. § 220521(a) (authorizing the USOC to certify only one national governing body for each Olympic sport).

Defendant United States Center for SafeSport (SafeSport) is a Colorado nonprofit corporation "empowered by Congress to exercise jurisdiction over" both the USOC and all its sport-specific NGBs, including USA Gymnastics. *Gonzalez v. U.S. Ctr. for SafeSport*, 374 F. Supp. 3d 1284, 1288 (S.D. Fla. 2019); SafeSport Business Summary, COLO. SEC'Y OF STATE https://www.sos.state.co.us/biz/BusinessEntityDetail.do?quitButtonDestination=BusinessEntityR esults&nameTyp=ENT&masterFileId=20141744474&entityId2=20141744474&fileId=2014174 4474&srchTyp=ENTITY (last visited Jan. 21, 2025) [https://perma.cc/6FLP-DT72]. SafeSport's mission is to safeguard "amateur athletes against abuse, including emotional, physical, and sexual abuse, in sports." 36 U.S.C. § 220541(a)(1)(B)).

## B. SafeSport's History

In the late 2000s and early 2010s, reports of sexual abuse in Olympic sports flooded the news. *See* Alexandria Murphy, *Better Late than Never: Why the USOC Took So Long to Fix a Failing System for Protecting Olympic Athletes from Abuse*, 26 JEFFREY S. MOORAD SPORTS L.J. 157, 170–78 (2019). In response, the USOC "sought to open" SafeSport in 2015 to provide coaching oversight and investigation, but it did not open until 2017, reportedly due to a lack of funding.[2] *Id.* at 160. Then, the United States Center for Safe Sport Authorization Act of 2017

---

[2] At its inception, SafeSport received its funding from the USOC and NGBs. *See* Rick Maese, *Olympic Sexual Abuse Prevention Center Needs Federal Funding Help USOC Chief Says*, WASH. POST (May 23, 2019), https://www.washingtonpost.com/sports/2019/05/23/olympic-sex-abuse-prevention-center-needs-federal-funding-help-usoc-chief-says/   [https://perma.cc/5BKG-76XQ].

"designated" SafeSport as "the independent organization to investigate and adjudicate abuse allegations in the Olympic movement." *See* 36 U.S.C. § 220541(a)(1)(B).

In addition to this designation, the SafeSport Act created a statutory framework for SafeSport's operations. Under the Act, SafeSport must "maintain an office for education and outreach that shall develop training, oversight practices, policies, and procedures to prevent the abuse, including emotional, physical, and sexual abuse, of amateur athletes participating in amateur athletic activities through [NGBs]." 36 U.S.C. § 220541(a)(1)(C). And the "policies and procedures" SafeSport develops "apply as though they were incorporated in and made a part of [36 U.S.C. § 220524]." 36 U.S.C. § 220541(b). In this way, SafeSport's policies and procedures—published as the SafeSport Code for the U.S. and Paralympic Movement (The Code)—carry the force of federal law. *See id.* Put simply, SafeSport's immense regulatory power is unique, considering SafeSport is a private corporation—not a federal agency or Congress—and is not required to comply with notice-and-comment procedures under the Administrative Procedures Act.

### C. This Case

In June 2020, SafeSport received a complaint that triggered investigations into Plaintiffs Nanci and Alexis. ECF No. 1 at PageID.11. Six months later, Plaintiffs received Notices of Allegations (NOAs).[3] *Id.* The NOAs outline allegations of misconduct that Plaintiffs argue "d[o] not provide any degree of specificity from which [they] could adequately prepare for an interview

_____

But aside from a $2.2 million grant from the Department of Justice earmarked for "educational programs," SafeSport received no federal funding. *See id.* Now, SafeSport receives most of its funding from the USOC, which has been statutorily required to pay SafeSport $20 million each year since January 2021. *See* 36 U.S.C. § 220541(g)(1).

[3] The details of these allegations are confidential under 36 U.S.C. § 220541(f)(4)(C) and will not be discussed here at length, but Plaintiffs have filed the relevant documents under seal and incorporated them by reference into their Complaint. *See* ECF Nos. 8; 9 (sealed).

or written response." *Id.* Plaintiffs cooperated with SafeSport's investigation, including meeting with Simone Cardosa—a SafeSport investigator—for interviews in February 2021. *Id.* at PageID.12. The investigation continued through March 2023, during which SafeSport sent "updated" NOAs to Plaintiffs. *Id.* According to Plaintiffs, each "updated" NOA again lacked specificity to allow Plaintiffs to prepare for interviews or responses. *Id.*

In March 2023, SafeSport released its Notice of Decision (NOD) and Investigation Report (IR) for both Plaintiffs. *Id.* SafeSport placed Alexis on a two-year term of probation and suspended Nanci for two years. ECF No. 7 at PageID.204. In response, Alexis challenged SafeSport's decision through arbitration, as SafeSport's Code requires. ECF No. 1 at PageID.25. After arbitration, all coaching restrictions were removed from Alexis, and SafeSport was ordered to pay her arbitration fees on June 8, 2023. *Id.*

But on April 14, 2023, before Alexis was "cleared," SafeSport sent Nanci an "Amended Notice of Allegations," alleging that she violated her two-year suspension "by teaching and coaching dancers who may have also been gymnasts," thus vacating the March 2023 NOD and IR and imposing a new temporary suspension. *Id.* at PageID.20–21; *see also* ECF No. 7 at PageID.204–05. Thirteen days later, SafeSport revoked the temporary suspension and allowed Nanci to coach under supervision. ECF No. 1 at PageID.21. She received an "updated" NOA the next day, followed by another "updated" NOA seventeen days later. *Id.*

On July 13, 2023, Nanci and Alexis sued SafeSport, Simone Cardosa, and four confidential claimants and witnesses who participated in the investigation (Participating Entities 1–4). Both Nanci and Alexis allege SafeSport's "dilatory investigatory process" harmed them, ECF No. 1 at PageID.2, and jointly bring eight claims:

| Count | Claim | Defendant(s) |
|---|---|---|
| I | Breach of contract | (1) SafeSport |

|  |  | (2) Simone Cardosa |
|---|---|---|
| II | Respondeat Superior | SafeSport |
| III | Negligent Supervision | SafeSport |
| IV | Tortious interference with a business relationship or expectancy | (1) SafeSport<br>(2) Simone Cardosa<br>(3) Participating Entity 3 |
| V | Tortious interference with a contract | (1) SafeSport<br>(2) Simone Cardosa<br>(3) Participating Entity 3 |
| VI | Defamation | (1) SafeSport<br>(2) Simone Cardosa<br>(3) Participating Entity 3 |
| VII | Invasion of privacy by false light | (1) SafeSport<br>(2) Simone Cardosa<br>(3) Participating Entity 3 |
| VIII | Intentional Infliction of Emotional Distress | (1) SafeSport<br>(2) Simone Cardosa |

*Id.* at PageID.38–55. In addition to these joint claims, Nanci brings five individual claims:

| Count | Claim | Defendant(s) |
|---|---|---|
| IX | Sherman Antitrust Act | SafeSport |
| X | Clayton Antitrust Act | SafeSport |
| XI | Michigan Antitrust Reform Act | SafeSport |
| XII | Defamation | (1) Participating Entity 1<br>(2) Participating Entity 2<br>(3) Participating Entity 4 |
| XIII | Invasion of privacy by false light | (1) Participating Entity 1<br>(2) Participating Entity 2<br>(3) Participating Entity 4 |

*Id.* at PageID.55–66.

Five days after Plaintiffs sued, SafeSport sent Nanci a new NOA and imposed an interim suspension. ECF No. 7 at PageID.206–07. According to Nanci, the NOA alleges Nanci retaliated against Participatory Entities 1–4 when naming them as Defendants in this case. *Id.* at PageID.207; *see also* SAFESPORT CODE FOR THE U.S. OLYMPIC AND PARALYMPIC MOVEMENT, at 19 (Apr. 1, 2023), https://uscenterforsafesport.org/wp-content/uploads/2023/02/2023_SafeSportCode.pdf (pr ohibiting retaliation against any person related to allegations of prohibited conduct) [https://perma.cc/JR8S-RUUX].

On July 21, 2023, an arbiter conducted an "Interim Measures" hearing and lifted Nanci's interim suspension three days later. ECF No. 7 at PageID.207. Four days later, Nanci filed an *ex parte* emergency motion for a temporary restraining order (TRO), seeking to enjoin SafeSport from taking further "punitive or retaliatory actions" against her pending this Court's decision on a preliminary injunction. ECF No. 7 at PageID.219–20. This Court denied Nanci's motion on August 1, 2023, because it neither articulated that she would suffer irreparable harm without a TRO nor certified that Nanci attempted to give SafeSport notice of the motion. ECF No. 12 at 1130–31 (citing FED. R. CIV. P. 65(b)(1)(B)).

### D. Participating Entities 2 and 3 and their Motion to Dismiss

Motions to dismiss followed. *See* ECF Nos. 19; 23. Relevant here, Participating Entities 2 and 3 filed a Joint Motion to Dismiss under Civil Rule 12(b)(2), arguing that this Court lacks personal jurisdiction over them. *See generally* ECF No. 19. For background, Participating Entities 2 and 3 are former Michigan residents who lived in Michigan until 2018. *See* ECF No. 9 at PageID.259, 451 (sealed). In 2018, before SafeSport launched its investigation into Plaintiffs, Participating Entities 2 and 3 moved to Alabama. *See id.* at PageID.451. In 2020 and 2021, SafeSport interviewed Participating Entities 2 and 3 virtually—while they were in Alabama— during its investigation. *See id*. at PageID.427, 897; *see also* ECF Nos. 1 at PageID.6 n.4; 19-1; 19-2. During these interviews, Participating Entities 2 and 3 allegedly made false statements about Plaintiffs. ECF No. 1 at PageID.29–31. Plaintiffs also allege that Participating Entity 3 made more false statements in Alexis's 2023 virtual arbitration hearing in Minnesota. *See id.* at PageID.30; *see also* ECF No. 31 at PageID.1440. And the only other specific fact that Plaintiffs allege related to jurisdiction is that Participating Entity 3 visited Michigan to watch a gymnastics competition in 2021. *See* ECF No. 9 at PageID.615, 788–90 (sealed).

- 6 -

## II. LEGAL STANDARD

Civil Rule 12(b)(2) governs motions to dismiss for lack of personal jurisdiction. *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 847 (6th Cir. 2017). In the Sixth Circuit, Civil Rule 12(b)(2) features a burden-shifting framework. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). To start, plaintiffs must establish personal jurisdiction. *Id.* Plaintiffs can meet this burden in the complaint alone. *Peters Broad. Eng'g, Inc. v. 24 Cap., LLC*, 40 F.4th 432, 437 (6th Cir. 2022). If they do, the burden shifts to the defendant, who may respond with evidence, such as affidavits. *Id.* Once the defendant does, the burden shifts back. *Id.* Plaintiffs may no longer rely on their complaint but must offer specific facts—by affidavit or otherwise—to show jurisdiction. *Id.* at 438.

When faced with a properly supported Civil Rule 12(b)(2) motion and opposition, courts have three options: (1) decide the motion based on written submissions alone, (2) allow discovery to decide the motion, or (3) hold an evidentiary hearing. *Theunissen*, 935 F.2d at 1458. The choice affects plaintiffs' ultimate burden. *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 505 (6th Cir. 2020). Indeed, where, as here, a court decides a Civil Rule 12(b)(2) motion without a hearing, plaintiffs need only make a *prima facie* showing of jurisdiction, not prove it by a preponderance of evidence as is required with a hearing. *Sullivan v. LG Chem, Ltd.*, 79 F.4th 651, 660 (6th Cir. 2023). In this posture, courts consider the pleadings in the light most favorable to plaintiffs and cannot weigh disputed facts.[4] *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012).

---

[4] Admittedly, case law explaining the plaintiff's burden when there is no hearing or fact-finding beyond the parties' written submissions can feel like a maze. Take *Peters Broad. Eng'g, Inc.*: there, the court held that even if a plaintiff makes a *prima facie* case in the complaint with general jurisdictional assertions, the plaintiff must reestablish jurisdiction with specific facts when the defendant files a factually supported motion to dismiss. 40 F.4th at 442. Likewise, in *Chrysler Corp.*, the court concluded that a defendant's affidavit undermining the plaintiff's general assertions of jurisdiction controls unless the plaintiff disputes it with specific facts. 643 F.2d at

### III. DISCUSSION

Plaintiffs present a two-fold argument for why this Court has personal jurisdiction over Participating Entities 2 and 3. *See* ECF No. 26 at PageID.1388–91. First, Plaintiffs seemingly argue that Participating Entities 2 and 3 had continuous contacts with Michigan *before* moving to Alabama in 2018 and committing the alleged torts. *See id.* at PageID.1388–90. These contacts include living in Michigan and holding contracts with Bay Valley Academy until 2018. *See id.* Plaintiffs further assert that the alleged tortious statements in interviews "centered around" Michigan. *See id.* at 1389–90. In essence, this first argument addresses the "typical" means of a court establishing personal jurisdiction over a defendant. *See infra* Section III, A. Second, Plaintiffs contend that 36 U.S.C. § 220541(d)(3)(A) establishes this Court's personal jurisdiction over Participating Entities 2 and 3. *Id.* at PageID.1390–91. These arguments miss the mark. So Plaintiffs have not—with specific facts in their complaint or in response to Participating Entities 2 and 3's properly supported Motion to Dismiss, ECF No. 19—made a *prima facie* showing of personal jurisdiction.

---

1237; *accord Kerry Steel, Inc. v. Paragon Indus., Inc.*, 106 F.3d 147, 153 (6th Cir. 1997). But elsewhere, Sixth Circuit precedent becomes confusing at best. In *Malone*, the court held that when a complaint establishes a *prima facie* case of jurisdiction with specific facts, a defendant's affidavits are "irrelevant," so courts shouldn't consider defendants' affidavits that "cut against jurisdiction." 965 F.3d at 505. That makes practical sense because, in this posture, plaintiffs' burden is simply to show a *prima facie case of jurisdiction with specific facts*. *Id.*; *accord Neogen Corp. v. Neo Gen Screening, Inc.,* 282 F.3d 883, 887 (6th Cir. 2002). But *Conn* seems to contradict *Malone*. In *Conn*, the court stated that courts may always consider a defendant's "undisputed factual assertion." 667 F.3d at 711. Here, these cases seeming conflict doesn't matter: Plaintiffs rest solely on their Complaint's general assertions of jurisdiction and do not challenge Participating Entities 2 and 3's Affidavits. *See generally* ECF No. 26. Those Affidavits, ECF Nos. 19-1, 19-2, align with the Complaint and its incorporated exhibits under Civil Rule 10(c). *Compare* ECF Nos. 1 at PageID.4, 44–45, 47, 50–51, 53–54, 61–63, 64–65; 9 at PageID.427 (sealed) *with* ECF Nos. 19-1, 19-2. Ultimately, the Complaint's *specific* facts do not establish a *prima facie* case of personal jurisdiction over Participating Entities 2 and 3. *See* Section III. And Plaintiffs do not respond to Participating Entities 2 and 3's Affidavits with specific facts that establish jurisdiction. *Id.*

## A. Typical Personal Jurisdiction Analysis

Federal courts possess limited authority. *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994). For instance, the standing doctrine limits whether a federal court's authority extends to a particular dispute. *Buchholz v. Meyer Njus Tanick, PA,* 946 F.3d 855, 860 (6th Cir. 2020) (noting that some disputes do not qualify as "Cases and Controversies" suitable for federal judicial resolution). Likewise, subject matter jurisdiction limits whether a federal court's authority extends to a particular type of case. *See, e.g.*, *Exxon Mobil Corp. v. Allapattah Servs.*, *Inc.*, 545 U.S. 546, 552 (2005) (citing 28 U.S.C. §§ 1331, 1332) (stating federal courts' power extends only to the types of cases authorized by the Constitution, and "federal district courts may not exercise jurisdiction absent a statutory basis"). And, relevant here, personal jurisdiction doctrines limit whether a federal court's authority extends to a particular defendant. *See Sullivan*, 79 F.4th at 660.

To determine personal jurisdiction, a federal court typically follows state law.[5] *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014) (citing FED R. CIV. P. (4)(k)(1)(A)). States' jurisdiction is governed by long-arm statutes and the Fourteenth Amendment's Due Process Clause. *Sullivan*, 79 F.4th at 661. These constraints yield a two-part inquiry for courts: (1) Does the state long-arm

---

[5] This general rule stems from Civil Rule 4(k)(1), which reads as follows:

> (1) Serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant:
>
> (A) *who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located*;
>
> (B) who is a party joined under Rule 14 or 19 and is served within a judicial district of the United States and not more than 100 miles from where the summons was issued; or
>
> (C) when authorized by a federal statute.

FED. R. CIV. P. 4(k)(1) (emphasis added). Most cases hinge on 4(k)(1)(A)'s state-law standard because the other two provisions—100-mile "bulge" jurisdiction and federal statutory authority—rarely apply. *See* 4B Wright & Miller, *Fed. Prac. & Proc. Civ.* §§ 1125, 1127 (4th ed. 2024).

statute authorize jurisdiction? (2) If so, does exercising jurisdiction comply with the Fourteenth Amendment?[6] *Id.*; *Green v. Wilson*, 565 N.W.2d 813, 815 (Mich. 1997). If the answer to either is no, the court must dismiss the relevant defendants. *Sullivan*, 79 F.4th at 661. Each question is addressed below.

### 1. Michigan's Long-Arm Statute

Michigan's applicable long-arm statute authorizes this Court to exercise personal jurisdiction over Participating Entities 2 and 3. Myriad Michigan long-arm statutes exist. *Sullivan*, 79 F.4th at 661 (citing MICH. COMP. LAWS §§ 600.701–600.735). Key here is Michigan's individual-tort provision, MICH. COMP. LAWS § 600.705(2).[7] *See* ECF No. 19 at PageID.1176–77; *see also* ECF No. 1 at PageID.42–54, 60–68. The individual-tort provision confers Michigan courts with jurisdiction over individuals who "do[] or caus[e] an act to be done, or consequences to occur, in the state resulting in an action for tort." MICH. COMP. LAWS § 600.705(2). Put simply, "[a] plain

---

[6] Why start with the state long-arm statute instead of jumping to the constitutional question? After all, a statute exceeding the Fourteenth Amendment's limits cannot establish jurisdiction. *See Green*, 565 N.W.2d at 815 n.4 (cleaned up). But there are reasons to start with the long-arm statute. First, long-arm statutes and due process serve different purposes. *Id.* at 815–16. Indeed, long-arm statutes authorize jurisdiction; due process sets the outer boundary. *Id.* Second, and relatedly, some states—like Michigan—use "laundry-list" long-arm statutes that do not always reach the Constitution's outer boundaries. *Id.* So starting with the long-arm statute ensures jurisdiction fits within the statute's limits before testing constitutional limits. *Id.* And even with a laundry-list statute, the constitutional step is still necessary. *Id.* Sometimes, the long-arm statute seems more restrictive, but applying it to certain facts violates due process. *See, e.g., Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 679 (6th Cir. 2012). In short, the long-arm statute comes first because it's the source of jurisdiction. The Constitution comes next to keep the statute in check.

[7] Plaintiffs do not dispute that this is the relevant long-arm statute. *Compare* ECF Nos. 19; 31, *with* ECF No. 26. In fact, Plaintiffs' bare-bones brief does not even address whether personal jurisdiction is permissible under *any* Michigan long-arm statute. *See generally* ECF No. 26. Instead, Plaintiffs proceed directly to the due process analysis. *Id.* To be fair, several Sixth Circuit cases collapsed the Michigan long-arm statute analysis with the due process analysis, *see, e.g., AlixPartners*, 836 F.3d at 549, but the Sixth Circuit recently clarified—around the same time Plaintiffs filed their brief—that Michigan law "requires that we conduct two separate inquiries when determining whether a court sitting in Michigan has personal jurisdiction over a defendant." *Sullivan*, 79 F.4th at 666. Because of this recent clarification, this Court will conduct the full personal jurisdiction analysis based on the Plaintiffs' Due Process Clause briefing.

language reading of these words reveals that either the tortious conduct or the injury must occur in Michigan." *Green*, 565 N.W.2d at 817. In the end, this long-arm provision is a low bar: Michigan courts have interpreted this provision's language "liberally to permit a wide-ranging exercise of personal jurisdiction." *Sullivan*, 79 F.4th at 670.

Here, Michigan's individual-tort provision authorizes jurisdiction over Participating Entities 2 and 3. True, Plaintiffs do not allege that the tortious acts out of which their claims arise—Participating Entities 2 and 3's allegedly false statements—occurred in Michigan. *See generally* ECF No. 26. Indeed, no one disputes Participating Entities 2 and 3 made the statements virtually while in Alabama. *Compare* ECF Nos. 1 at PageID.4, 29–31, 44–45, 47, 50–51, 53–54, 61–63, 64–65; 9 at PageID.427 (sealed); 26, *with* ECF Nos. 19 at PageID.1176–77; 19-1; 19-2; 31 at PageID.1438–39. But the tortious act occurring in Michigan is just one of two ways to fall within § 600.705(2)'s reach.

The consequences of the tortious act—an injury springing from the tortious conduct—felt in Michigan is a second way for § 600.705(2) to authorize jurisdiction. *Green*, 565 N.W.2d at 817. And intentional torts, especially those involving false statements,[8] may occur in one state but cause an injury in another. *Air Sys., Inc. v. Newton*, No. 18-13889, 2019 WL 1281919, at *4 (E.D. Mich. Mar. 19, 2019) (collecting cases); *see also Datres v. Winfree*, No. 1:23-CV-519, 2024 WL

---

[8] Recall that Plaintiff Nanci Moore sues Participating Entity 2 for (1) defamation, and (2) invasion of privacy by false light, and both Plaintiffs sue Participating Entity 3 for (1) tortious interference with a business relationship, (2) tortious interference with a contract, (3) defamation, and (4) invasion of privacy by false light. *See* ECF No. 1 at PageID.44–54, 61–65. These claims are based on Participating 2 and 3's allegedly false statements during interviews with SafeSport investigators and Participating Entity 3's allegedly false statements during an arbitration hearing, *see id.,* and all sound in intentional tort. *See Dalley v. Dykema Gossett,* 788 N.W.2d 679, 685–86 (Mich. Ct. App. 2010) (invasion of privacy and tortious interference with a business relationship); *Knight Enterprises v. RPF Oil Co.*, 829 N.W.2d 345, 348 (Mich. Ct. App. 2013) (tortious interference with a contract); *Michigan Mun. Risk Mgmt. Auth. v. State Farm Fire & Cas. Co.*, 559 F. Supp. 2d 794, 805 (E.D. Mich. 2008) (defamation).

1756160, at *4 (W.D. Mich. Apr. 24, 2024) (citing *Sullivan*, 79 F.4th at 670). So when plaintiffs allege that they "felt" the "consequences of [a defendant's] alleged tortious activities" in Michigan, resulting in an action for intentional tort, § 600.705(2) authorizes jurisdiction. *Air Sys., Inc.*, 2019 WL 1281919, at *4 (collecting cases); *see also Hadad v. Lewis*, 382 F. Supp. 1365, 1370 (E.D. Mich. 1974); *Neogen Corp.*, 282 F.3d at 888–89 (applying a long-arm tort provision with identical language that applies to corporations rather than individuals, § 600.715(2)); *Sullivan*, 79 F.4th at 670 (same); *cf. Brown v. Handysides*, No. CV 23-11700, 2024 WL 1334307, at *3 (E.D. Mich. Mar. 28, 2024) (finding no jurisdiction under § 600.705(2) when tortious acts occurred and consequences were "felt" in a different forum); *Bagsby v. Gehres*, 195 F. Supp. 2d 957, 963 (E.D. Mich. 2002) (same).

The Plaintiffs allege in their Complaint, supported by exhibits incorporated into the Complaint under Civil Rule 10(c), that they felt at least some of the consequences of the alleged tortious statements in Michigan: probation and suspension from coaching at Bay Valley Academy in Michigan. *See* ECF Nos. 1 at PageID.24–31, 45, 48, 51, 54, 62, 65; 8 (sealed). Plaintiffs have thus satisfied § 600.705(2)'s low threshold, so Michigan's individual-tort provision authorizes jurisdiction over Participating Entities 2 and 3. The inquiry thus shifts to whether exercising personal jurisdiction over Participating Entities 2 and 3 complies with the Fourteenth Amendment's Due Process Clause. *See Miller*, 694 F.3d at 679–80 (finding that Michigan's long-arm statute was met but not due process).

### 2. Fourteenth Amendment's Due Process Clause

Even though Michigan's long-arm statute authorizes jurisdiction here, this Court's exercise of personal jurisdiction over Participating Entities 2 and 3 would flout due process. Under the Fourteenth Amendment's personal jurisdiction framework, a defendant's physical presence within the forum state is not required. *Walden v. Fiore*, 571 U.S. 277, 283 (2014). Still, courts may only

exercise personal jurisdiction over defendants having sufficient "contacts" with the forum state so that "the maintenance of the suit" doesn't "offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Flowing from these due process principles are two types of personal jurisdiction: general and specific. *Sullivan*, 79 F.4th at 661. Neither type works here.

### a. General Jurisdiction

Plaintiffs argue that Participating Entities 2 and 3's residence in Michigan until 2018 establishes this Court's general jurisdiction over them. Not so. A court can assert general jurisdiction only if the defendant is "essentially at home" in the state. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021). True to its name, general jurisdiction covers "all claims" against a defendant. *Id.* Those claims do not even have to relate to the forum or the defendant's actions there—they may stem from conduct anywhere in the world. *Id.* But such broad reach comes with a narrow rule: only particular "affiliations with a forum" justify that scope of jurisdiction. *Daimler AG*, 571 U.S. at 137. For individuals, the "paradigm" affiliation warranting general jurisdiction is their place of domicile when the plaintiff sues. *Id.* Here, Participating Entities 2 and 3 are individuals domiciled in Alabama—not Michigan—when Plaintiffs sued, *see* ECF Nos. 9 at PageID.427 (sealed); 19-1; 19-2, so this Court does not possess general jurisdiction over Participating Entities 2 and 3. *See Daimler AG*, 571 U.S. at 137.

### b. Specific Jurisdiction

Nor does this Court have specific jurisdiction over Participating Entities 2 and 3. Specific jurisdiction is satisfied when the defendants' *suit-specific* contacts fulfill due process. *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 919 (2011). The Sixth Circuit employs a three-prong test to determine whether specific jurisdiction is proper. *Sullivan*, 79 F.4th at 670. First, the defendants must have purposefully availed themselves "of the privilege of acting in the

forum state or causing a consequence in the forum state." *Id.* (cleaned up). Second, the claims "'must arise out of or relate to'" a defendant's contacts with the forum state. *Id.* (citing *Ford*, 592 U.S. at 359). Third, exercising jurisdiction over the defendant must be reasonable under the circumstances. *Id.* If any prong is not satisfied, jurisdiction is improper. *Miller*, 694 F.3d at 680.

Plaintiffs have not established the first prong—that Participating Entities 2 and 3 purposefully availed themselves of Michigan. For nonresident defendants to be sued in a particular state, they must have purposefully availed themselves of the "privilege of conducting activities" in that state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985). The availment must be the defendant's own choice—not because of a plaintiff's or third party's conduct. *Ford*, 592 U.S. at 359. In other words, a plaintiff or third party "cannot be the only link between the defendant and the forum." *Walden*, 571 U.S. at 285. And purposeful availment requires more than happenstance: a nonresident defendant's random, fortuitous, attenuated, or isolated contacts with the forum state won't do. *Id.* For the purposeful availment inquiry, the defendant's contacts at the time the plaintiff's claims arose—here, the time at which Participating Entities 2 and 3 made their allegedly tortious statement—are the relevant contacts. *See also Cole v. Mileti,* 133 F.3d 433, 436 (6th Cir. 1998) (assessing defendants contacts at the time plaintiffs alleged cause of action arose); *Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg.*, 295 F.3d 59, 66 (1st Cir. 2002); *Steel v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987); *Stein v. Horwitz*, 191 F.3d 448 (4th Cir. 1999) (table); *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 848 (10th Cir. 2020); *Gen. Motors Corp. v. Ignacio Lopez de Arriortua*, 948 F. Supp. 656, 664 (E.D. Mich. 1996).

Though unclear, Plaintiffs seemingly argue that Participating Entities 2 and 3's contacts with Michigan show that they purposefully availed themselves of Michigan because (1) they lived in Michigan until 2018 and had contracts with Bay Valley Academy until then, or (2) the content

of their interviews and alleged tortious statements establish purposeful contacts Michigan. *See* ECF No. 26 at PageID.1389–90. Neither presents a *prima facie* case of purposeful availment.

    ***Former Residence.*** First, Participating Entities 2 and 3's Michigan residence until 2018 doesn't show that they purposefully availed themselves of Michigan in 2020, 2021, and 2023— the years they made the allegedly tortious statements in Alabama. *See* ECF Nos. 9 at PageID.427, 897; 1 at PageID.6 n.4, 29–31; 19-1; 19-2. True, some courts have found that former forum state residents purposefully availed themselves of that state after they moved. *See Cole,* 133 F.3d at 436; *see also Steel*, 813 F.2d at 1549–50; *Stein*, 191 F.3d at 448; *Ajuba Int'l, L.L.C. v. Saharia*, 871 F. Supp. 2d 671, 677, 682 (E.D. Mich. 2012). But in those cases, the defendant's purposeful availment had nothing to do with their status as a former resident of the forum state. Rather, those cases found that the former residents purposefully availed themselves of the forum state because either (1) the unlawful acts underlying the claims occurred when the defendant was a resident of the forum state, *Steel*, 813 F.2d at 1549–50; *Stein*, 191 F.3d at 448, or (2) the defendant maintained continuing obligations in, or persistent contacts with, the forum, *Cole,* 133 F.3d at 436. By contrast, in cases where former-resident-defendants fall outside those two categories, the defendants have not purposefully availed themselves of the forum state. *See First Mich. Bank v. Mueller*, No. 11-10975, 2011 WL 3320524, at *1 (E.D. Mich. Aug. 2, 2011); *see also Conn. Artcraft Corp. v. Smith*, 574 F. Supp. 626, 630 (D. Conn. 1983).

    Here, Plaintiffs have not alleged specific facts showing that Participating Entities 2 and 3 fall within either category. Plaintiffs do not contend that Participating Entities 2 and 3's allegedly unlawful conduct underlying the claims—the interview statements—occurred when Participating Entities 2 and 3 lived in Michigan. *See generally* ECF Nos. 26; 1; 9 (sealed). Again, Plaintiff's allegations show that Participating Entities 2 and 3 made these statements much later in Alabama.

*See* ECF Nos. 1 at PageID.4, 29–31, 44–45, 47, 50–51, 53–54, 61–63, 64–65; 9 at PageID.427, 451, 897 (sealed). Nor do Plaintiffs assert that Participating Entities 2 and 3 maintained continuing obligations in, or persistent contacts with, Michigan after they moved. *See generally* ECF Nos. 1; 9 (sealed); 26. And the only facts Plaintiffs allege related to continuing contacts post-move-to-Alabama is that Participating Entity 3 briefly visited Michigan to watch a gymnastics competition in 2021. *See* ECF No. 9 at PageID.615, 788–90 (sealed). But that visit is, at best, an isolated and attenuated contact with Michigan. At bottom, Participating Entities 2 and 3's former Michigan residence and corresponding activities are insufficient for purposeful availment purposes.

**Alleged Tortious Statement's Relation to Michigan.** Second, Participating Entities 2 and 3's statements made in Alabama—which, remember, underly all Plaintiffs' intentional tort claims against them, *see supra* n.8—insufficiently bond them to Michigan and thus do not satisfy the purposeful availment prong. This component of Plaintiffs' argument triggers the "*Calder* Effects" framework. *See Blessing v. Chandrasekhar*, 988 F.3d 889, 904 (6th Cir. 2021) (citing *Calder v. Jones*, 465 U.S. 783 (1984)). Under this framework, the in-state effects of out-of-state intentional torts can sometimes satisfy specific jurisdiction's purposeful availment prong. *Id.* But, unlike Michigan's long-arm statute, *see supra* Section III.A.1, when a plaintiff bases purposeful availment on a nonresident defendant's out-of-state tortious statements, "mere injury to a" plaintiff in the forum state "is not a sufficient connection to the forum." *Walden*, 571 U.S. at 290. Rather, the defendants must have "specifically directed" their statements and the resulting harm "at the forum state." *Blessing*, 988 F.3d at 905. This requires a fact-intensive inquiry. *See Johnson v. Griffin*, 85 F.4th 429, 433 (6th Cir. 2023).

The Sixth Circuit has stated that two Supreme Court cases "bookend" this inquiry. *Id.* First, *Calder v. Jones*, 465 U.S. 783 (1984). In *Calder*, a California resident sued Florida journalists in

California for defamation. *Id.* at 785–86. The California plaintiff based her claims on an article the Florida defendants authored in Florida and circulated in California. *Id.* In preparing this article, the defendants relied on numerous California sources, wrote the story about the plaintiff's California activities, knew that the company for which they worked had a roughly 600,000-strong readership in California, and knew that they would publish the underlying statements to that large readership in California. *Id.* at 788–90. Under those facts, the Supreme Court determined that the Florida defendants "expressly aimed" their tortious conduct at California, making jurisdiction proper. *Id.*

Second, *Walden v. Fiore*, 571 U.S. 277 (2014), props up the other end of the shelf. In *Walden*, two Nevada residents sued a Georgia officer who seized their gambling winnings at a Georgia airport. *Id.* at 280–81. The officer knew the plaintiffs lived in Nevada. *Id.* Sometime after the seizure, the Georgia officer completed an affidavit containing allegedly tortious statements about the Nevada plaintiffs. *Id.* The Nevada plaintiffs sued the Georgia officer in Nevada, alleging that the officer's seizure of their winnings and affidavit were unlawful. *Id.* at 281. The Supreme Court held that although the Georgia officer knew that the plaintiffs lived in Nevada, the seizure and statement's harm to the plaintiffs was insufficient to show that the officer aimed his conduct at Nevada. *Id.* at 290–91. The Court emphasized that the plaintiffs would have suffered that harm anywhere they happened to live, unlike in *Calder*, where the tortious article's development and circulation were aimed at the forum state generally, not just the plaintiff-resident. *Id.*

The Sixth Circuit has confronted cases leaning on these bookends. Take *Johnson v. Griffin*, 85 F.4th 429 (6th Cir. 2023), sitting on *Calder*'s end of the shelf. There, a California celebrity posted a slew of allegedly tortious statements on social media about a Tennessee resident who was the Chief Executive Officer of a Tennessee-based company. *Id.* at 431. The statements were based on Tennessee sources, about the CEO's Tennessee activities, and intended the reputational harm

to occur to the CEO in Tennessee. *Id.* at 433. Indeed, the California tortfeasor "tagged" the Tennessee company in several posts, encouraging it to fire the CEO, and summoned her social media followers to pressure the company to do the same. *Id.* at 433–34. When the Tennessee CEO sued the California star in Tennessee, the Sixth Circuit held that jurisdiction was proper in Tennessee because the facts showed the defendant aimed her conduct at Tennessee. *Id.* In addition to parallels to *Calder*, the Sixth Circuit noted that the defendant actively pressuring a Tennessee decisionmaker to fire a Tennessee CEO targeted Tennessee and its economy more broadly—not just a Tennessee resident—further supported jurisdiction. *Id.* at 434 (citing *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 902 (6th Cir. 2017)) ("Due process provides no refuge for lies or reckless conduct directly sent to a decisionmaker in a forum.") *accord Dorn v. Dominique*, No. 22-5620, 2023 WL 2543714, at *5 (6th Cir. Mar. 14, 2023) (communications from California directed to Kentucky decisionmaker resulting in the termination of plaintiff's contract with decisionmaker permitted jurisdiction in Kentucky over California tortfeasor).

Now consider *Schneider v. Hardesty*, 669 F.3d 693 (6th Cir. 2012), a private communications case. There, a Utah attorney established an agency relationship with a foreign insurance company run by a Utah resident. *Id.* at 695. The attorney drafted two letters to investors for the company that allegedly contained tortious statements. *Id.* at 696. The attorney knew these letters would be sent to an investor in Ohio. *Id.* at 702–03. The Ohio investor eventually sued the Utah attorney in Ohio based on the letters' allegedly tortious statements. *Id.* at 700. The Sixth Circuit determined the Ohio court had jurisdiction over the Utah attorney because the Utah attorney wrote the letters, knowing they were directed to at least one Ohio investor. *Id.* at 702–03; *accord Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001) ("[T]he actions of sending false information into Tennessee by phone and fax had foreseeable effects in Tennessee and were

directed at individuals in Tennessee."); *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1170 (6th Cir.1988) (holding threatening letters and phone calls to plaintiff in Ohio satisfied due process).

But there are also Sixth Circuit cases resting on *Walden* at the other end of the shelf. One such case is *Blessing v. Chandrasekhar*, 988 F.3d 889 (6th Cir. 2021). Coincidentally, *Blessing* featured the same social media star as *Johnson. See Johnson*, 85 F.4th at 434 (citing *Blessing*, 988 F.3d. at 892–93). But in *Blessing*, the California celebrity, along with a New Jersey doctor, posted tortious statements on social media about Kentucky high schoolers' activities at a Washington, D.C. political rally. 988 F.3d at 893. The posts did not target Kentucky readers or any Kentucky decisionmakers. *Id.* at 906. The content for the posts' statements was effectively drawn from Washington, D.C. sources. *See id.* at 905–06. And the California and New Jersey tortfeasors did not directly send the communications to the Kentucky plaintiffs. *Id.* at 905. Put differently, to the extent the statements reached Kentucky, it wasn't because of the defendant's direct conduct. *Id.* at 905–06. So when the Kentucky high schoolers sued the California star and New Jersey doctor in Kentucky, the Sixth Circuit held that the Kentucky court lacked personal jurisdiction over the defendants. *Id.* at 907; *see also Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1114 (6th Cir. 1994) (holding a foreign association not subject to suit in Ohio for an allegedly tortious press release about an Ohio plaintiff when the association did not specifically direct the release to Ohio); *Cadle Co. v. Schlichtmann*, 123 F. App'x 675, 679 (6th Cir. 2005) (holding Massachusetts defendant not subject to suit in Ohio for online statements about an Ohio resident's because they did not "specifically target" Ohio readers).

Against that backdrop, this case, as it relates to Participating Entities 2 and 3, belongs on *Walden*'s end of the shelf. True, construing the facts in a light most favorable to Plaintiffs, Participating Entities 2 and 3 knew that Plaintiffs lived and coached in Michigan, *see generally*

ECF Nos. 1; 9 at PageID.427–63 (sealed)—but that doesn't control. *Walden*, 571 U.S. at 290–91. Likewise, it doesn't matter that Participating 2 and 3 made the allegedly tortious statements about Michigan residents. *See id.*; *see also Blessing*, 988 F.3d. at 905–07; *Reynolds*, 23 F.3d at 1114; *Cadle Co.*, 123 F. App'x at 679.

Focusing on what counts, Participating Entities 2 and 3 made the allegedly tortious statements in Alabama to either a Colorado-based investigator (during the 2020 and 2021 interviews) or a Minnesota-based arbiter (during the 2023 arbitration hearing). *See* ECF Nos. 9 at PageID.427, 897; 19-1; 19-2; 31 at PageID.1440. In other words, like in *Blessing*, *Reynolds*, and *Cadle Co.*, and unlike in *Schneider*, *Neal*, and *Am. Greetings Corp.*, Participating Entities 2 and 3 did not specifically direct these statements to anyone in Michigan or at Michigan. Further, as in *Blessing*, to the extent these statements were conveyed to Plaintiffs and entered Michigan, it wasn't because of Participating Entities 2 and 3's direct conduct. *See* ECF No. 1 at PageID.12–13. Instead, Plaintiffs' allegations show that SafeSport—not at Participating Entities 2 and 3's direction—sent Plaintiffs the investigation and interview materials. *Id.* Not to mention, resembling *Walden*, *Blessing*, *Cadle Co.*, and *Reynolds*, Plaintiffs would have endured their alleged harm anywhere they chose to live, not just in Michigan, because the suspension and sanctions applied nationwide. *See* ECF Nos. 8 at PageID.236, 246–47 (sealed). So the "effects" of Participating 2 and 3's statements were not chained to Michigan.

And any lingering *Calder* cases are distinguishable. For example, unlike in *Johnson* and *Dorn*, any decisionmakers that could impose harm on Plaintiffs were not based in the forum state, wilting any link between the statements and Michigan. Indeed, these decisionmakers were either Colorado-based (SafeSport), *see supra* Section I, A, or Minnesota-based (the arbiter), 31 at PageID.1440—not Michigan. In addition, distinct from *Johnson* and *Calder*, Plaintiffs do not

allege that Participating Entities 2 and 3 made the statements as Michigan sources but rather as Alabama residents. *See* ECF No. 9 at PageID.427 (sealed). All said, Participating Entities 2 and 3's allegedly tortious statements do not satisfy the purposeful availment prong. And because Plaintiffs' allegations do not satisfy the purposeful availment prong of specific jurisdiction, this Court need not address the other two prongs. *Miller*, 694 F.3d at 680.

In short, this Court does not have personal jurisdiction over Participating Entities 2 and 3 based on the "typical" route to personal jurisdiction. Yes, Michigan's long-arm statute authorizes jurisdiction. But the Fourteenth Amendment's Due Process Clause forbids jurisdiction here. Indeed, this Court does not have general jurisdiction over Participating Entities 2 and 3. Nor does this court have specific jurisdiction over Participating Entities 2 and 3 because Plaintiffs have not established with specific facts that Participating Entities 2 and 3 purposefully availed themselves of Michigan.

### B. 36 U.S.C. § 220541(d)(3)(A) Analysis

Onto Plaintiffs' final argument: that this Court has personal jurisdiction over Participating Entities 2 and 3 under 36 U.S.C. § 220541(d)(3)(A). ECF No. 26 at PageID.1390–91. It doesn't. Section 220541(d)(3)(A) provides the following:

> Any civil action brought in a State court against [SafeSport] relating to the responsibilities of [SafeSport] under this section, section 220542, or section 220543, shall be removed, on request by [SafeSport], to the district court of the United States in the district in which the action was brought, and such district court shall have original jurisdiction over the action without regard to the amount in controversy or the citizenship of the parties involved.

Given that Plaintiffs devote just three sentences to this argument, *see id.*, it is unclear how this provision authorizes *personal jurisdiction* here. Nor can this Court find a case saying as much. And to the extent Plaintiffs are arguing that § 220541(d)(3)(A) is a rare federal statute contemplated by Civil Rule 4(k)(1)(C), it is not. *See Peters Broad. Eng'g, Inc.,* 40 F.4th at 438.

Civil Rule 4(k)(1)(C) provides that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." FED. R. CIV. P. 4(k)(1)(C). Thus, if a federal statute permits district courts to issue summons for defendants in particular cases, then any federal "district court[] in the country" has personal jurisdiction over any served defendant, regardless of the typical personal jurisdiction analysis discussed in Section III, A. *See Peters Broad. Eng'g, Inc.,* 40 F.4th at 438; *see also Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 119 (3d Cir. 2020) (collecting examples of 4(k)(1)(C) statutes). Here, § 220541(d)(3)(A) says nothing about services of process—either expressly or implicitly—and is thus not a Civil Rule 4(k)(1)(C) statute. *See id.* at 438–41.

Instead, examining its text and comparing it with other statutes, § 220541(d)(3)(A) simply authorizes federal *subject matter jurisdiction* over all cases involving SafeSport. *Compare, e.g.,* 28 U.S.C. § 1331 (federal subject matter jurisdiction statute providing "[D]istrict courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.") and 28 U.S.C. § 1332(a) (federal subject matter jurisdiction statute providing "[D]istrict courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between (1) citizens of different States; (2) citizens of a State and citizens or subjects of a foreign state . . . ; (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and (4) a foreign state . . . as plaintiff and citizens of a State or of different States") *with* 36 U.S.C. § 220541(d)(3)(A). Ultimately, Plaintiffs' argument that this Court has personal jurisdiction over Participating Entities 2 and 3 under 36 U.S.C. § 220541(d)(3)(A) lacks merit.

In sum, Plaintiffs have not established a *prima facie* case of this Court's personal jurisdiction over Participating Entities 2 and 3. Neither the typical state-law route nor the atypical

federal statute route to personal jurisdiction works here. So Participating Entities 2 and 3's Motion to Dismiss for lack of personal jurisdiction, ECF No. 19, will be granted, and Participating Entities 2 and 3 will be dismissed from this case.

**IV.**

Accordingly, it is **ORDERED** that Defendants Participating Entity 2 and Participating Entity 3's Motion to Dismiss, ECF No. 19, is **GRANTED**.

Further, it is **ORDERED** that Defendants Participating Entity 2 and Participating Entity 3 are **DISMISSED** from the above-captioned case.

**This is not a final order and does not close the above-captioned case**.

Dated: January 23, 2025

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge